1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

NICK HARLEY, derivatively on behalf of
ZOOMINFO TECHNOLOGIES, INC.,

        Plaintiff,

    v.

HENRY SCHUCK, CAMERON HYZER,
KEITH ENRIGHT, ASHLEY EVANS,
ALISON GLEESON, MARK MADER,
PATRICK MCCARTER, D. RANDALL
WINN, TODD CROCKETT, and MITESH
DHRUV,

        Defendants,

    and

ZOOMINFO TECHNOLOGIES, INC.,

        Nominal Defendant.

No.  3:24-cv-5987

**COMPLAINT**


**DEMAND FOR JURY TRIAL**

COMPLAINT - 1

1

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

2        Plaintiff Nick Harley ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and

3 on behalf of Nominal Defendant ZoomInfo Technologies, Inc. ("ZoomInfo" or the "Company")

4 files this Verified Shareholder Derivative Complaint against defendants Henry Schuck

5 ("Schuck"), Cameron Hyzer ("Hyzer"), Keith Enright ("Enright"), Ashley Evans ("Evans"),

6 Alison Gleeson ("Gleeson"), Mark Mader ("Mader"), Patrick McCarter ("McCarter"), D. Randall

7 Winn ("Winn"), Todd Crockett ("Crockett"), and Mitesh Dhruv ("Dhruv") (collectively, the

8 "Individual Defendants", and together with ZoomInfo, the "Defendants") for breaches of their

9 fiduciary duties as directors and/or officers of ZoomInfo, unjust enrichment, abuse of control,

10 gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and

11 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and against Defendants Schuck

12 and Hyzer for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's

13 complaint against the Individual Defendants, Plaintiff alleges the following based upon personal

14 knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters,

15 based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which

16 included, among other things, a review of the Defendants' public documents, conference calls and

17 announcements made by Defendants, United States Securities and Exchange Commission ("SEC")

18 filings, wire and press releases published by and regarding ZoomInfo, legal filings, news reports,

19 securities analysts' reports and advisories about the Company, and information readily obtainable

20 on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations

21 set forth herein after a reasonable opportunity for discovery.

22

23                          **NATURE OF THE ACTION**

24        1.        This is a shareholder derivative action that seeks to remedy wrongdoing committed

25 by the directors and officers of ZoomInfo from November 10, 2020 to August 5, 2024, both dates

26 inclusive (the "Relevant Period").

27        2.        ZoomInfo is a Delaware-incorporated international software and data company that

28 COMPLAINT - 2

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

provides sales and marketing teams with customer analytics and intelligence. The Company's main product is its data platform, which provides clients with customer contact and other business information. Through this platform, ZoomInfo's customers are supposedly able to sell and market more effectively through enabling them to target organizations and personnel with ideal timing and messaging.

3.    The Company provides clients access to its platform through subscription contracts that are not able to be canceled for anywhere from one to three years. The price of a subscription is dependent upon the number of users (or "seats") who would be granted access to the Company's applications, the functionality levels sought by a client, and the amount of data that is ultimately utilized. The Company's revenue is recognized ratably over the life of the contract, starting with when platform is first made available to the customer. Under the Company's regular billing terms, customers are required to pay for services at the beginning of each period (whether it be annual, semi-annual, or quarterly).

4.    Throughout the Relevant Period, the Company claimed to have a strong customer base of approximately 35,000 companies, ranging from small businesses to large enterprises. Further, this customer base was supposedly "diversified" such that no single customer accounted for more than 1% of annual revenues.

5.    The supposed results of this customer base was strong financials quarter after quarter. For example, on November 10, 2020, the Company issued a press release (the "Q3 2020 Earnings Release") announcing the Company's financial results for the third quarter of the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"). The Q3 2020 Earnings Release revealed that the Company's quarterly revenues had grown year-over-year to $123 million, a 56% increase from the prior year's third quarter revenue of $79 million. In addition, the Q3 2020 Earnings Release announced the Company's operating income grew to $18 million year-over-year, a 41% increase from the prior year's third quarter operating income of $13 million. Lastly, the Q3 2020 Earnings Release revealed that the Company ended the quarter with at least 720 customers who

COMPLAINT - 3

1   had annual contract values ("ACVs") of at least $100,000.

2       6.      During the Relevant Period, the Individual Defendants breached their fiduciary

3   duties by personally making and/or causing the Company to make to the investing public a series

4   of materially false and misleading statements regarding the business, operations, and prospects of

5   the Company. Specifically, the Individual Defendants willfully or recklessly made and/or caused

6   the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1)

7   the Company's financial results had been temporarily inflated by the effects of the COVID-19

8   pandemic; (2) as the pandemic began to subside, the Company's customers had less need for its

9   platform; (3) as a result, material portions of the existing customer base attempted to significantly

10  reduce their use of the Company's platform, or completely stop using the platform; (4) to avoid

11  this mass loss of retention, the Company began a series of manipulative and coercive auto-renewal

12  policies that required clients to give at least 60 days' notice prior to the end of a contract term for

13  non-renewal; (5) as a result, the Company's customer relations were irreparably harmed to the

14  detriment of future contract renewals; and (6) the Company lacked internal controls. As a result of

15  the foregoing, the Company's public statements were materially false and misleading at all

16  relevant times.

17      7.      On August 5, 2024, the truth emerged when ZoomInfo issued a press release (the

18  "Q2 2024 Earnings Release") that revealed the Company's financial performance for the second

19  quarter of the fiscal year ending December 31, 2024 (the "2024 Fiscal Year"). In relevant part, the

20  Q2 2024 Earnings Release revealed that the Company was taking on a $33 million charge as the

21  result of non-payments from its customers. As such, the Company was forced to implement a "new

22  business risk model" to help it reduce write-offs. As a result of this new model, the Q2 2024

23  Earnings Release revealed that the Company was amending its operation procedures to require

24  payments up-front from small businesses, an indication that many of these smaller customers had

25  been unable to afford the Company's product. This also resulted in a reduction in the Company's

26  guidance for the 2024 Fiscal Year.

27

28  COMPLAINT - 4

8.    On this news, the price of the Company's common stock fell $9.80 per share, or approximately 55%, from its closing price of $17.81 per share on August 5, 2024, to close at $8.01 per share on August 6, 2024.

9.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

10.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing ZoomInfo to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between December 2020 and July 2024, approximately 45 million shares of ZoomInfo common stock were repurchased, costing the Company over $729.4 million. As the Company's stock was actually worth only $8.01 per share, the price at which it was trading when markets closed on August 6, 2024, the Company overpaid for repurchases of its own stock by over $368.9 million in total.

11.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

12.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.    Moreover, five of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping personal profits of approximately $4.6 billion.

14.    The Individual Defendants' misconduct has subjected the Company, its former Chief Executive Officer ("CEO"), and its former Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Western District of Washington (the "Securities Class Action").

15.    Moreover, the Company must undertake internal investigations and needs to

COMPLAINT - 5

1 | implement adequate internal controls over its financial reporting.

2 | 16.  Due to the Individual Defendants' breaches of fiduciary duties, the Company has

3 | been and will continue to be forced to expend millions of dollars.

4 | 17.  In light of the breaches of fiduciary duty engaged in by the Individual Defendants,

5 | of the collective engagement in fraud and misconduct by the Company's directors, of their being

6 | beholden to one another and to various of the Individual Defendants, of their receipt of material

7 | personal benefits as a result of the Individual Defendants' misconduct, of the substantial likelihood

8 | of the directors' liability in this derivative action and of Defendants Schuck's and Hyzer's liability

9 | in the Securities Class Action, and of their not being disinterested and/or independent directors, a

10 | majority of the Company's Board cannot consider a demand to commence litigation against

11 | themselves on behalf of the Company with the requisite level of disinterestedness and

12 | independence.

13 | **JURISDICTION AND VENUE**

14 | 18.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

15 | Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §

16 | 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the

17 | Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-

18 | 5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

19 | Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class

20 | Action based on violations of the Exchange Act.

21 | 19.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

22 | to 28 U.S.C. § 1367(a).

23 | 20.  This derivative action is not a collusive action to confer jurisdiction on a court of

24 | the United States that it would not otherwise have.

25 | 21.  The Court has personal jurisdiction over each of the Defendants because each

26 | Defendant is either a corporation conducting business and maintaining operations in this District,

27 |

28 | COMPLAINT - 6

or he or she is an individual who is a citizen of Washington or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.    Plaintiff is a current shareholder of ZoomInfo. Plaintiff has continuously owned ZoomInfo common stock since first receiving the stock on June 3, 2021.

### Nominal Defendant ZoomInfo

24.    ZoomInfo is a Delaware corporation with its principal executive offices at 805 Broadway Street, Suite 900, Vancouver, WA 98660. ZoomInfo's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "ZI."

### Defendant Schuck

25.    Defendant Schuck has served as ZoomInfo's CEO and Chairman of the Board since co-founding the Company in November 2019. According to the Schedule 14A the Company filed with the SEC on March 29, 2024 (the "2024 Proxy Statement"), as of March 15, 2024, Defendant Schuck beneficially owned 26,999,547 total shares of the Company's common stock, which represents 7.2% of shares beneficially owned. Given that the price per share of the Company's common stock at the close of trading on March 15, 2024 was $15.99, Defendant Schuck owned approximately $431.7 million worth of ZoomInfo's common stock as of that date.

26.    For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Schuck received $4,973,764 in total compensation from the Company, which consisted of $550,000 in salary, $4,412,514 in stock awards, and $11,250 in all other compensation. For the

COMPLAINT - 7

fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Schuck received $834,971 in total compensation from the Company, which consisted of $549,460 in salary, $275,261 in non-equity incentive plan compensation, and $10,250 in all other compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Schuck received $1,309,234 in total compensation from the Company, which consisted of $538,880 in salary, $760,604 in non-equity incentive plan compensation, and $9,750 in all other compensation. For the 2020 Fiscal Year, Defendant Schuck received $4,853,682 in total compensation from the Company, which included $474,832 in salary, $3,765,600 in stock awards, $603,500 in non-equity incentive plan compensation, and $9,750 in all other compensation.

27.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Schuck made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 12/15/2020 | 400,000 | $41.59 | $16,638,000 |
| 1/15/2021 | 291,708 | $46.15 | $13,462,324 |
| 1/19/2021 | 108,292 | $47.02 | $5,091,889 |
| 1/26/2021 | 20,633 | $50.04 | $1,032,475 |
| 1/27/2021 | 71,599 | $50.02 | $3,581,381 |
| 2/1/2021 | 407,768 | $50.69 | $20,669,759 |
| 3/15/2021 | 225,750 | $47.90 | $10,812,296 |
| 3/16/2021 | 174,250 | $49.09 | $8,553,932 |
| 4/15/2021 | 262,665 | $48.51 | $12,742,667 |
| 4/16/2021 | 137,335 | $47.38 | $6,506,932 |
| 5/14/2021 | 400,000 | $40.14 | $16,056,000 |
| 6/15/2021 | 400,000 | $45.40 | $18,158,000 |
| 7/15/2021 | 264,580 | $49.68 | $13,144,334 |
| 7/16/2021 | 135,420 | $50.17 | $6,794,698 |
| 8/4/2021 | 786,607 | $60.26 | $47,398,577 |
| 8/5/2021 | 213,393 | $61.35 | $13,092,300 |
| 8/6/2021 | 3,286,639 | $54.75 | $179,943,485 |
| 8/11/2021 | 2,545,328 | $62.00 | $157,810,336 |
| 8/16/2021 | 400,000 | $60.49 | $24,195,600 |
| 9/2/2021 | 386,020 | $62.00 | $23,933,240 |
| 9/15/2021 | 400,000 | $66.68 | $26,673,200 |
| 11/16/2021 | 929,327 | $76.08 | $70,701,339 |
| 11/17/2021 | 370,673 | $76.73 | $28,441,739 |

COMPLAINT - 8

| 11/23/2021 | 1,300,000 | $70.34 | $91,447,199 |
| 11/30/2021 | 1,127,028 | $66.02 | $74,404,134 |
| 3/18/2022 | 31,328 | $60.00 | $1,879,773 |
| 3/23/2022 | 114,584 | $60.15 | $6,892,571 |
| 3/31/2022 | 20,380 | $60.02 | $1,223,187 |
| 4/1/2022 | 245,588 | $60.08 | $14,753,699 |
| 4/4/2022 | 188,120 | $60.62 | $11,403,834 |
| 5/18/2022 | 254,102 | $42.89 | $10,899,451 |
| 5/19/2022 | 45,898 | $42.24 | $1,938,639 |
| 6/3/2022 | 48,264 | $42.05 | $2,029,549 |
| 6/6/2022 | 143,761 | $42.77 | $6,148,514 |
| 2/8/2023 | 1,041,667 | $28.66 | $29,858,342 |
| 6/16/2023 | 2,083,334 | $26.39 | $54,975,017 |

Thus, in total, before the fraud was exposed, he sold 19,262,041 shares of Company common stock on inside information, for which he received approximately $1 billion in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

28.    The 2024 Proxy Statement stated the following about Defendant Schuck:

Mr. Schuck has served as Chief Executive Officer, Chairman of the Board and a director of ZoomInfo Technologies Inc. since its formation in November 2019 and served as Chief Executive Officer and a director of ZoomInfo Holdings LLC (formerly known as DiscoverOrg Holdings, LLC) since founding it in 2007. Prior to founding ZoomInfo Holdings LLC, Mr. Schuck was VP of Research & Marketing at iProfile, a sales intelligence firm focused on the IT market. Mr. Schuck serves on the Board of Directors of Tegus, a leading market intelligence platform. Mr. Schuck is a cum laude graduate of the University of Nevada, Las Vegas with a B.S. in Business Administration and a B.S. in Hospitality Management and holds a J.D., cum laude, from The Ohio State University Moritz College of Law.

Nomination considerations: Mr. Schuck's perspective and the experience he brings as our co-founder and CEO.

**Defendant Hyzer**

29.    Defendant Hyzer served as the Company's CFO from November 2019 until October 2024. According to the 2024 Proxy Statement, as of March 15, 2024, Defendant Hyzer beneficially owned 1,294,887 total shares of the Company's common stock. Given that the price

COMPLAINT - 9

per share of the Company's common stock at the close of trading on March 15, 2024 was $15.99, Defendant Hyzer owned approximately $20.7 million worth of ZoomInfo's common stock as of that date.

30.    For the 2023 Fiscal Year, Defendant Hyzer received $573,250 in total compensation from the Company, which consisted of $562,000 in salary and $11,250 in all other compensation. For the 2022 Fiscal Year, Defendant Hyzer received $17,936,399 in total compensation from the Company, which consisted of $552,750 in salary, $17,200,052 in stock awards, $173,347 in non-equity incentive plan compensation, and $10,250 in all other compensation. For the 2021 Fiscal Year, Defendant Hyzer received $4,057,761 in total compensation from the Company, which included $518,750 in salary, $3,000,049 in stock awards, $529,212 in non-equity incentive plan compensation, and $9,750 in all other compensation.

31.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hyzer made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 12/22/2020 | 90,950 | $45.25 | $4,115,214 |
| 3/1/2021 | 18,497 | $55.33 | $1,023,494 |
| 3/2/2021 | 9,290 | $56.25 | $522,562 |
| 6/1/2021 | 18,174 | $43.08 | $782,935 |
| 8/4/2021 | 9,292 | $58.05 | $539,428 |
| 8/9/2021 | 28,140 | $61.35 | $1,726,360 |
| 9/15/2021 | 300,000 | $66.89 | $20,067,600 |
| 11/17/2021 | 15,000 | $76.74 | $1,151,115 |
| 12/17/2021 | 15,000 | $60.35 | $905,250 |
| 3/18/2022 | 35,893 | $60.00 | $2,153,687 |
| 3/23/2022 | 9,107 | $60.02 | $546,574 |
| 10/10/2022 | 5,000 | $43.88 | $219,415 |
| 5/3/2023 | 10,000 | $22.09 | $220,900 |
| 7/5/2023 | 10,000 | $25.46 | $254,600 |
| 6/13/2024 | 7,500 | $12.78 | $95,850 |
| 7/9/2024 | 7,500 | $12.37 | $92,775 |

Thus, in total, before the fraud was exposed, he sold 589,343 shares of Company common stock on inside information, for which he received approximately $34.4 million in proceeds. His insider

COMPLAINT - 10

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32.    The 2024 Proxy Statement states the following about Defendant Hyzer:

> Mr. Hyzer has served as Chief Financial Officer of ZoomInfo Holdings LLC since 2018 and as Chief Financial Officer of ZoomInfo Technologies Inc. since its formation in November 2019. Prior to joining ZoomInfo Holdings LLC, Mr. Hyzer served as the Chief Financial Officer and an Executive Managing Director of Eze Software Group LLC, a global provider of order management and investment technology to hedge funds and asset managers, from 2013 to 2018 through its sale to SS&C Technologies, Inc. Prior to that, Mr. Hyzer served as Managing Director, Controller and Treasurer of ConvergEx Group, a provider of global agency brokerage and investment technology, from 2007 to 2013 and Vice President of Finance at Eze Castle Software from 2005 to 2007. Earlier in his career, Mr. Hyzer served in executive and financial roles at other software and information companies, including Thomson Financial and Cramer Systems, and started his career in investment banking and private equity at Broadview International LLC and Broadview Capital Partners, LLC. Mr. Hyzer holds a B.S. in Economics from the University of Pennsylvania Wharton School and a B.S. in Electrical Engineering from the University of Pennsylvania School of Engineering and Applied Science. Mr. Hyzer is also a CFA® charterholder.

**Defendant Enright**

33.    Defendant Enright has served as a Company director since March 2020. He also serves as Chair of the Privacy, Security and Technology Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 15, 2024, Defendant Enright beneficially owned 20,535 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2024 was $15.99, Defendant Enright owned approximately $328,355 worth of ZoomInfo's common stock as of that date.

34.    For the 2023 Fiscal Year, Defendant Enright received $277,316 in total compensation from the Company, which consisted of $75,000 in fees earned or paid in cash and $202,316 in stock awards. For the 2022 Fiscal Year, Defendant Enright received $272,541 in total compensation from the Company, which consisted of $72,500 in fees earned or paid in cash and $200,041 in stock awards. For the 2021 Fiscal Year, Defendant Enright received $265,014 in total

COMPLAINT - 11

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

compensation from the Company, which consisted of $65,000 in fees earned or paid in cash and $200,014 in stock awards. For the 2020 Fiscal Year, Defendant Enright received $357,506 in total compensation from the Company, which consisted of $57,500 in fees earned or paid in cash and $300,006 in stock awards.

35.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Enright made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 8/16/2021 | 555 | $62.00 | $34,410.00 |
| 11/15/2021 | 555 | $74.92 | $41,580.00 |
| 3/5/2022 | 555 | $52.95 | $29,387.00 |
| 8/3/2022 | 555 | $45.00 | $24,975.00 |

Thus, in total, before the fraud was exposed, he sold 2,220 shares of Company common stock on inside information, for which he received approximately $130,352 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

36.     The 2024 Proxy Statement stated the following about Defendant Enright:

Mr. Enright has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since March 2020 and served as a member of the Board of Managers of ZoomInfo Holdings LLC from March 2020 to June 2020. Mr. Enright currently serves as the Chief Privacy Officer of Google LLC, a multinational technology company that specializes in Internet-related services and products, which include online advertising technologies, a search engine, cloud computing, software, and hardware. Prior to joining Google in 2011, Mr. Enright was the Chief Privacy Officer and Vice President, Privacy of Macy's Inc. Mr. Enright holds a Bachelor of Arts Degree from the University of Massachusetts at Amherst and a Juris Doctor degree from The George Washington University Law School.

Nomination considerations: Mr. Enright's extensive experience with data privacy, including as Chief Privacy Officer for Google LLC, and his significant core business skills.

**Defendant Evans**

37.     Defendant Evans has served as a Company director since February 2020. She also serves as Chair of the Audit Committee and as a member of the Compensation Committee.

COMPLAINT - 12

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

According to the 2024 Proxy Statement, as of March 15, 2024, Defendant Evans beneficially owned 4,499 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2024 was $15.99, Defendant Evans owned approximately $71,939 worth of ZoomInfo's common stock as of that date.

38.    For the 2023 Fiscal Year, Defendant Evans received $262,316 in total compensation from the Company, which consisted of $60,000 in fees earned or paid in cash and $202,316 in stock awards. For the 2022 Fiscal Year, Defendant Evans received $189,686 in total compensation from the Company, which consisted of $22,998 in fees earned or paid in cash and $166,688 in stock awards.

39.    The 2024 Proxy Statement stated the following about Defendant Evans:

Ms. Evans has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since February 2020 and served as a member of the Board of Managers of ZoomInfo Holdings LLC from 2018 to June 2020. Ms. Evans is a Partner at Francisco Partners, a leading global investment firm that partners with technology businesses. Previously she was a Partner at The Carlyle Group. She invests in enterprise software businesses and currently serves on the board of Greenslate, Macrobond, PayScale, SourceScrub, and Litmos and has previously served on the boards of HireVue, Jagex, NEOGOV, Saama, TriNetX and Veritas. She is a founder of SynGAP Research Fund, a public charity focused on improving the lives of SynGAP patients through the research and development of precision treatments. Ms. Evans holds an A.B. summa cum laude from Harvard College, where she was elected to Phi Beta Kappa, an M.Phil from the University of Cambridge, where she was a Knox Scholar, and a M.B.A from Stanford University's Graduate School of Business, where she was a Siebel Scholar and an Arjay Miller Scholar.

Nomination considerations: Ms. Evans' significant core business skills, including financial and strategic planning, and her extensive management experience, including her involvement with Francisco Partners and Carlyle.

**Defendant Gleeson**

40.    Defendant Gleeson has served as a Company director since July 2022. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 15, 2024, Defendant Gleeson beneficially owned 5,516 total shares of the Company's common stock. Given that the price per share of the Company's common

COMPLAINT - 13

1  stock at the close of trading on March 15, 2024 was $15.99, Defendant Gleeson owned

2  approximately $88,201 worth of ZoomInfo's common stock as of that date.

3      41.    For the 2023 Fiscal Year, Defendant Gleeson received $256,316 in total

4  compensation from the Company, which consisted of $54,000 in fees earned or paid in cash and

5  $202,316 in stock awards. For the 2022 Fiscal Year, Defendant Gleeson received $210,352 in total

6  compensation from the Company, which consisted of $27,000 in fees earned or paid in cash and

7  $183,352 in stock awards.

8      42.    The 2024 Proxy Statement stated the following about Defendant Gleeson:

9  Ms. Gleeson has served as a member of the Board of Directors of ZoomInfo
   Technologies Inc. since July 2022. She currently also serves on the boards of
10 directors of publicly traded SaaS companies Elasic N.V, since January 2020, and
   8x8, Inc., since August 2021, as a Special Advisor and Portfolio Committee
11 Member at Brighton Park Capital, an investment firm, since October 2019, and on
   The Eli Broad College of Business Advisory Board of Directors for her alma mater,
12 Michigan State University, since June 2017. From January 1996 to October 2018,
   Ms. Gleeson was with Cisco, where she served in various roles, most recently as
13 Senior Vice President, Americas from July 2014 to October 2018. In that role she
   was responsible for Cisco's largest geographic region, with $25B+ in annual sales,
14 and led 9,000 employees across 35 countries. Ms. Gleeson is also a highly-regarded
   international speaker on the drivers for digital disruption across industries, the role
15 of technology in enabling business transformation, and empowering women in
   technology. Ms. Gleeson holds a B.S. in Finance and Marketing from Michigan
16 State University.
17
   Nomination considerations: Ms. Gleeson's extensive enterprise sales and
18 marketing experience, including her leadership roles and go-to-market experience
   at a large public company.
19

20 **Defendant Mader**

21      43.    Defendant Mader has served as a Company director since February 2020. He also

22 serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March

23 15, 2024, Defendant Mader beneficially owned 11,841 total shares of the Company's common

24 stock. Given that the price per share of the Company's common stock at the close of trading on

25 March 15, 2024 was $15.99, Defendant Mader owned approximately $189,338 worth of

26 ZoomInfo's common stock as of that date.

27

28 COMPLAINT - 14

44.    For the 2023 Fiscal Year, Defendant Mader received $262,316 in total compensation from the Company, which consisted of $60,000 in fees earned or paid in cash and $202,316 in stock awards. For the 2022 Fiscal Year, Defendant Mader received $260,041 in total compensation from the Company, which consisted of $60,000 in fees earned or paid in cash and $200,041 in stock awards. For the 2021 Fiscal Year, Defendant Mader received $260,014 in total compensation from the Company, which consisted of $60,000 in fees earned or paid in cash and $200,014 in stock awards. For the 2020 Fiscal Year, Defendant Mader received $429,370 in total compensation from the Company, which consisted of $60,000 in fees earned or paid in cash and $369,370 in stock awards.

45.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mader made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 12/15/2021 | 7,500 | $60.49 | $453,705.00 |
| 5/4/2022 | 5,079 | $51.33 | $260,684.00 |
| 6/13/2024 | 3,112 | $12.78 | $39,771.00 |

Thus, in total, before the fraud was exposed, he sold 15,691 shares of Company common stock on inside information, for which he received approximately $754,160 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

46.    The 2024 Proxy Statement stated the following about Defendant Mader:

Mr. Mader has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since February 2020 and served as a member of the Board of Managers of ZoomInfo Holdings LLC from February 2020 to June 2020. Mr. Mader currently serves as President, Chief Executive Officer and director of Smartsheet Inc., a SaaS collaboration and work management provider. Prior to joining Smartsheet Inc. in 2006, Mr. Mader served in various leadership positions from 1995 to 2005 at Onyx Software Corporation, a customer relationship management software company acquired by M2M Holdings, including as Senior Vice President of Global Services. From 1993 to 1995, Mr. Mader was a senior associate at Greenwich Associates, a financial consulting firm. Mr. Mader holds a B.A. in Geography from Dartmouth College.

COMPLAINT - 15

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

Nomination considerations: Mr. Mader's extensive knowledge and experience in our industry and with SaaS companies, and his experience leading a public company as President, Chief Executive Officer and director of Smartsheet.

**Defendant McCarter**

47.    Defendant McCarter has served as a Company director since February 2020. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

48.    The 2024 Proxy Statement stated the following about Defendant McCarter:

Mr. McCarter has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since February 2020 and served as a member of the Board of Managers of ZoomInfo Holdings LLC from 2018 to June 2020. Mr. McCarter is a Managing Director and Head of Global Technology. Mr. McCarter founded Carlyle's Menlo Park, CA office in 2016 and is currently based there. Since joining Carlyle in 2001, Mr. McCarter has led or been a key contributor to several Carlyle investments, including Hexaware, Abrigo, NEOGOV, Jagex, Tribute Technology, Unison, HireVue, ZoomInfo, Ampere Computing, Veritas, CommScope, Open Link Financial, Open Solutions, Freescale Semiconductor, Jazz Semiconductor, Sippican, and CPU Technology. Prior to joining Carlyle, Mr. McCarter held positions at Morgan Stanley with a focus on financial institutions in New York. Mr. McCarter serves as a director on the boards of publicly traded ZoomInfo and CommScope as well as the privately held HireVue, Veritas, Ampere Computing and Saama Technologies. He is also a member of Northwestern's McCormick School of Engineering Advisory Council. Mr. McCarter received his M.B.A. from Harvard Business School and a B.S. with a double major in industrial engineering and economics from Northwestern University.

Nomination considerations: Mr. McCarter's extensive core business skills, including financial and strategic planning, and many years of management experience at portfolio companies through his involvement with Carlyle.

**Defendant Winn**

49.    Defendant Winn has served as a Company director since February 2020. He also serves as Chair of the Compensation Committee and as a member of the Privacy, Security and Technology Committee. According to the 2024 Proxy Statement, as of March 15, 2024, Defendant Winn beneficially owned 1,548,455 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2024 was

COMPLAINT - 16

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

$15.99, Defendant Winn owned approximately $24.8 million worth of ZoomInfo's common stock as of that date.

50.     For the 2023 Fiscal Year, Defendant Winn received $274,816 in total compensation from the Company, which consisted of $72,500 in fees earned or paid in cash and $202,316 in stock awards. For the 2022 Fiscal Year, Defendant Winn received $273,166 in total compensation from the Company, which consisted of $73,125 in fees earned or paid in cash and $200,041 in stock awards.

51.     The 2024 Proxy Statement stated the following about Defendant Winn:

Mr. Winn has served as a member of the board of directors of ZoomInfo Technologies Inc. since February 2020 and served as a member of the Board of Managers of ZoomInfo Holdings LLC from 2014 to June 2020. Mr. Winn currently serves as a Managing Member of 22C Capital, a principal investment firm, which he founded in 2017 and also serves as Managing Member of FiveW Capital. Mr. Winn is currently a director of the following private companies: LMI, Aurora Energy Research and Canoe Intelligence. Mr. Winn previously was the nonexecutive chairman of Dealogic, served on the board of Definitive Healthcare (NASDAQ:DH) and served on the boards of private companies such as Viteos Fund Services, Merit Software, and eMarketer. Prior to founding 22C Capital, Mr. Winn was a co founder of, and Co-Managing Partner and ultimately Executive Managing Director/CEO of Capital IQ from 1999 to 2011. Mr. Winn holds an A.B. from the Woodrow Wilson School of Public and International Affairs at Princeton University.

Nomination considerations: Mr. Winn's deep knowledge of our industry, extensive financial and business skills, including strategic planning, and his significant management and leadership experience, including with CapitalIQ.

**Defendant Crockett**

52.     Defendant Enright served as a Company director from February 2020 until July 2024. According to the 2024 Proxy Statement, as of March 15, 2024, Defendant Crockett beneficially owned 408,093 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2024 was $15.99, Defendant Crockett owned approximately $6.5 million worth of ZoomInfo's common stock as of that date.

COMPLAINT - 17

53.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Crockett made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 12/4/2020 | 6,859,327 | $43.88 | $300,952,972 |
| 2/1/2021 | 424,401 | $50.37 | $21,374,956 |
| 2/2/2021 | 91,366 | $50.78 | $4,639,474 |
| 2/3/2021 | 1,734,233 | $54.03 | $93,707,545 |
| 2/4/2021 | 1,250,000 | $56.28 | $70,346,250 |
| 2/5/2021 | 568,845 | $58.05 | $33,019,176 |
| 2/8/2021 | 59,903 | $58.04 | $3,476,949 |
| 2/12/2021 | 84,425 | $58.06 | $4,901,968 |
| 2/16/2021 | 126,641 | $58.12 | $7,361,008 |
| 2/23/2021 | 754,818 | $58.90 | $44,459,535 |
| 6/23/2021 | 689,600 | $52.77 | $36,391,571 |
| 6/25/2021 | 48,599 | $53.88 | $2,618,319 |
| 6/28/2021 | 29,500 | $53.88 | $1,589,578 |
| 7/6/2021 | 40,461 | $53.91 | $2,181,454 |
| 7/13/2021 | 254,906 | $54.05 | $13,778,688 |
| 7/23/2021 | 130,662 | $53.91 | $7,043,465 |
| 7/26/2021 | 654,572 | $54.35 | $35,575,988 |
| 7/27/2021 | 59,147 | $54.36 | $3,215,112 |
| 7/28/2021 | 642,809 | $54.73 | $35,180,293 |
| 7/29/2021 | 122,130 | $54.41 | $6,645,337 |
| 8/2/2021 | 422,981 | $54.85 | $23,200,084 |
| 8/3/2021 | 3,460,757 | $59.09 | $204,482,288 |
| 8/6/2021 | 9,625,934 | $54.75 | $527,019,886 |
| 8/9/2021 | 3,620,333 | $61.10 | $221,187,864 |
| 8/11/2021 | 6,953,598 | $62.00 | $431,123,076 |
| 8/12/2021 | 214,036 | $62.55 | $13,387,523 |
| 8/13/2021 | 140,473 | $62.56 | $8,788,693 |
| 8/23/2021 | 523,587 | $62.59 | $32,771,310 |
| 8/24/2021 | 92,503 | $62.60 | $5,790,965 |
| 8/25/2021 | 251,830 | $62.65 | $15,776,142 |
| 8/26/2021 | 192,272 | $62.91 | $12,095,254 |
| 8/27/2021 | 314,966 | $62.86 | $19,798,447 |
| 8/30/2021 | 266,514 | $65.16 | $17,366,052 |
| 8/31/2021 | 652,810 | $65.21 | $42,571,698 |
| 9/1/2021 | 119,233 | $65.03 | $7,754,318 |
| 9/2/2021 | 991,362 | $66.03 | $65,459,632 |
| 9/2/2021 | 1,043,039 | $62.00 | $64,668,418 |
| 9/3/2021 | 745,860 | $65.74 | $49,030,598 |

COMPLAINT - 18

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

| 9/7/2021 | 724,221 | $65.41 | $47,371,295 |
| 9/14/2021 | 228,687 | $68.02 | $15,555,747 |
| 9/16/2021 | 464,877 | $68.12 | $31,669,745 |
| 9/17/2021 | 416,609 | $68.18 | $28,402,735 |
| 9/21/2021 | 415,193 | $68.08 | $28,266,339 |
| 9/22/2021 | 1,085,545 | $68.35 | $74,198,086 |
| 9/23/2021 | 705,398 | $68.27 | $48,157,521 |
| 9/24/2021 | 70,613 | $68.00 | $4,801,895 |
| 9/27/2021 | 10,400 | $68.00 | $707,200 |
| 10/14/2021 | 196,315 | $68.03 | $13,355,309 |
| 10/18/2021 | 156,363 | $68.34 | $10,685,847 |
| 10/19/2021 | 129,021 | $70.03 | $9,035,598 |
| 10/20/2021 | 2,100 | $70.00 | $147,006 |
| 10/22/2021 | 26,194 | $70.02 | $1,834,103 |
| 10/25/2021 | 42,880 | $70.01 | $3,001,943 |
| 10/26/2021 | 290,382 | $70.11 | $20,359,843 |
| 11/2/2021 | 1,612,547 | $70.15 | $113,120,172 |
| 11/3/2021 | 30,772 | $70.00 | $2,154,040 |
| 11/4/2021 | 1,591,191 | $71.58 | $113,895,860 |
| 11/5/2021 | 1,169,784 | $73.00 | $85,394,232 |
| 11/8/2021 | 647,944 | $73.53 | $47,646,562 |
| 11/9/2021 | 58,895 | $74.11 | $4,364,826 |
| 11/12/2021 | 1,019,531 | $74.31 | $75,765,426 |
| 11/15/2021 | 262,655 | $74.19 | $19,486,111 |
| 11/16/2021 | 884,301 | $76.09 | $67,290,884 |
| 11/17/2021 | 1,109,619 | $76.81 | $85,228,725 |
| 11/18/2021 | 115,198 | $77.41 | $8,917,707 |
| 11/19/2021 | 702,567 | $78.19 | $54,934,416 |

54.    Thus, in total, before the fraud was exposed, he sold 58,428,235 shares of Company common stock on inside information, for which he received approximately $3.5 billion in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

55.    The 2024 Proxy Statement stated the following about Defendant Crockett:

Mr. Crockett has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since February 2020 and served as a member of the Board of Managers of ZoomInfo Holdings LLC from 2014 to June 2020. Mr. Crockett currently serves as a Managing Director of TA Associates, a private equity firm and an affiliate of the Company, which he joined in 1994, and is a member of TA Associates' Management Committee and Core Investment Committee. Mr.

COMPLAINT - 19

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

Crockett also currently serves on the boards of several private companies, including MAO Corporation, Orion Adviser Solutions, Procare Software, LLC, Russell Investments, and Wealth Enhancement Group and Green Street. Mr. Crockett holds a B.A. from Princeton University and a MBA from Harvard Business School.

Nomination considerations: Mr. Crockett's extensive core business and leadership skills, including financial and strategic planning, and his significant management experience, including his involvement with TA Associates.

**Defendant Dhruv**

56.     Defendant Dhruv served as a Company director from February 2020 until May 2024. According to the 2024 Proxy Statement, as of March 15, 2024, Defendant Dhruv beneficially owned 30,847 total shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2024 was $15.99, Defendant Dhruv owned approximately $493,244 worth of ZoomInfo's common stock as of that date.

57.     For the 2023 Fiscal Year, Defendant Dhruv received $277,316 in total compensation from the Company, which consisted of $75,000 in fees earned or paid in cash and $202,316 in stock awards. For the 2022 Fiscal Year, Defendant Dhruv received $270,041 in total compensation from the Company, which consisted of $70,000 in fees earned or paid in cash and $200,041 in stock awards. For the 2021 Fiscal Year, Defendant Dhruv received $270,014 in total compensation from the Company, which consisted of $70,000 in fees earned or paid in cash and $200,014 in stock awards. For the 2020 Fiscal Year, Defendant Dhruv received $608,736 in total compensation from the Company, which consisted of $70,000 in fees earned or paid in cash and $538,736 in stock awards.

58.     The Schedule 14A the Company filed with the SEC on March 29, 2023 (the "2023 Proxy Statement") stated the following about Defendant Dhruv:

Mr. Dhruv has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since February 2020 and served as a member of the Board of Managers of ZoomInfo Holdings LLC from February 2020 to June 2020. Mr. Dhruv most recently served as Chief Financial Officer of RingCentral, Inc., a cloud-based communications and collaboration solutions provider. Prior to joining RingCentral, Inc. in 2012, Mr. Dhruv worked at Bank of America Merrill Lynch as an equity research analyst and at PricewaterhouseCoopers. Mr. Dhruv is a CPA,

COMPLAINT - 20

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

Chartered Accountant, and CFA® charterholder, and holds an undergraduate degree in accounting from the University of Mumbai, India.

Nomination considerations: Mr. Dhruv's extensive financial and accounting experience, including as the Chief Financial Officer of RingCentral and his accounting and financial certifications, his knowledge and experience in our industry and with SaaS companies, and his experience in management of a public company.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

59.     By reason of their positions as officers and directors and/or fiduciaries of ZoomInfo and because of their ability to control the business and corporate affairs of ZoomInfo, the Individual Defendants owed ZoomInfo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ZoomInfo in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of ZoomInfo and its shareholders so as to benefit all shareholders equally.

60.     Each director and officer of the Company owes to ZoomInfo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

61.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of ZoomInfo, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

62.     To discharge their duties, the officers and directors of ZoomInfo were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

63.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

obligations as directors and officers of ZoomInfo, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

64.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

65.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of ZoomInfo were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Washington, and the United States, and pursuant to ZoomInfo's corporate governance and applicable codes of conduct and/or ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so

COMPLAINT - 22

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how ZoomInfo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of ZoomInfo and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that ZoomInfo's operations would comply with all applicable laws and ZoomInfo's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

66.     Each of the Individual Defendants further owed to ZoomInfo and the shareholders the duty of loyalty requiring that each favor ZoomInfo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position,

COMPLAINT - 23

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

influence or knowledge of the affairs of the Company to gain personal advantage.

67.     At all times relevant hereto, the Individual Defendants were the agents of each other and of ZoomInfo and were at all times acting within the course and scope of such agency.

68.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with ZoomInfo, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

69.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ZoomInfo.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

70.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

72.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under

COMPLAINT - 24

the authority of the Board, each of the Individual Defendants who is or was a director of ZoomInfo was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

73.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

74.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ZoomInfo and was at all times acting within the course and scope of such agency.

**ZOOMINFO'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

***ZoomInfo's Code of Business Conduct and Ethics***

75.    ZoomInfo's Code of Business Conduct and Ethics (the "Code of Conduct") states that "[i]ntegrity, honesty and sound judgment are fundamental to the reputation and success of" the Company and that the Code is:

> designed to ensure that ***all directors, officers (including the principal executive officer, principal financial officer, principal accounting officer, controller and persons performing similar functions) and employees of the Company*** (collectively, "Covered Parties") not only conduct themselves lawfully at all times, but also maintain the highest ethical standards in every aspect of their business dealings and seek to avoid even the appearance of improper behavior.[1]

76.    Under the heading "Conflicts of Interest," the Code of Conduct states, in relevant part:

> It is the Company's policy that all Covered Parties avoid any conflict between their

---

[1] All emphasis added unless stated otherwise.

COMPLAINT - 25

personal interests and those of the Company. The purpose of this policy is to ensure that the Company's honesty and integrity, and therefore its reputation, are not compromised. The fundamental principle guiding this policy is that no Covered Party should have, or appear to have, personal interests or relationships that actually or potentially conflict with the best interests of the Company. In the case of the Company's non-employee directors, compliance with this Code is subject to provisions of the Company's certificate of incorporation, bylaws and any stockholders agreement with the Company.

77.    Under the heading "Confidential Information," the Code of Conduct states:

In the course of their participation in the work of the Company, a Covered Party may obtain or have access to non-public information that might be of use to competitors, or harmful to the Company or the other source of such information, if disclosed. Such information may have been or may be provided in written or electronic form or orally. All such information, from whatever source obtained and regardless of the Company's connection to the information, is referred to herein as "Confidential Information."

The Company is strongly committed to protecting Confidential Information, whether generated within the Company or obtained from some other source. The Company is also strongly committed to avoiding the misuse, or the appearance of misuse, of such information, whether in connection with the trading of securities or otherwise.

Covered Parties must maintain the confidentiality of Confidential Information, except when disclosure is either expressly authorized by the Company or required by law.

Notwithstanding the foregoing, and notwithstanding any other confidentiality or non-disclosure agreement {whether in writing or otherwise, including without limitation as part of an employment agreement, separation agreement or similar employment or compensation arrangement) applicable to current or former employees, this Code does not restrict any current or former employee from communicating, cooperating or filing a complaint with any U.S. federal, state or local governmental or law enforcement branch, agency or entity {collectively, a "Governmental Entity") with respect to possible violations of any U.S. federal, state or local law or regulation, or otherwise making disclosures to any Governmental Entity, in each case, that are protected under the whistleblower provisions of any such law or regulation, provided that {i) in each case such communications and disclosures are consistent with applicable law and {ii) the information subject to such disclosure was not obtained by the current or former employee through a communication that was subject to the attorney-client privilege, unless such disclosure of that information would otherwise be permitted by an attorney pursuant to 17 CFR 205.3{d){2), applicable state attorney conduct rules, or otherwise. Any agreement in conflict with the foregoing is hereby deemed amended by the Company to be consistent with the foregoing.

COMPLAINT - 26

78.     Under the heading "Compliance with Laws, Rules and Regulations," the Code of Conduct states that:

> Obeying the law, both in letter and in spirit, is one of the foundations on which the Company's ethical standards are built. In conducting the business of the Company, Covered Parties must respect and obey the laws of the jurisdictions in which we operate. Although not all Covered Parties are expected to know the details of these laws, it is important to know enough about the applicable local, state and national laws to determine when to seek advice from the Company's General Counsel or other appropriate personnel. If a law conflicts with any Company policy or this Code, you must comply with the law. There are serious consequences for failing to follow any applicable laws, rules and regulations, including termination of service and potential criminal and civil penalties.

79.     Under the heading "Inappropriate Trading," in the subsection "Prohibition Against Insider Trading," the Code of Conduct states that:

> The federal securities laws prohibit any person who is in possession of material, non-public information from engaging in securities transactions on the basis of such information and from communicating such information to any other person for such use. Transacting in securities of the Company, or any other company, while you possess material, nonpublic information is known as "insider trading." "Tipping," which is also prohibited, means communicating such material, nonpublic information to another for their or its use. Any of these actions may amount to "insider trading" and are strictly prohibited.

80.     Under the heading "Accuracy of Records," the Code of Conduct states that:

> It is the Company's policy to make full, fair, accurate, timely and understandable disclosures in compliance with applicable laws and regulations in all reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission, state agencies, and in all other public communications made by the Company.

> The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements are fundamental to the Company's continued and future business success. In addition, as a company whose stock is publicly traded, the Company is subject to a number of laws and regulations that govern our business records, including U.S. securities laws. The Company must record its financial activities in compliance with all applicable laws and accounting practices and provide current, complete and accurate information to any and all government agencies. No Covered Party may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no Covered Party may create any false or artificial documentation or book entry for any transaction entered into by the Company. Similarly, Covered Parties who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and

COMPLAINT - 27

transactions on the Company's books and records.

81.    Under the heading "Waivers of the Code," the Code of Conduct states that:
Any waiver of any provision of this Code for executive officers or directors of the
Company must be approved by the Board of Directors or a committee of the Board
of Directors of the Company and will be promptly disclosed as required by
applicable securities law and/or stock exchange rules.

***ZoomInfo's Corporate Governance Guidelines***

82.    ZoomInfo also maintains Corporate Governance Guidelines (the "Governance
Guidelines") to "describe the principles and practices that the Board is expected to follow in
carrying out its responsibilities."

83.    The Governance Guidelines state that the "Role and Responsibility of the Board"
are:

The Board directs and oversees the management of the business and affairs of the
Company in a manner consistent with the best interests of the Company and its
stockholders. The Board's responsibility is one of oversight, and in performing its
oversight role, the Board serves as the ultimate decision-making body of the
Company, except for those matters reserved for the Company's stockholders. The
Board selects and oversees the members of senior management, who are charged
by the Board with conducting the business of the Company.

The Board exercises direct oversight of strategic risks to the Company, including
information technology security risks. The Audit Committee reviews guidelines
and policies governing the process by which senior management assesses and
manages the Company's exposure to risk, including the Company's major financial
and operational risk exposures and the steps management takes to monitor and
control such exposures. The Compensation Committee oversees risks relating to
the Company's compensation policies and practices. The Nominating and
Corporate Governance Committee assists the Board by overseeing and evaluating
programs and risks associated with Board organization, membership, and structure
and corporate governance. Each committee charged with risk oversight reports to
the Board on those matters.

84.    In violation of the Code of Conduct and Governance Guidelines, the Individual
Defendants (as key officers and members of the Company's Board) caused the Company to issue
materially false and misleading statements to the public, facilitated and disguised the Individual
Defendant's violations of law, including breaches of fiduciary duty, gross mismanagement, abuse
of control, waste of corporate assets, unjust enrichment, and aiding and abetting thereof. Moreover,
five of the Individual Defendants violated the Code of Conduct by engaging in lucrative insider

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

trading, netting proceeds of approximately $4.6 billion. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations and conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**ZoomInfo's Audit Committee Charter**

85.     The Audit Committee Charter states that the purpose of the Audit Committee is as follows:

A.  Provide assistance to the Board of Directors (the "Board of Directors") of ZoomInfo Technologies Inc. (the "Company") with respect to its oversight of:

   i.     The quality and integrity of the Company's financial statements, including oversight of the Company's accounting and financial reporting processes and financial statement audits;

   ii.    The Company's compliance with legal and regulatory requirements applicable to financial statements and accounting and financial reporting processes;

   iii.   The independent registered public accounting firm's qualifications, performance and independence;

   iv.    The performance of the Company's internal audit function;

   v.     Risk assessment and management, particularly with respect to financial risk exposure; and

   vi.    The Company's environmental, social, and governance ("ESG") related strategy, policies, practices, risk assessment and management, and public disclosures.

B.  Prepare the audit committee report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

86.     Under a heading titled "Responsibilities and Duties," the Audit Committee Charter states, in relevant part:

The following functions are expected to be the common recurring activities of the Committee in carrying out its responsibilities. These functions should serve as a guide with the understanding that the Committee may carry out additional functions and adopt additional policies and procedures as may be required or appropriate in light of changing business, legislative, regulatory, legal, or other conditions. The Committee shall also carry out any other responsibilities and duties delegated to it

COMPLAINT - 29

by the Board of Directors from time to time.

The Committee, in discharging its oversight role, is empowered to study or investigate any matter of interest or concern that the Committee deems appropriate. In this regard, the Committee shall have the authority, in its sole discretion, to engage and terminate independent counsel and other advisors, as it determines necessary or appropriate to carry out its duties. The Committee may also utilize the services of the Company's regular internal and/or external counsel or other advisors to the Company. The Company shall provide appropriate funding, as determined by the Committee, for payment of compensation to the independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and any advisors that the Committee chooses to engage, as well as funding for the payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

87.     Under the same heading, in a subsection titled "Documents/Reports Review," the Audit Committee Charter states:

1. Review and discuss with management and the independent registered public accounting firm prior to public dissemination the Company's annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

2. Discuss with the independent registered public accounting firm the matters required to be discussed by the applicable auditing standards adopted by the PCAOB and approved by the SEC from time to time, including any critical audit matters.

3. Review and discuss with management and the independent registered public accounting firm the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information and measures), as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (e.g., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

4. Review and discuss with management and the independent registered public accounting firm any major issues arising as to the adequacy and effectiveness of the Company's internal controls, any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

5.   Review and discuss with the independent registered public accounting firm a draft of the auditor's report.

88.    Under the same heading, in a subsection titled "Independent Registered Public Accounting Firm," the Audit Committee Charter states, *inter alia*:

6.   Be solely and directly responsible for the appointment, compensation, retention, oversight and, when necessary, termination of any independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (including the resolution of disagreements between management and such firm regarding financial reporting).

7.   Inform each independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company that such firm must report directly to the Committee.

8.   Pre-approve all auditing services and non-audit services (other than "prohibited non-audit services") to be provided to the Company by its independent registered public accounting firm. The Committee may delegate authority to one or more independent members to grant pre-approvals of audit and permitted non-audit services; provided that any such preapprovals shall be presented to the full Committee at its next scheduled meeting.

Notwithstanding the foregoing, pre-approval is not necessary for minor non-audit services if: (i) the aggregate amount of all such non-audit services provided to the Company constitutes not more than five percent of the total amount of revenues paid by the Company to its independent registered public accounting firm during the fiscal year in which the non-audit services are provided; (ii) such services were not recognized by the Company at the time of the engagement to be non-audit services; and (iii) such services are promptly brought to the attention of the Committee and approved prior to the completion of the audit by the Committee or by one or more members of the Committee who are members of the Board of Directors to whom authority to grant such approvals has been delegated by the Committee.

The following shall be "prohibited non-audit services": (i) bookkeeping or other services related to the accounting records or financial statements of the Company; (ii) financial information systems design and implementation; (iii) appraisal or valuation services, providing fairness opinions or preparing contribution-in-kind reports; (iv) actuarial services; (v) internal audit outsourcing services; (vi) management functions or human resources; (vii) broker or dealer, investment adviser or investment banking services; (viii) legal services and expert services unrelated to the audit; and (ix) any other service that the Public Company Accounting Oversight Board prohibits through regulation.

COMPLAINT - 31

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

89.    Under the same heading, in a subsection titled "Accounting and Financial Reporting Process," the Audit Committee Charter states:

12. In consultation with the independent registered public accounting firm, management and the internal auditors (or other personnel or service providers responsible for the internal audit function), review the integrity of the Company's financial reporting processes. In that regard, the Committee must obtain, review and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding:

● all critical accounting policies and practices to be used by the Company;

● analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments on the Company's financial statements and the treatment preferred by the independent registered public accounting firm;

● major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

● major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; and

● any other material written communications between the independent registered public accounting firm and the Company's management, such as any management letter or schedule of unadjusted differences.

13. Review periodically the effect of regulatory and accounting initiatives, as well as offbalance sheet structures (if any), on the financial statements of the Company.

14. Review with the independent registered public accounting firm (i) any problems or difficulties encountered by such firm in the course of the review or audit work, including any restrictions on the scope of its activities or on access to requested information, and any significant disagreements with management and (ii) management's responses to such matters. Without excluding other possibilities, the Committee may wish to review with the independent registered public accounting firm (i) any accounting adjustments that were noted or proposed by such firm but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and such firm's national office respecting auditing or accounting issues presented by the engagement and (iii) any "management" or "internal control" letter

COMPLAINT - 32

issued, or proposed to be issued, by the independent registered public accounting firm to the Company

90.    Under the same heading, in a subsection titled "Internal Audit," the Audit Committee Charter states:

15. Oversee the Company's internal audit function, which may be outsourced to a third-party service provider.

16. Review the significant reports to management prepared by the internal auditors (or other personnel or service providers responsible for the internal audit function) and management's responses.

17. Review and discuss with management, and if appropriate, the independent registered public accounting firm and/or any service provider providing internal audit services to the Company, the responsibilities, budget and staffing of the Company's internal audit function.

91.    Under the same heading, in a subsection titled "Legal Compliance/General," the Audit Committee Charter states:

18. Periodically review and discuss with the Company's General Counsel, or their designee, any legal matters that have been brought to the Committee's attention and that could have a significant impact on the Company's financial statements.

19. Review and discuss with management and the independent registered public accounting firm the Company's guidelines and policies with respect to risk assessment and risk management. The Committee should discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

20. Set clear policies for the Company's hiring of partners or employees or former partners or former employees of the independent registered public accounting firm. At a minimum, these policies must provide that any independent registered public accounting firm may not provide audit services to the Company if the chief executive officer, controller, chief financial officer, chief accounting officer or any person serving in an equivalent capacity for the Company was employed by the independent registered public accounting firm and participated in any capacity in the audit of the Company during the one-year period preceding the date of the initiation of the audit.

21. Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

22. Oversee, review and periodically update the Company's Code of Business

COMPLAINT - 33

Conduct and Ethics (the "Code") (including review of requests of waivers thereof by executive officers and directors) and the Company's system to monitor compliance with and enforce the Code.

23. Unless otherwise approved or ratified pursuant to the Board's "Related Person Transaction Policy," the Committee shall review and approve or ratify all transactions between the Company and any Related Person that are required to be disclosed pursuant to Item 404(a) of Regulation S-K ("Item 404(a)"). "Related Person" shall have the meaning given to such term in Item 404(a), as amended from time to time. Discuss with the independent registered public accounting firm its evaluation of the Company's identification of, accounting for, and disclosure of its relationships with related parties as set forth under the standards of the PCAOB.

24. Review and approve at least on an annual basis the decisions by management to enter into derivative transactions on a cleared or non-cleared basis, and the policies and processes of the Company related thereto, and review and recommend to the Board of Directors on matters pertaining to the Company's derivative transactions and hedging strategy.

92.    In violation of the Audit Committee Charter, the Individual Defendants sitting on the Audit Committee (as key officers and members of the Company's Board) caused the Company to issue materially false and misleading statements to the public, facilitated and disguised the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and aiding and abetting thereof. Also, in violation of the Audit Committee Charter, the Individual Defendants failed to implement risk assessment and risk management protocol and failed to ensure the Company's compliance with applicable law.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

93.    ZoomInfo is a software and data company that sells customer analytics and intelligence to sales and marketing teams. The Company markets its product through a data platform that provides its clients with customer contact and business information. Through this platform, data, and customer intelligence, the Company claims its clients will be able to sell and market more efficiently by allowing them to target organizations and personnel with optimal messaging and timing.

COMPLAINT - 34

94.     The Company's platform is able to be accessed through subscription contracts that last for one to three years, and customers are unable to cancel. The price of these subscriptions is based on the amount of users (or "seats") that will have access to the Company's information, the amount of functionality the customer aimed to utilize, and the amount of data customers use.

95.     The Company recognizes its revenue ratably throughout the life of a subscription, beginning when the platform is first made available to a client. Under the Company's regular billing terms, clients are required to pay for services at the beginning of an annual, semi-annual, or quarterly period.

**False and Misleading Statements**

***November 10, 2020 Press Release***

96.     On November 10, 2020, the Company issued the Q3 2020 Earnings Release. The Q3 2020 Earnings Release announced that the Company's quarterly revenues had grown year-over-year, from $79 million in the same period the prior year up 56% to $123 million. The Q3 2020 Earnings Release also announced the Company's operating revenue grew, from $13 million in the same period the prior year up 41% to $18 million. Lastly, the Q3 2020 Earnings Release announced that the Company had closed the quarter with over 720 customers who had a ACVs of at least $100,000.

97.     In quoting Defendant Schuck, the Q3 2020 Earnings Release stated the following, in relevant part:

> "We delivered another quarter of record results, ***as more customers than ever modernized their go-to-market motions*** with ZoomInfo's data and insights platform . . . . In the third quarter, we added a ***record number of new customers, drove record expansion with our largest clients***, and launched new platform enhancements. With a model that combines durable growth and profitability and a team that is executing on all fronts, we are seeing momentum across all areas of the business. This momentum gives us even more confidence that we can capitalize on the many growth opportunities ahead."

***November 10, 2020 Earnings Call***

COMPLAINT - 35

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

98.    The same day, the Company hosted an earnings call with investors to discuss the results announced by the Q3 2020 Earnings Release (the "Q3 2020 Earnings Call"). On the Q3 2020 Earnings Call, Defendant Schuck highlighted the Company's "record" quarterly sales and growing customer spend, stating:

> Because of the strength that we're seeing across all areas of the business, including *record quarterly new sales, record engagement levels and a new high watermark for – of customers spending over $100,000 a year with us*, we are raising our financial guidance for the full year.

99.    Similarly, Defendant Hyzer highlighted the strong new sales and expansion, stating:

> Both new sales activity and existing client net expansion improved relative to Q2 and last year. *We continue to build momentum and increase win rates throughout the quarter, and this combination of strength in new sales and expansion activity helped drive sequential revenue growth of 10%*, adjusted for the relative days in each quarter.

100.    Later in the call, during the question-and-answer portion, one analyst questioned the underlying drivers of the Company's sudden growth. Defendant Hyzer responded:

> Yes. Thanks. That's a great question, Brent. *It was broad-based across the board. We saw really strong new business sales*, and that's with enterprises and mid-market and SMB customers.
>
> I think one thing to make sure to think about is that all of our customers are selling to other businesses. So at the end of the day, they are probably less impacted by some of the COVID headwinds that you might see than, say, restaurant or other folks. And many of them are pivoting and finding ways to succeed. These happen to be many of the more agile and forward-leaning go-to-market teams in the world. So I think our system really helped people to continue to perform.
>
> *And I think one of the things that we continue to see throughout was that the retention or expansion among our customers continued to accelerate month-over-month throughout the year*. So again, broad-based on both new sales and retention and across all of the different segments of customers that we serve.

***November 13, 2020 Form 10-Q***

101.    On November 13, 2020, the Company filed its quarterly report for the third quarter of the 2020 Fiscal Year on Form 10-Q with the SEC (the "Q3 2020 10-Q"). The Q3 2020 10-Q

COMPLAINT - 36

1    was signed by Defendant Hyzer and attached certifications pursuant to Rules 13a-14(a) and 15(d)-

2    14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants

3    Schuck and Hyzer attesting to the accuracy of the Q3 2020 10-Q and that the "information included

4    in this [Q3 2020 10-Q], fairly present in all material respects the financial condition, results of

5    operations and cash flows of the [Company]."

6        102.    The Q3 2020 10-Q confirmed and repeated the financial and operational results that

7    had been announced in the Q3 2020 Earnings Release.

8        103.    In addition, the Q3 2020 10-Q revealed that the Company ended the third quarter

9    with total Remaining Performance Obligations ("RPOs") of $458 million and current RPOs of

10    $349 million.

11    ***December 2, 2020 Prospectus***

12        104.    On December 2, 2020, the Company filed a prospectus on Form 424(b)(4) with the

13    SEC (the "December 2020 Prospectus"). The December 2020 Prospectus informed investors that

14    the Company had a customer base of over 17,000, while also claiming an implied 2% penetration

15    into a total addressable market for the Company's products and services which was valued at $30

16    billion. The December 2020 Prospectus also stated that that over 720 customers had ACVs of at

17    least $100,000, and 18 customers had ACVs of at least $1 million.

18    ***February 22, 2021 Press Release***

19        105.    On February 22, 2021, the Company issued a press release announcing the financial

20    results for the fourth quarter and full year of the 2020 Fiscal Year (the "FY 2020 Earnings

21    Release"). The FY 2020 Earnings Release announced that the Company's quarterly revenues had

22    increased year-over-year, from $91 million for the fourth quarter the prior year up 53% to $140

23    million. The FY 2020 Earnings Release also announced that the Company's operating income

24    increased year-over-year, from $29 million for the fourth quarter the prior year up 54% to $29.6

25    million.

26        106.    In regards to customers, the FY 2020 Earnings Release announced that the

27

28    COMPLAINT - 37

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

Company ended the quarter with over 20,000 customers, with at least 850 who had at least ACVs of $100,000. The FY 2020 Earnings Release also announced that the Company had a Net-Revenue Retention ("NRR") of 108%.

107.    Defendant Schuck was quoted in the FY 2020 Earnings Release as praising the Company's "record results" and supposed "industry-leading" growth and profitability.

**February 22, 2021 Earnings Call**

108.    The same day, the Company hosted an earnings call with investors and analysts to discuss the results from the fourth quarter and fiscal year (the "FY 2020 Earnings Call"). On the FY 2020 Earnings Call, Defendant Schuck highlighted the Company's "broad-based strength across all areas of the business" and revealing that ZoomInfo had set "growth records" for new sales, new customers added, and customers with over $100,000 annual spend. Additionally, Defendant Schuck stated that the Company's products were "resonating" with clients, which was leading to "new customer acquisition" and "retention."

109.    Defendant Hyzer hyped many of the same strengths in new customer acquisitions and expansion, stating:

> So currently, *we're seeing real strength on both sides, both from new logos and customers* coming on as well as from the expansion opportunity within our existing customer base. And if you look at our largest customers, *we had a record quarter in terms of the addition of new customers* that are above $100,000 at this point.

110.    In response to an analyst's question around what was driving the large influx of customers to the platform, Defendant Schuck stated:

> And so you see customers from all sorts of industries now coming to us, and we have a solution that can serve all of their needs. It doesn't matter if you sell into an IT decision-maker or a medical director, if you're selling in France or you're selling in California, the solution can serve up better go-to-market efficiencies for your sales teams regardless of what kind of company you are.

> And I think what you're seeing is companies, one, making the realization, the digitization of their go-to-market efforts is a must; and two, you see really the investments that we made over the last 2 years in our go-to-market teams and our product really paying off. *And so we saw a broad-based momentum, again, from all industries across the world across sizes, and that's the momentum that we don't think is a blip or something that's short lived or short term. We think that's here to stay*.

COMPLAINT - 38

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1

***February 26, 2021 Form 10-K***

2    111.   On February   26, 2021, the Company filed its annual report for the 2020 Fiscal

3   Year on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants

4   Schuck, Crockett, Dhruv, Enright, Evans, Mader, McCarter, Winn, and Hyzer and attached SOX

5   certifications signed by Defendants Schuck and Hyzer attesting to the accuracy of the 2020 10-K

6   and that the "information included in this [2020 10-K], fairly present in all material respects the

7   financial condition, results of operations and cash flows of the [Company]."

8    112.   The 2020 10-K repeated the financial and operational results that were reported in

9   the FY 2020 Earnings Release. The 2020 10-K also stated that the Company ended the fourth

10  quarter with total RPOs of $559 million and current RPOs of $432 million.

11   ***May 3, 2021 Press Release***

12   113.   On May 3, 2021, the Company issued a press release announcing the quarterly

13  financial and operational results for the first quarter of the 2021 Fiscal Year (the "Q1 2021

14  Earnings Release"). The Q1 2021 Earnings Release revealed that the Company's quarterly

15  revenues had increased year-over-year, from $102 million in the first quarter of the prior year up

16  50% to $153 million. In addition, the Q1 2021 Earnings Release announced that the Company's

17  operating income had also increased year-over-year, from $20 million in the first quarter of the

18  prior year up 38% to $28 million.

19   114.   Regarding customer growth, the Q1 2021 Earnings Release announced that the

20  Company ended the quarter with over 950 customers who had ACVs of at least $100,000.

21   115.   In discussing these promising results, the Q1 2021 Earnings Release quoted

22  Defendant Schuck, who stated that the Company was "executing well" across "all areas of the

23  business." He was further quoted as saying the Company was "'well-positioned to capitalize on

24  [a] growing market opportunity."

25   ***May 3, 2021 Earnings Call***

26   116.   That same day, the Company hosted an earnings call with analysts and investors to

27

28  COMPLAINT - 39

discuss the financial and operational results of the first quarter (the "Q1 2021 Earnings Call").

117.   On the Q1 2021 Earnings Call, Defendant Schuck emphasized the Company's "strong" financial results, which he attributed to "accelerating growth" throughout the business, including "record renewals" and new customer acquisition. In full, he stated:

> *The first quarter was marked by strong accelerating growth across all of our business lines*. We delivered GAAP revenue of $153 million, representing 50% year-over-year growth and 12% sequentially when adjusted for the number of days in the quarter. Adjusted operating income was $66 million, representing an operating margin of 43%. These results were driven by dependable execution across the entire company from new business to product development to retention. *Our focus on continuous improvement as a core cultural value and the execution we build on top of that has allowed us to deliver our near-term financial results consistently while setting us up for long-term durable growth*.
>
> We had strong results across all areas of the business, and I want to specifically call out that *we achieved our best-ever Q1 results this quarter on 3 dimensions: new business, new customer additions and retention activity*. We doubled the number of new customers added this quarter compared to Q1 2020. *We also had record renewals and upsells as a percentage of beginning ACV* for a first quarter as we saw demand for our products continue to accelerate with companies looking to drive a digital data-driven go-to-market motion.

118.   During his own scripted remarks on the Q1 2021 Earnings Call, Defendant Hyzer highlighted the Company's "positive momentum," stating:

> Q1 was a great quarter with strong financial results that exceeded our guidance. *We saw broad-based strength across the business*. And as Henry indicated, we achieved our best-ever Q1 results for new business, new customer additions and retention activity. This quarter was also highlighted by our successful expansion with enterprise customers, growing sales of our newer products and strong international growth.
>
> *     *     *
>
> *During the first quarter, we continued to see strong new customer additions and positive momentum with respect to retention and upsell activity*. We also continued to successfully execute against the large and growing enterprise opportunity. *We had strong enterprise renewals, and our enterprise upsell motion is really hitting its stride*. In the quarter, we doubled the number of greater than $100,000 ACV customers added as compared to the year ago period. As a result, as of March 31, we had more than 950 customers with $100,000 or more in ACV, up from more than 850 last quarter.

119.   Responding to an analyst question regarding the demand environment the Company

COMPLAINT - 40

was experiencing, Defendant Schuck stated:

> Yes. I think we – I think it's a pretty – ***I don't think we see organizations sort of correcting for the pandemic world anymore. We think that's largely behind us***. And so what we're seeing mostly is organizations trying to bring to life, especially in the enterprise, their CRM systems, their marketing automation systems, their sales automation system. They're trying to get high ROI and real engagement out of those systems, and they view us as a strategic partner to be able to fill those systems with insights and really drive adoption and engagement from their frontline sellers and their marketing teams through those systems. And so I don't really – I don't think anyone is focused on the pandemic mindset. Everybody is focused today on really digitizing their motion.

***May 3, 2021 Form 10-Q***

120.    On May 3, 2021, the Company filed its quarterly report for the first quarter of the 2021 Fiscal Year on Form 10-Q with the SEC (the "Q1 2021 10-Q"). The Q1 2021 10-Q was signed by Defendant Hyzer and attached SOX certifications signed by Defendants Schuck and Hyzer attesting to the accuracy of the Q1 2021 10-Q and that the "information included in this [Q1 2021 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

121.    The Q1 2021 10-Q repeated the same financial and operational results as the Q1 2021 Earnings Release. The Q1 2021 10-Q also revealed that the Company ended the quarter with total RPOs of $592 million and current RPOs of $461 million.

***August 2, 2021 Press Release***

122.    On August 2, 2021, the Company issued a press release announcing its financial and operational results from the second quarter of the 2021 Fiscal Year (the "Q2 2021 Earnings Release"). The Q2 2021 Earnings Release revealed that the Company's quarterly revenues increased again year-over-year, from $111 million in the second quarter the year prior up 57% to $174 million. In addition, the Q2 2021 Earnings Release revealed the Company's operating income increased as well year-over-year, from $31 million in the second quarter the prior year up to $41 million.

123.    Lastly, the Q2 2021 Earnings Release revealed that the Company ended the quarter with over 1,100 customers who had ACVs of at least $100,000.

COMPLAINT - 41

*August 2, 2021 Earnings Call*

124.   That same day, the Company hosted an earnings call with analysts and investors to discuss the Company's second quarter results (the "Q2 2021 Earnings Call"). On the Q2 2021 Earnings Call, Defendant Schuck discussed the Company's high levels of customer retention, stating:

> Q2 was another record quarter with accelerating revenue growth and improved operating margin performance. We continue to see positive trends across the entire business, driven by our continued investments in our sales, marketing, product, data and engineering organizations and a strong demand environment for accelerating digital transformation across go-to-market teams. ***This was our best ever second quarter for new customer additions, and we recorded the highest levels ever for both retention activity and customer engagement***. We saw accelerating growth with our largest customers, growing the number of customers who spend more than $100,000 a year with us, by 70% year-over-year, ending the quarter with more than 1,100 showing meaningful traction behind the investments we've made in our enterprise motion. We're also seeing our investment in international payoff. With more reps focused on the opportunity, we drove year over-year international revenue growth greater than 75%, with international now representing 11% of our overall business.

125.   Defendant Schuck continued his statements by stating:

> We had our best ever Q2 for new customer adds. ***We drove the highest ever levels of retention activity***. And our data accuracy and coverage levels are at the highest in our history. Our investment in customer onboarding, user experience enhancements and integrations are improving customer satisfaction and driving the highest levels of engagement ever. International is taking off. We saw great growth across the enterprise opportunity, and we continue to develop, acquire and integrate new functionality, delivering on our vision of the modern go-to-market platform.

126.   In response to an analyst's question regarding the Company's NRR trend in the second quarter, Defendant Hyzer stated:

> So we do report our net retention on an annual basis, given that it's an annual calculation kind of starting at the end of the year, going to the end of the next year. What we do look at is the retention activity that we see. So that's – those customers that are renewing within a quarter and the upsells that we're generating within a quarter. ***And we have seen that Q2 was the best quarter we've ever had from a retention activity perspective, and I think that gives us confidence that we will see higher net retention in 2021 than we saw in 2020***. And certainly, part of that is all of the investments that we've made in terms of our operational capabilities, investing in the customer support and customer success teams, investing in improving the product and providing additional functionality.

COMPLAINT - 42

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

*August 2, 2021 Form 10-Q*

127.   On August 2, 2021, the Company filed its quarterly report for the second quarter of the 2021 Fiscal Year on Form 10-Q with the SEC (the "Q2 2021 10-Q"). The Q2 2021 10-Q was signed by Defendant Hyzer and attached SOX certifications signed by Defendants Schuck and Hyzer attesting to the accuracy of the Q2 2021 10-Q and that the "information included in this [Q2 2021 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

128.   The Q2 2021 10-Q reiterated the financial and operational results of the Q2 2021 Earnings Release. The Q2 2021 10-Q also revealed that the Company's quarterly RPO total was $648 million, and current RPO total was $505 million.

*August 5, 2021 Prospectus*

129.   On August 5, 2021, the Company filed a prospectus on Form 424(b)(7) with the SEC (the "August 5, 2021 Prospectus"). The August 5, 2021 Prospectus incorporated by reference, and therefore repeated the statements within, the 2020 10-K, the Q1 2021 10-Q, and the Q2 2021 10-Q.

*August 10, 2021 Prospectus*

130.   On August 10, 2021, the Company filed a prospectus on Form 424(b)(7) with the SEC (the "August 10, 2021 Prospectus"). The August 10, 2021 Prospectus incorporated by reference, and therefore repeated the statements within, the 2020 10-K, the Q1 2021 10-Q, and the Q2 2021 10-Q.

*November 1, 2021 Press Release*

131.   On November 1, 2021, the Company issued a press release announcing its financial and operational results from the third quarter of the 2021 Fiscal Year (the "Q3 2021 Earnings Release"). The Q3 2021 Earnings Release revealed that the Company's quarterly revenues increased again year-over-year, from $123 million in the third quarter the year prior up 60% to $198 million. In addition, the Q3 2021 Earnings Release revealed the Company's operating income

COMPLAINT - 43

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

increased as well year-over-year, from $18 million in the third quarter the prior year up 10% to $20 million.

132.    Lastly, the Q3 2021 Earnings Release revealed that the Company ended the quarter with over 25,000 customers. Of those, over 1,250 customers who had ACVs of at least $100,000.

***November 1, 2021 Earnings Call***

133.    That same day, the Company hosted an earnings call with analysts and investors to discuss the Company's third quarter results (the "Q3 2021 Earnings Call"). On the Q3 2021 Earnings Call, Defendant Schuck highlighted the Company's surpassing of 25,000 total customers, stating:

> During the quarter, we surpassed 25,000 customers, and we now have more than 1,250 customers with greater than 100,000 in ACV. These customers now represent more than 40% of our overall ACV with the ACV from not cohort growing by more than 85% year-over-year. ***Growth is coming both from expansions of existing customers and landing new customers above the 100,000 threshold, with customers taking up more and more products at the point of initial sale***.

134.    Defendant Schuck continued on, stating that the recent third quarter was the Company's "best ever" in customer acquisition, stating:

> This was our best ever third quarter for new customer addition. ***And the leading indicators are pointing to meaningfully higher annual net dollar retention rates with expected improvements across customers of all sizes***. In the quarter, we delivered GAAP revenue of $198 million, representing 60% year-overyear growth, up from 57% in Q2 and up 12% sequentially when adjusted for the number of days in the quarter. We delivered unlevered free cash flow of $73 million, up 23% year-over-year. We closed the quarter with more than 25,000 customers, of which more than 1,250 customers have greater than $100,000 in ACV. The number of customers with more than $100,000 in ACV grew more than 70% year-over-year.

135.    Later on the call, in response to an analyst's question regarding the underlying driver of the Company's recent customer growth, Defendant Schuck stated:

> Yes. I think we see growth in both of those cities. ***We see growth from a user and seat expansion across the enterprise***. And that just fits into our land and expand motion where we can land in one sort of business unit of an enterprise customer and then expand as that business unit see success. And then the other is, we are selling an expanding product set into the enterprise. And so where we may land with the intelligence layer, we end up selling the engagement layer in or we sell our chat functionality, our engage functionality, the Chorus functionality. We sell our DAS offering, which is an outgrowth of our EverString acquisition last year into the enterprise in an accelerated fashion. ***And so you really see growth in that***

COMPLAINT - 44

*enterprise cohort coming from both new products that we're able to cross-sell in as well as new user seats and expansion within that customer base*.

**November 1, 2021 Form 10-Q**

136.     On November 1, 2021, the Company filed its quarterly report for the third quarter of the 2021 Fiscal Year on Form 10-Q with the SEC (the "Q3 2021 10-Q"). The Q3 2021 10-Q was signed by Defendant Hyzer and attached SOX certifications signed by Defendants Schuck and Hyzer attesting to the accuracy of the Q3 2021 10-Q and that the "information included in this [Q3 2021 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

137.     The Q3 2021 10-Q reiterated the financial and operational results of the Q3 2021 Earnings Release. The Q3 2021 10-Q also revealed that the Company's quarterly RPO total was $712 million, and current RPO total was $552 million.

**February 15, 2022 Press Release**

138.     On February 15, 2022, the Company issued a press release announcing the financial results for the fourth quarter and full year of the 2021 Fiscal Year (the "FY 2021 Earnings Release"). The FY 2021 Earnings Release announced that the Company's quarterly revenues had increased year-over-year, from $140 million for the fourth quarter the prior year up 59% to $222 million. The FY 2021 Earnings Release also announced that the Company's operating income decreased year-over-year, from $30 million for the fourth quarter the prior year down to $24 million.

139.     In regards to customers, the FY 2021 Earnings Release announced that the Company ended the quarter with 1,452 who had of at least ACVs of $100,000. The FY 2021 Earnings Release also announced that the Company had a NRR of 116%.

140.     The FY 2021 Press Release quoted Defendant Schuck, stating that the Company "delivered a leading combination of growth profitability" in 2021 and the Company had acquired more customers "than ever before", achieving "record customer retention."

COMPLAINT - 45

1    *February 15, 2022 Earnings Call*

2    141.    That same day, the Company hosted an earnings call with analysts and investors to

3    discuss the Company's fourth quarter and year-end results (the "FY 2021 Earnings Call"). On the

4    FY 2021 Earnings Call, Defendant Schuck highlighted the Company's new customer acquisitions,

5    stating:

> We are delivering a leading combination of growth, profitability and free cash flow
> generation at scale. ***We closed the quarter with 1,452 customers with greater than***
> ***$100,000 in ACV, up 70% year-over-year, while adding more new customers to***
> ***the overall business than any other quarter in our history***. Growth across our
> newly introduced products was strong as well, with Chorus and RingLead leading
> the way. At the time of acquisition, our conversation Intelligence platform, Chorus,
> was growing 100% year-over-year, and we accelerated that growth in both the third
> and fourth quarters of 2021.

6

7

8

9

10   142.    Later in his remarks, Defendant Schuck hyped the "continued strong demand

11   environment" the Company was going through, which supposedly would set the stage for

12   ""continued growth and profitability" within a "$70 billion market opportunity."

13   143.    For his turn on the FY 2021 Earnings Call, Defendant Hyzer stated that the

14   Company "continue[d] to successfully execute" its sales strategy, allowing it to "driv[e] more seat

15   expansion, data consumption, and further adoption of product functionality." Defendant Hyzer

16   further claimed that the Company's annual NRR of 116% was the result of this sales strategy.

17   144.    In response to an analyst's question about the strength of the Company's enterprise

18   pipeline, Defendant Schuck stated:

> ***We have built a stronger enterprise pipeline than we've ever had in the history of***
> ***our business***. And that's coming from a number of different ways. I think first, the
> natural tailwind in the enterprise is they continue to modernize their go-to-market
> systems and they continue to leverage digital technologies to go to market is a very
> clear continued tailwind.

19

20

21

22

> But I think the second thing that we're seeing is that the platform story is really
> resonating. I talked to an enterprise customer in Q4 who was using 12 different
> vendors to accomplish what they could do with just one ZoomInfo subscription.
> And that story (technical difficulty) best-in-class products, across that platform
> suite, I think we're going to continue to take market share and continue to expand
> in the enterprise. We've hired a great team (technical difficulty) our enterprise sales
> that we feel really strongly about. ***And so we continue to build a really great***
> ***pipeline within the enterprise. And I would describe it as more demand within the***

23

24

25

26

27

28   COMPLAINT - 46

*enterprise than we've seen in our history*.

145.    Defendant Schuck further stated how he was "really excited" about the Company's NRR, and that the NRR rates were not only "sustainable" but also something the Company would ""look to improve upon" in the "next year and the following years."

146.    An analyst then posed the question of whether the COVID-19 pandemic was temporarily inflating the Company's product demand, referencing that analysts "continue[d] to field some questions from investors around this pull-forward in direct selling efforts kind of post-COVID." In response, Defendant Schuck stated:

> Thanks, Brent. I have not had a single enterprise call with a single enterprise customer where there isn't double-digit expansion opportunity within those accounts from a SalesOS perspective. They're just – we still continue to be really early in our penetration across the enterprise. *And so we continue to make headway there, but it's still really, really early and lots and lots of opportunity in the core SalesOS motion*.

> I'll tell you, we're constantly looking at the data, the historical data. We look at win rates, funnel conversion, top of funnel activity. And we spent a real amount of time looking for anomalies that we could tie back to some relation to COVID. *And we didn't see anything that (technical difficulty) believe that the current strong demand trends we're seeing wouldn't continue or were one-off or a pull forward*.

> And we wanted to be confident about that because it would affect the way we operate the business. *We didn't see any anomalies like that, that made us think that COVID caused a pull-forward and the demand environment that we're seeing today wouldn't continue*.

*February 24, 2022 Form 10-K*

147.    On February   24, 2022, the Company filed its annual report for the 2021 Fiscal Year on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants Schuck, Crockett, Dhruv, Enright, Evans, Mader, McCarter, Winn, and Hyzer and attached SOX certifications signed by Defendants Schuck and Hyzer attesting to the accuracy of the 2021 10-K and that the "information included in this [2021 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

148.    The 2021 10-K repeated the financial and operational results that were reported in the FY 2021 Earnings Release. The 2021 10-K also stated that the Company ended the fourth

COMPLAINT - 47

quarter with total RPOs of $864 million and current RPOs of $671.5 million.

**2022 Proxy Statement**

149.    On March 29, 2022 the Company filed a Schedule 14A with the SEC with the SEC (the "2022 Proxy Statement"). The 2022 Proxy Statement was solicited by Defendants Schuck, Crockett, Dhruv, Enright, Evans, Mader, and Winn pursuant to Section 14(a) of the Exchange Act and contained various materially false and misleading statements and omissions.

150.    The 2022 Proxy Statement called for shareholders to approve, *inter alia*: (1) the reelection of Defendant Mader to the Board; (2) the ratification of KPMG LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year; (3) the compensation paid to the Company's named executive officers, on a nonbinding, advisory basis; and (4) to approve two administrative amendments related to the governing documents related to the Company's corporate reorganization. The relevant amendments shareholders were asked to approve were: (4A) to amend provisions in the Certificate of Incorporation related to the Company's classes of common stock; and (4B) to remove pass-through voting provisions from the Company's subsidiaries Certificate of Incorporation.

151.    Regarding "Oversight of Risk Management," the 2022 Proxy Statement stated the following, in relevant part:

> The Board has extensive involvement in the oversight of risk management related to us and our business. The Board accomplishes this oversight both directly, including as it relates to ESG risk exposures, and through its Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Privacy, Security and Technology Committee, each of which assists the Board in overseeing a part of our overall risk management and regularly reports to the Board. The Audit Committee represents the Board by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the oversight of administrative and financial controls, our compliance with legal and regulatory requirements and our policies with respect to risk assessment and risk management. Through its regular meetings with management, including the finance, legal and internal audit functions, the Audit Committee reviews and discusses significant areas of our business and related risks and summarizes for the Board areas of risk and any mitigating factors. The Compensation Committee considers, and discusses with management, management's assessment of certain risks, including whether any risks arising from

COMPLAINT - 48

our compensation policies and practices for our employees are reasonably likely to have a material adverse effect on us. The Nominating and Corporate Governance Committee oversees and evaluates programs and risks associated with Board organization, membership and structure, succession planning and corporate governance. In addition, our Board receives periodic detailed operating performance reviews from management. The Privacy, Security and Technology Committee, represents the Board by periodically reviewing and discussing with Company management the Company's major risk exposures relating to privacy, cybersecurity, and technology, and the steps the Company takes to detect, monitor, and actively manage such exposures.

152.    Regarding the Code of Conduct, the 2022 Proxy Statement stated the following:

We maintain a Code of Business Conduct and Ethics that is applicable to all of our directors, officers and employees, including our Chairman and Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and other senior officers. The Code of Business Conduct & Ethics sets forth our policies and expectations on a number of topics, including conflicts of interest, corporate opportunities, confidentiality, compliance with laws (including insider trading laws), use of our assets and business conduct and fair dealing. This Code of Business Conduct and Ethics also satisfies the requirements for a code of ethics, as defined by Item 406 of Regulation S-K promulgated by the SEC. The Code of Business Conduct and Ethics may be found on our website at *ir.zoominfo.com* under Governance: Governance Highlights: Governance Documents: Code of Business Conduct and Ethics.

We will disclose within four business days any substantive changes in or waivers of the Code of Business Conduct and Ethics granted to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, by posting such information on our website as set forth above rather than by filing a Form 8-K. In the case of a waiver for an executive officer or a director, the required disclosure also will be made available on our website within four business days of the date of such waiver.

153.    The 2022 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

154.    The 2022 Proxy Statement was also false and misleading because it failed to

COMPLAINT - 49

disclose that: (1) the Company's financial results had been temporarily inflated by the effects of the COVID-19 pandemic; (2) as the pandemic began to subside, the Company's customers had less need for its platform; (3) as a result, material portions of the existing customer base attempted to significantly reduce their use of the Company's platform, or completely stop using the platform; (4) to avoid this mass loss of retention, the Company began a series of manipulative and coercive auto-renewal policies that required clients to give at least 60 days' notice prior to the end of a contract term for non-renewal; (5) as a result, the Company's customer relations were irreparably harmed to the detriment of future contract renewals; and (6) the Company lacked internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

155.    As a result of Defendants Schuck, Crockett, Dhruv, Enright, Evans, Mader, and Winn causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendant Mader to the Board, thereby allowing him to continue breaching his fiduciary duties to the Company; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year; (3) approve executive officer compensation on an advisory, non-binding basis; and (4) approve the two amendments to the Company's governing documents, namely: (4A) to amend provisions in the Certificate of Incorporation related to the Company's classes of common stock; and (4B) to remove pass-through voting provisions from the Company's subsidiaries Certificate of Incorporation.

### May 2, 2022 Press Release

156.    On May 2, 2022, the Company issued a press release announcing the quarterly financial and operational results for the first quarter of the 2022 Fiscal Year (the "Q1 2022 Earnings Release"). The Q1 2022 Earnings Release revealed that the Company's quarterly revenues had increased year-over-year, from $153 million in the first quarter of the prior year up 58% to $242 million. In addition, the Q1 2022 Earnings Release announced that the Company's

COMPLAINT - 50

operating income had also increased year-over-year, from $28 million in the first quarter of the prior year up 16% to $32 million.

157.   Regarding customer growth, the Q1 2022 Earnings Release announced that the Company ended the quarter with 1,623 customers who had ACVs of at least $100,000.

*May 2, 2022 Earnings Call*

158.   That same day, the Company held an earnings call with analysts and investors to discuss the second quarter financial and operational results (the "Q1 2022 Earnings Call"). On the Q1 2022 Earnings Call, Defendant Schuck highlighted how the Company was able to continue a pattern of "strong growth" in acquiring new customers, stating:

> We closed the quarter with 1,623 customers with greater than $100,000 in ACV, up more than 65% year-over-year, while the average revenue across these customers continues to grow. ***And we saw incredibly strong growth in new business as the new customer team had their best Q1 ever on an ACV basis and the best quarter ever on a TCV basis***.

159.   Defendant Schuck continued to highlight how the Company's customer base "continue[d] to grow" and was indicative of the Company continuing to see "solid traction" with its enterprise clients.

160.   For his scripted remarks, Defendant Hyzer also highlighted how the Company's platform was "resonating with customers," stating:

> ***The demand environment remains strong***. Companies continue to invest behind improving their go-to-market motions, and the platform strategy is resonating with customers. ***We are confident that given the tremendous value we provide to our customers and our current narrow level of market penetration that we will be able to drive durable growth regardless of the economic environment***.

161.   Defendant Hyzer went on to then discuss the Company's recent growth in customers with over $100,000 in ACV as being driven by pre-existing customers who have chosen to "expand" over the threshold, stating:

> As has been historically the case, we tend to land customers with a kind of smaller offering or sometimes a trial and then expand and grow them over time. So that continues to be the case that we've – that most of the customers that we add in that 100,000 are customers that started at a smaller level with us and we've upsell. ***But there does continue to be momentum in customers coming on over 100,000***.

COMPLAINT - 51

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

. . . I think last year, *we started to see a little bit more momentum, and that's continued in Q1, where a growing number of customers are coming in at 200,000 or 500,000 and then continuing to grow from there as well*.

**May 2, 2022 Form 10-Q**

162.    On May 2, 2022, the Company filed its quarterly report for the first quarter of the 2022 Fiscal Year on Form 10-Q with the SEC (the "Q1 2022 10-Q"). The Q1 2022 10-Q was signed by Defendant Hyzer and attached SOX certifications signed by Defendants Schuck and Hyzer attesting to the accuracy of the Q1 2022 10-Q and that the "information included in this [Q1 2022 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

163.    The Q1 2022 10-Q reiterated the financial and operational results of the Q1 2022 Earnings Release. The Q1 2022 10-Q also revealed that the Company's quarterly RPO total was $918 million, and current RPO total was $715 million.

**August 1, 2022 Press Release**

164.    On August 1, 2022, the Company issued a press release announcing the quarterly financial and operational results for the second quarter of the 2022 Fiscal Year (the "Q2 2022 Earnings Release"). The Q2 2022 Earnings Release revealed that the Company's quarterly revenues had increased year-over-year, from $174 million in the second quarter of the prior year up 54% to $267 million. In addition, the Q2 2022 Earnings Release announced that the Company's operating income went from $41 million in the second quarter of the prior year to $39.5 million.

165.    Regarding customer growth, the Q2 2022 Earnings Release announced that the Company ended the quarter with 1,763 customers who had ACVs of at least $100,000.

**August 1, 2022 Earnings Call**

166.    That same day, the Company hosted an earnings call with investors and analysts to discuss the second quarter's financial and operational results (the "Q2 2022 Earnings Call"). On the Q2 2022 Earnings Call, Defendant Schuck discussed the recent "generational transformation" of how businesses conduct their marketing, stating:

While a more uncertain macroeconomic environment may create some elongating

COMPLAINT - 52

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

near-term sales cycles, *our very efficient go-to-market motion and proven quick time to value for our customers will help insulate us. The market opportunity is huge, and we are executing against it*.

We are in the earliest days of what we believe is a generational transformation of how businesses go to market with data, insights and a purpose-built software platform, a transformation that we are uniquely positioned to lead. We have the right platform, the integrated data and insights that power that platform, and we are delivering success to our customers as they look for efficiencies and look to consolidate with fewer and fewer strategic vendors.

*We continue to deliver success to customers of all sizes across all industries with customers increasingly choosing ZoomInfo as a pillar of their goto-market tech stack*. As companies focus on efficiency, profitability and unit economics, the most obvious path is to get more out of your existing sales and marketing resources. For 2 decades, we have been a trusted partner to deliver just that.

167.    In his scripted remarks, Defendant Hyzer also discussed the Company continuing to "see strong demand", exuding that he was "confident" ZoomInfo would "continue to drive durable growth" despite of a "macro environment."

168.    When asked about customer retention trends, Defendant Hyzer responded:
So there isn't anything worth calling out in terms of specific segments or anything else. I do think, as we look forward, macroeconomic headwinds could create some pressure with respect to net retention, but *we're still seeing our customers continue to want to invest into really enabling and creating a better environment for their sellers. So I think what we're seeing today gives us even more confidence in our ability to drive towards that $2 billion run rate revenue target that we've set for ourselves and continue to see retention over the long term continue to improve*.

169.    Regarding how hiring freezes may impact the Company's growth, Defendant Schuck stated:
*I think just from a penetration perspective, we still feel like we're in very, very early innings*. I get asked often what happens if sales hiring slows in these accounts. Are you limited by your ability to add user seats? On the vast majority, the overwhelming majority of the accounts that we operate inside of, we're not wall-to-wall across the sales team. *And so we have this tremendous growth opportunity within sales organizations that we're executing against. And so we still feel like we're in the incredible early innings of the opportunity*. And so we don't feel special exposure across any industry or any customer side segment.

170.    Similarly, Defendant Hyzer stated that the Company was still in the "early innings" of its market penetration, stating:
So I think consistent with what we've seen historically and continue to see in –

COMPLAINT - 53

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

throughout the year, ***new sales continues to be a really strong driver of growth, and it's more than half of the growth that we see. I think that we're in such early innings in terms of the penetration of the overall market***.

Ultimately, every business that's selling to another business can and should use ZoomInfo to do a better job of that. And we have customers 30,000 today. There are over 700 potential customers that we can go out and get. So we have a lot of excitement about our ability to go out and continue to bring on new customers and help them be successful.

At the same time, within our existing customers, I think the consolidation play is an important lever that we can continue to use. But there's also a tremendous amount of white space expansion within those customers. Whether it's adding on new users to go wall-to-wall, whether it's helping their data teams really get to higher-quality data or, honestly, a lot of the advanced functionality that we offer is still relatively nascent out in the market. And there are a number of large enterprise customers where we can double, triple, quadruple the amount of revenue that we're getting in a white space way as opposed to consolidating other spend that's out there. And I think in a challenging macroeconomic environment, that replacement might be the easiest thing for us. ***But over the long term, there's a lot more opportunity for the white space opportunity within our existing customers as well***.

***August 1, 2022 Form 10-Q***

171.    On August 1, 2022, the Company filed its quarterly report for the second quarter of the 2022 Fiscal Year on Form 10-Q with the SEC (the "Q2 2022 10-Q"). The Q2 2022 10-Q was signed by Defendant Hyzer and attached SOX certifications signed by Defendants Schuck and Hyzer attesting to the accuracy of the Q2 2022 10-Q and that the "information included in this [Q2 2022 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

172.    The Q2 2022 10-Q reiterated the financial and operational results of the Q2 2022 Earnings Release. The Q2 2022 10-Q also revealed that the Company's quarterly RPO total was $985 million, and current RPO total was $764 million.

173.    The statements referenced in ¶¶96-148 and 156-172 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's financial results had been temporarily inflated by the effects of the COVID-19

COMPLAINT - 54

1  pandemic; (2) as the pandemic began to subside, the Company's customers had less need for its

2  platform; (3) as a result, material portions of the existing customer base attempted to significantly

3  reduce their use of the Company's platform, or completely stop using the platform; (4) to avoid

4  this mass loss of retention, the Company began a series of manipulative and coercive auto-renewal

5  policies that required clients to give at least 60 days' notice prior to the end of a contract term for

6  non-renewal; (5) as a result, the Company's customer relations were irreparably harmed to the

7  detriment of future contract renewals; and (6) the Company lacked internal controls. As a result of

8  the foregoing, the Company's public statements were materially false and misleading at all

9  relevant times.

10                **The Truth Starts Emerging as False and Misleading Statements Continue**

11          *November 1, 2022 Earnings Call*

12      174.   On November 1, 2022, the truth began to emerge when ZoomInfo hosted an

13  earnings call with investors and analysts to discuss its financial results for the third quarter of the

14  2022 Fiscal Year (the "Q3 2022 Earnings Call"). On the Q3 2022 Earnings Call, Defendant Hyzer

15  announced that the Company had experienced increased "scrutiny" by its customers throughout

16  the contract renewal process, which had a negative impact on the Company's respective financial

17  results and caused the Company to "retrace" its NRR gains achieved in 2021.

18      175.   Defendant Hyzer also revealed that the Company's total RPOs and current RPOs

19  had both declined. In total, total RPOs fell from $985 million in the second quarter to $979 million

20  in the third, while current RPOs fell from $764 million in the second quarter to $757 million in the

21  third.

22      176.   Analysts responded negatively to these disclosures, with one analyst at Canaccord

23  Genuity stating that the Company's abrupt change in tone from the recent "bullish" commentary

24  had caught analysts "flat-footed."

25      177.   On this news, the price of the Company's common stock fell $12.69 per share, or

26  approximately 29%, from its closing price of $43.50 per share on November 1, 2022, to close at

27

28  COMPLAINT - 55

$30.81 per share on November 2, 2022. However, the Individual Defendants continued to obfuscate the truth about its customer retention issues.

178.    For example, on the Q3 2022 Earnings Call, Defendant Schuck downplayed the client issues mentioned by Defendant Hyzer, instead discussing how gross client retention had still "stayed largely the same" and any deals that slipped into the fourth quarter from the third quarter were "already closed."

179.    Defendant Hyzer parroted these sentiments, stating:

*What we are seeing is that gross retention continues to be really strong, over 90%. So we still have customers that are renewing, and we have seen an acceleration in terms of functionality upsells*. Where we're seeing more pressure is with respect to the seat expansions and data expansions that we had seen historically. That's the area where we feel our team isn't able to go after as much of the upsell opportunity given the incremental time that they're spending on renewals and deals in general.

180.    Defendant Hyzer continued, in relevant part, stating:

*Gross churn. So gross churn actually hung in very well despite the macroeconomic environment. So when people were using ZoomInfo, they're continuing to renew the gross churn rate or gross retention continues to be well over 90%. So I think that we feel really good about that*. The change in the NRR aspect has much more to do with those seat-based expansion opportunities that our team is spending more time getting those renewals just based on greater scrutiny that's being applied by our customers, and therefore, is getting less opportunities to go out and really push those upsells that we've seen historically.

181.    Defendant Schuck also claimed that during conversations with clients, the Company had been informed "over and over again" how clients were opting to invest with ZoomInfo as opposed to hiring additional sales personnel, stating:

What I will tell you is the largest new business deal and the largest expansion deal in our history, *those customers are coming to us and saying, listen, I'm going to forego the next 3 or 4 head count from a sales perspective. And I'm going to use those dollars to invest in ZoomInfo and make the entire additional team more productive, more efficient and more effective*.

We hear that over and over again. And so I think that thinking around how do I make the rest of my team more efficient? How do I make everybody more efficient is starting to materialize throughout our customer base and throughout our new business prospects. Where the historical view of how do I grow has been, I just need to add another head count, another 5 head count, another 10 head count.

COMPLAINT - 56

I think teams across the world are saying, how do I grow without adding head count? How do I make all of my team more efficient and more productive? And that's the message that we're trying to land with our customer base as well.

***November 1, 2022 Press Release***

182.    That same day, the Company issued a press release announcing its quarterly financial and operational results for the third quarter of the 2022 Fiscal Year (the "Q3 2022 Earnings Release"). The Q3 2022 Earnings Release revealed that the Company's quarterly revenues had increased year-over-year, from $198 million in the third quarter of the prior year up 46% to $288 million. In addition, the Q3 2022 Earnings Release announced that the Company's operating income also increased year-over-year, from $20 million in the third quarter of the prior year up 156% to $52 million.

183.    Regarding customer growth, the Q3 2022 Earnings Release announced that the Company ended the quarter with 1,623 customers who had ACVs of at least $100,000.

184.    Lastly, the Q3 2022 Earnings Release quoted Defendant Schuck in emphasizing the Company's record revenue, stating:

> As a best-in-class high-growth software company with strong profitability, ***our customers are looking to us for best practices on how to grow efficiently*** – we do that by leveraging ZoomInfo's data, insights, and automation. . . . We drive a quick and measurable ROI for customers and our innovative platform scales with them. ***As a result, we delivered another quarter of record revenue and profitability, as we are quickly becoming the go-to-market platform of choice for B2B companies looking to drive efficient growth***.

***November 1, 2022 Form 10-Q***

185.    On November 1, 2022, the Company filed its quarterly report for the third quarter of the 2022 Fiscal Year on Form 10-Q with the SEC (the "Q3 2022 10-Q"). The Q3 2022 10-Q was signed by Defendant Hyzer and attached SOX certifications signed by Defendants Schuck and Hyzer attesting to the accuracy of the Q3 2022 10-Q and that the "information included in this [Q3 2022 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

186.    The Q3 2022 10-Q reiterated the financial and operational results of the Q3 2022 Earnings Release. The Q3 2022 10-Q also revealed that the Company's quarterly RPO total was

COMPLAINT - 57

$979 million, and current RPO total was $757 million.

187.   The statements referenced in ¶¶178-186 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's financial results had been temporarily inflated by the effects of the COVID-19 pandemic; (2) as the pandemic began to subside, the Company's customers had less need for its platform; (3) as a result, material portions of the existing customer base attempted to significantly reduce their use of the Company's platform, or completely stop using the platform; (4) to avoid this mass loss of retention, the Company began a series of manipulative and coercive auto-renewal policies that required clients to give at least 60 days' notice prior to the end of a contract term for non-renewal; (5) as a result, the Company's customer relations were irreparably harmed to the detriment of future contract renewals; and (6) the Company lacked internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *November 16, 2022 RBC Capital Markets Conference*

188.   Just fifteen days later, on November 16, 2022, Defendant Hyzer participated in an investor conference hosted by RBC Capital Markets. At the conference, Defendant Hyzer revealed that, despite the assertions made two weeks prior, the customer scrutiny over the contract renewal process had in fact continued into the fourth quarter, and thus would negatively impact the Company's ability to grow its revenues for the upcoming 2023 Fiscal Year.

189.   On this news, the price of the Company's common stock fell $5.52 per share, or approximately 17% over two days, from its closing price of $31.69 per share on November 15, 2022, to close at $26.17 per share on November 17, 2022. However, the Individual Defendants continued to obfuscate the truth about its customer retention issues.

### *February 6, 2023 Press Release*

190.   On February 6, 2023, the Company issued a press release announcing the financial

COMPLAINT - 58

results for the fourth quarter and full year of the 2022 Fiscal Year (the "FY 2022 Earnings Release"). The FY 2022 Earnings Release announced that the Company's quarterly revenues had increased year-over-year, from $222 million for the fourth quarter the prior year up 36% to $302 million. The FY 2022 Earnings Release also announced that the Company's operating income increased year-over-year, from $24 million for the fourth quarter the prior year up 115% to $52 million.

191.    In regard to customers, the FY 2022 Earnings Release announced that the Company ended the quarter with 1,926 who had of at least ACVs of $100,000. The FY 2022 Earnings Release also announced that the Company had a NRR of 104%.

192.    The FY 2022 Earnings Release also quoted Defendant Schuck, who highlighted the Company's "leading" growth and profitability while claiming that ZoomInfo was "well-positioned" as a "durable grower."

***February 6, 2023 Earnings Call***

193.    That same day, the Company hosted an earnings call with investors and analysts to discuss the financial and operational results from the fourth quarter and full year of the 2022 Fiscal Year (the "FY 2022 Earnings Call"). On the FY 2022 Earnings Call, an analyst asked a question regarding the demand environment for the Company, to which Defendant Schuck replied:

> ***Look, there hasn't been any material change in buyer behavior that we're seeing out in the market as it relates to uncertainty or the macroeconomic environment. So we haven't seen any change in that***. What I'll tell you from a demand and pipeline generation perspective. January, we saw our largest pipeline we've ever generated. ***We're generating more MQLs than we've had in our history. When buyers are buying, they're buying decisively and at strong ASPs, and we're seeing less competition in our deals in Q4. And where we do see competition primarily in the SMB segment of our business, we're seeing the highest in-month win rate ever for a non end of the quarter month***. And so all of that tells me that while there is room for improvement from an execution perspective, it really is customers' uncertainty about the broader economic environment that's holding us back from delivering more top line growth. ***So as the uncertainty fades, I'm confident that we'll be in a great position to accelerate out. We haven't seen that stating yet***.

194.    Another analyst asked about the claims that the Company's recent issues were the result of macroeconomic trends. Defendant Schuck responded:

COMPLAINT - 59

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

I think the big thing that we know today is that, there is a real growth opportunity within our enterprise customer base. Today, we have 35,000 customers, and we're driving real growth across our enterprise customers. ***But when we look within the enterprise, we think we can significantly accelerate that***. And so bringing in a Chief Revenue Officer who has a ton of experience within the enterprise, this felt like the right time to do it. We see that segment as the biggest growth opportunity, and we wanted to bring somebody in who had significant experience in that land and expand motion and especially across the enterprise.

195.    In addition to responding to analyst questions, Defendant Schuck also discussed how the Company's pipeline was "the strongest it's ever been," stating:

> ***I would add that our pipeline in January was the strongest it's ever been. We generated more MQLs than we ever have in our history. So there's real demand out there in the market for our products***. But ultimately, what we're ending up seeing is customers are waiting. They're not making purchase decisions at the level – the velocity levels as they were a year ago. ***But there is real demand out there. We're generating it. We're generating that pipeline, and so we'll continue to do that and feel like as the uncertainty phase will be in a really great position to accelerate through that***.

196.    Defendant Hyzer later echoed these sentiments, stating that there was "more pipeline" than ever before, and the Company's win rates were "modestly starting to improve."

***February 16, 2023 Form 10-K***

197.    On February    16, 2023, the Company filed its annual report for the 2022 Fiscal Year on Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, Winn, and Hyzer and attached SOX certifications signed by Defendants Schuck and Hyzer attesting to the accuracy of the 2022 10-K and that the "information included in this [2022 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

198.    The 2022 10-K repeated the financial and operational results that were reported in the FY 2022 Earnings Release. The 2022 10-K also stated that the Company ended the fourth quarter with total RPOs of $1.1 billion and current RPOs of $842 million.

199.    The 2022 10-K also reported on the Company's accounts receivable, revealing there were $223 million by quarter end. The 2022 10-K held out that the Company "maintain[s] an allowance for credit losses based upon the expected collectability of accounts receivable" and

COMPLAINT - 60

that reported accounts receivable were the "net" of such allowance. The 2022 10-K continued that the Company's management had evaluated the adequacy of these allowances based on ""historical collection experience, changes in customer payment profiles, the aging of receivable balances, as well as current economic conditions," and, as of the end of 2022, the allowance established for expected credit losses was "immaterial."

### *2023 Proxy Statement*

200.    On March 29, 2023 the Company the 2023 Proxy Statement. The 2023 Proxy Statement was solicited by Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, and Winn pursuant to Section 14(a) of the Exchange Act and contained various materially false and misleading statements and omissions.

201.    The 2023 Proxy Statement called for shareholders to approve, *inter alia*: (1) the reelection of Defendants Crockett, McCarter, and Winn to the Board; (2) the ratification of KPMG LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; and (3) the compensation paid to the Company's named executive officers, on a nonbinding, advisory basis.

202.    Regarding "Oversight of Risk Management," the 2023 Proxy Statement stated the following, in relevant part:

> The Board has extensive involvement in the oversight of risk management related to us and our business. The Board accomplishes this oversight both directly and through its Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Privacy, Security and Technology Committee, each of which assists the Board in overseeing a part of our overall risk management and regularly reports to the Board. The Audit Committee represents the Board by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the oversight of administrative and financial controls, our compliance with legal and regulatory requirements and our policies with respect to risk assessment and risk management. Through its regular meetings with management, including the finance, legal and internal audit functions, the Audit Committee reviews and discusses significant areas of our business and related risks and summarizes for the Board areas of risk and any mitigating factors. The Compensation Committee considers, and discusses with management, management's assessment of certain risks, including whether any risks arising from our compensation policies and practices for our employees

COMPLAINT - 61

are reasonably likely to have a material adverse effect on us. The Nominating and Corporate Governance Committee oversees and evaluates programs and risks associated with Board organization, membership and structure, succession planning and corporate governance. In addition, our Board receives periodic detailed operating performance reviews from management. The Privacy, Security and Technology Committee, represents the Board by periodically reviewing and discussing with Company management the Company's major risk exposures relating to privacy, cybersecurity, and technology, and the steps the Company takes to detect, monitor, and actively manage such exposures.

203.    Regarding the Code of Conduct, the 2023 Proxy Statement stated the following:
We maintain a Code of Business Conduct and Ethics that is applicable to all of our directors, officers and employees, including our Chairman and Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and other senior officers. The Code of Business Conduct & Ethics sets forth our policies and expectations on a number of topics, including conflicts of interest, corporate opportunities, confidentiality, compliance with laws (including insider trading laws), use of our assets and business conduct and fair dealing. This Code of Business Conduct and Ethics also satisfies the requirements for a code of ethics, as defined by Item 406 of Regulation S-K promulgated by the SEC. The Code of Business Conduct and Ethics may be found on our website at *ir.zoominfo.com* under Governance: Governance Highlights: Governance Documents: Code of Business Conduct and Ethics.

We will disclose within four business days any substantive changes in or waivers of the Code of Business Conduct and Ethics granted to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, by posting such information on our website as set forth above rather than by filing a Form 8-K. In the case of a waiver for an executive officer or a director, the required disclosure also will be made available on our website within four business days of the date of such waiver.

204.    The 2023 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

205.    The 2023 Proxy Statement was also false and misleading because it failed to disclose that: (1) the Company's financial results had been temporarily inflated by the effects of

COMPLAINT - 62

1   the COVID-19 pandemic; (2) as the pandemic began to subside, the Company's customers had

2   less need for its platform; (3) as a result, material portions of the existing customer base attempted

3   to significantly reduce their use of the Company's platform, or completely stop using the platform;

4   (4) to avoid this mass loss of retention, the Company began a series of manipulative and coercive

5   auto-renewal policies that required clients to give at least 60 days' notice prior to the end of a

6   contract term for non-renewal; (5) as a result, the Company's customer relations were irreparably

7   harmed to the detriment of future contract renewals; and (6) the Company lacked internal controls.

8   As a result of the foregoing, the Company's public statements were materially false and misleading

9   at all relevant times.

10      206.   As a result of Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson,

11  Mader, McCarter, and Winn causing the 2023 Proxy Statement to be false and misleading,

12  Company shareholders voted, *inter alia*, to: (1) reelect Defendants Crockett, McCarter, and Winn

13  to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company;

14  (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting

15  firm for the 2023 Fiscal Year; and (3) approve executive officer compensation on an advisory,

16  non-binding basis.

17          ***May 1, 2023 Press Release***

18      207.   On May 1, 2023, the Company issued a press release announcing the quarterly

19  financial and operational results for the first quarter of the 2023 Fiscal Year (the "Q1 2023

20  Earnings Release"). The Q1 2023 Earnings Release revealed that the Company's quarterly

21  revenues had increased year-over-year, from $242 million in the first quarter of the prior year up

22  24% to $301 million. In addition, the Q1 2023 Earnings Release announced that the Company's

23  operating income had also increased year-over-year, from $32 million in the first quarter of the

24  prior year up 105% to $66 million.

25      208.   Regarding customer growth, the Q1 2023 Earnings Release announced that the

26  Company ended the quarter with 1,905 customers who had ACVs of at least $100,000.

27

28  COMPLAINT - 63

1

*May 1, 2023 Earnings Call*

2      209.    That same day, the Company hosted an earnings call with analysts and investors to

3   discuss the Company's financial and operational results for the first quarter of 2023 (the "Q1 2023

4   Earnings Call"). On the Q1 2023 Earnings call, an analyst asked a question regarding sales trends.

5   In response, Defendant Hyzer replied:

6           So in terms of linearity, specifically April was better than January. Typically, we
            do have some level of linearity within the month. So the first month is oftentimes a
7           little less than the second month, which has been less than the third month. ***But we
            do feel that momentum and on an adjusted basis, comparing it to January gives***
8           ***us good confidence in where Q2 is going. And certainly from a – and that's actual***
            ***sales, closed sales. From a pipeline perspective, I think we're seeing a similar***
9           ***dynamic of improvement in Q2***.

10     210.    These sentiments were further echoed by Defendant Schuck, who said that April

11  was "off to a much better start" than January had started, and there was "a lot of demand" for the

12  Company's products.

13     211.    Later, an analyst asked about the Company's ability to meet its revenue guidance

14  for the year, which would require accelerated revenue growth in the second quarter. Defendant

15  Hyzer responded that he had "very good visibility into Q2" and "good confidence" that the

16  Company would be able to accelerate revenues accordingly.

17      *May 1, 2023 Form 10-Q*

18     212.    On May 1, 2023, the Company filed its quarterly report for the first quarter of the

19  2023 Fiscal Year on Form 10-Q with the SEC (the "Q1 2023 10-Q"). The Q1 2023 10-Q was

20  signed by Defendant Hyzer and attached SOX certifications signed by Defendants Schuck and

21  Hyzer attesting to the accuracy of the Q1 2023 10-Q and that the "information included in this [Q1

22  2023 10-Q], fairly present in all material respects the financial condition, results of operations and

23  cash flows of the [Company]."

24     213.    The Q1 2023 10-Q reiterated the financial and operational results of the Q1 2023

25  Earnings Release. The Q1 2023 10-Q also revealed that the Company's quarterly RPO total was

26  $1.1 billion, and current RPO total was $839 million.

27

28  COMPLAINT - 64

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

214.    Regarding accounts receivable, the Q1 2023 10-Q revealed the Company finished the quarter with $215.5 million, and that the Company "maintain[s] an allowance for credit losses based upon the expected collectability of accounts receivable" and that reported accounts receivable were the "net" of such allowance. The Q1 2023 10-Q continued that the Company's management had evaluated the adequacy of these allowances based on ""historical collection experience, changes in customer payment profiles, the aging of receivable balances, as well as current economic conditions," and, as of the end of the first quarter, the allowance established for expected credit losses was "immaterial."

215.    The statements referenced in ¶¶188-199, 207-214 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's financial results had been temporarily inflated by the effects of the COVID-19 pandemic; (2) as the pandemic began to subside, the Company's customers had less need for its platform; (3) as a result, material portions of the existing customer base attempted to significantly reduce their use of the Company's platform, or completely stop using the platform; (4) to avoid this mass loss of retention, the Company began a series of manipulative and coercive auto-renewal policies that required clients to give at least 60 days' notice prior to the end of a contract term for non-renewal; (5) as a result, the Company's customer relations were irreparably harmed to the detriment of future contract renewals; and (6) the Company lacked internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

*July 31, 2023 Press Release*

216.    On July 31, 2023, the Company issued a press release announcing its financial and operational results for the second quarter of the 2023 Fiscal Year (the "Q2 2023 Earnings Release"). The Q2 2023 Earnings Release announced that the Company's clients who had ACVs of at least $100,000 had declined, from 1,905 in the first quarter down to 1,893 in the second

COMPLAINT - 65

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

quarter.

217.   On the earnings call held to discuss these results later that day (the "Q2 2023 Earnings Call"), Defendant Hyzer also revealed that customer cancellations during the second quarter increased "modestly" and that customers who weren't cancelling were renewing for less than the market was conditioned to expect. Defendant Hyzer further revealed that, of customers who had already reduced the size of their contracts during the prior renewal period, many were now renewing their contracts for even less. This resulted in the Company's annual guidance being decreased by $50 million, from an initial range of $1.275 billion to $1.285 billion down to a range of $1.225 billion to $1.235 billion.

218.   On this news, the price of the Company's common stock fell $7.17 per share, or approximately 28% over two days, from its closing price of $25.57 per share on July 31, 2023, to close at $18.40 per share on August 2, 2023. However, the Individual Defendants continued to obfuscate the truth about its customer retention issues.

219.   For example, the Q2 2023 Earnings Release revealed that the Company's quarterly revenues still increased year-over-year in the second quarter, from $267 million in the second quarter the year prior up 16% to $309 million. Similarly, the Company's operating income increased year-over-year as well, from $40 million in the second quarter the prior year up 51% to $60 million.

*July 31, 2023 Earnings Call*

220.   That same day, the Company hosted the Q2 2023 Earnings Call with investors and analysts to discuss the second quarter results. On the Q2 2023 Earnings Call, Defendant Schuck discussed the Company's working with clients who were downsizing their packages to "keep the contract," stating:

> **[O]ne of the things that we're doing internally operationally is giving our – working with those customers as they downsize, so that they stay with us, and we have an opportunity to grow with them in the future.** We have another customer example that had literally 600 salespeople in 2021, has 20 today. And that's a contract that was in our 100,000 cohort and is now a $30,000 a year contract, but our mentality around that is let's work with this customer, let's keep the contract.

COMPLAINT - 66

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

We're both on the same page about growing back up with them in the future. ***And so from a gross retention perspective, we're doing everything we can to hold on to those customers, so that they turn the corner and start thinking about growth again that we're a trusted partner on that journey***.

***July 31, 2023 Form 10-Q***

221.    On July 31, 2023, the Company filed its quarterly report for the second quarter of the 2023 Fiscal Year on Form 10-Q with the SEC (the "Q2 2023 10-Q"). The Q2 2023 10-Q was signed by Defendant Hyzer and attached SOX certifications signed by Defendants Schuck and Hyzer attesting to the accuracy of the Q2 2023 10-Q and that the "information included in this [Q2 2023 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

222.    The Q2 2023 10-Q reiterated the financial and operational results of the Q2 2023 Earnings Release. The Q2 2023 10-Q also revealed that the Company's quarterly RPO total was $1.1 billion, and current RPO total was $849 million.

223.    Regarding accounts receivable, the Q2 2023 10-Q revealed the Company finished the quarter with $207 million, and that the Company "maintain[s] an allowance for credit losses based upon the expected collectability of accounts receivable" and that reported accounts receivable were the "net" of such allowance. The Q2 2023 10-Q continued that the Company's management had evaluated the adequacy of these allowances based on ""historical collection experience, changes in customer payment profiles, the aging of receivable balances, as well as current economic conditions," and, as of the end of the second quarter, the allowance established for expected credit losses was "immaterial."

***October 30, 2023 Press Release***

224.    On October 30, 2023, the Company issued a press release announcing the quarterly financial and operational results for the third quarter of the 2023 Fiscal Year (the "Q3 2023 Earnings Release"). The Q3 2023 Earnings Release revealed that the Company's quarterly revenues had increased year-over-year, from $288 million in the third quarter of the prior year up 9% to $314 million. In addition, the Q3 2023 Earnings Release announced that the Company's

COMPLAINT - 67

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

operating income had also increased year-over-year, from $52 million in the third quarter of the prior year up 22% to $63 million.

225.    Regarding customer growth, the Q3 2023 Earnings Release announced that the Company ended the quarter with 1,869 customers who had ACVs of at least $100,000.

**October 30, 2023 Earnings Call**

226.    That same day, the Company hosted an earnings call with analysts and investors to discuss the financial and operational results of the third quarter (the "Q3 2023 Earnings Call"). On the Q3 2023 Earnings Call, Defendant Hyzer announced that the Company was experiencing success in securing new business, stating:

> The assumptions really are very focused on renewals. ***New business continues to be relatively strong***. Obviously, the environment impacts that as well, but the sales efficiency of our new business team and the demand that we see continue to be good out there and we continue to bring on new customers to support that. So we're really focused much more on mitigating and getting through this renewal cycle that we're in right now.

**October 30, 2023 Form 10-Q**

227.    On October 30, 2023, the Company filed its quarterly report for the third quarter of the 2023 Fiscal Year on Form 10-Q with the SEC (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed by Defendant Hyzer and attached SOX certifications signed by Defendants Schuck and Hyzer attesting to the accuracy of the Q3 2023 10-Q and that the "information included in this [Q3 2023 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

228.    The Q3 2023 10-Q reiterated the financial and operational results of the Q3 2023 Earnings Release. The Q3 2023 10-Q also revealed that the Company's quarterly RPO total was $1.05 billion, and current RPO total was $795 million.

229.    Regarding accounts receivable, the Q3 2023 10-Q revealed the Company finished the quarter with $219 million, and that the Company "maintain[s] an allowance for credit losses based upon the expected collectability of accounts receivable" and that reported accounts receivable were the "net" of such allowance. The Q3 2023 10-Q continued that the Company's

COMPLAINT - 68

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

management had evaluated the adequacy of these allowances based on ""historical collection experience, changes in customer payment profiles, the aging of receivable balances, as well as current economic conditions," and, as of the end of the third quarter, the allowance established for expected credit losses was "not significant."

### *February 12, 2024 Press Release*

230.    On February 12, 2024, the Company issued a press release announcing the financial results for the fourth quarter and full year of the 2023 Fiscal Year (the "FY 2023 Earnings Release"). The FY 2023 Earnings Release announced that the Company's quarterly revenues had increased year-over-year, from $302 million for the fourth quarter the prior year up 5% to $316 million. The FY 2023 Earnings Release also announced that the Company's operating income increased year-over-year, from $52 million for the fourth quarter the prior year up 35% to $70.5 million.

231.    In regard to customers, the FY 2023 Earnings Release announced that the Company ended the quarter with 1,820 who had of at least ACVs of $100,000. The FY 2023 Earnings Release also announced that the Company had a NRR of 87%.

### *February 12, 2024 Earnings Call*

232.    That same day, the Company hosted an earnings call with investors and analysts to discuss the fourth quarter and year-end financial and operational results (the "FY 2023 Earnings Call"). On the FY 2023 Earnings Call, Defendant Schuck discussed the Company's success with new customers, stating:

> However, ***our demand and sales velocity for new business was our best ever. We closed the most new logos on record in Q4. Our in-month create and closed win rate for December was the highest we've ever had in a single month, and our median sales cycle shortened significantly year-over-year***.

233.    Continuing on, Defendant Schuck discussed how this would impact the Company's ability to forecast demand, stating:

> ***Throughout the year, relative to the customer base, new business demand and close stayed strong, we saw that continue throughout the year. And then at the end of the year, we brought on the most new logos we've had in a quarter. We had great metrics around the new sales motion. And then we had many customers***

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

*who had left to come back to us as well.*

*So we feel pretty good about our ability to forecast demand on the new business side and see it continuing strength throughout 2024.*

234.    For his scripted remarks, Defendant Hyzer discussed the "fairly stable" levels of churn among small business clients, stating:

So *our churn levels have actually remained fairly stable*. And '23, they are a little down from what we saw in '22, but not meaningfully so. Obviously, that part of the equation is largely driven by the lower end of the market. And so while we do see pressure on SMBs, particularly around write-offs and some downsells in kind of price requirements, *we don't see a meaningful increase in the churn that we're seeing.*

*February 15, 2024 Form 10-K*

235.    On February   15, 2024, the Company filed its annual report for the 2023 Fiscal Year on Form 10-K with the SEC (the "2023 10-K"). The 2023 10-K was signed by Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, Winn, and Hyzer and attached SOX certifications signed by Defendants Schuck and Hyzer attesting to the accuracy of the 2023 10-K and that the "information included in this [2023 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

236.    The 2023 10-K repeated the financial and operational results that were reported in the FY 2023 Earnings Release. The 2023 10-K also stated that the Company ended the fourth quarter with total RPOs of $1.15 billion and current RPOs of $856 million.

237.    The 2023 10-K also reported on the Company's accounts receivable, revealing there were $272 million by quarter end. The 2023 10-K held out that the Company "maintain[s] an allowance for credit losses based upon the expected collectability of accounts receivable" and that reported accounts receivable were the "net" of such allowance. The 2023 10-K continued that the Company's management had evaluated the adequacy of these allowances based on ""historical collection experience, changes in customer payment profiles, the aging of receivable balances, as well as current economic conditions," and, as of the end of 2023, the allowance established for expected credit losses was "not significant."

238.    The statements referenced in ¶¶219-237 were materially false and misleading and

COMPLAINT - 70

failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's financial results had been temporarily inflated by the effects of the COVID-19 pandemic; (2) as the pandemic began to subside, the Company's customers had less need for its platform; (3) as a result, material portions of the existing customer base attempted to significantly reduce their use of the Company's platform, or completely stop using the platform; (4) to avoid this mass loss of retention, the Company began a series of manipulative and coercive auto-renewal policies that required clients to give at least 60 days' notice prior to the end of a contract term for non-renewal; (5) as a result, the Company's customer relations were irreparably harmed to the detriment of future contract renewals; and (6) the Company lacked internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *2024 Proxy Statement*

239.    On March 29, 2024 the Company the 2024 Proxy Statement. The 2024 Proxy Statement was solicited by Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, and Winn pursuant to Section 14(a) of the Exchange Act and contained various materially false and misleading statements and omissions.

240.    The 2024 Proxy Statement called for shareholders to approve, *inter alia*: (1) the reelection of Defendants Schuck and Enright to the Board; (2) the ratification of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) the compensation paid to the Company's named executive officers, on a nonbinding, advisory basis.

241.    Regarding "Oversight of Risk Management," the 2024 Proxy Statement stated the following, in relevant part:

> The Board has extensive involvement in the oversight of risk management related to us and our business. The Board accomplishes this oversight both directly and through its Audit Committee, Compensation Committee, Nominating and

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

Corporate Governance Committee, and Privacy, Security and Technology Committee, each of which assists the Board in overseeing a part of our overall risk management and regularly reports to the Board. The Audit Committee represents the Board by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the oversight of administrative and financial controls, our compliance with legal and regulatory requirements and our policies with respect to risk assessment and risk management. Through its regular meetings with management, including the finance, legal and internal audit functions, the Audit Committee reviews and discusses significant areas of our business and related risks and summarizes for the Board areas of risk and any mitigating factors. The Compensation Committee considers, and discusses with management, management's assessment of certain risks, including whether any risks arising from our compensation policies and practices for our employees are reasonably likely to have a material adverse effect on us. The Nominating and Corporate Governance Committee oversees and evaluates programs and risks associated with Board organization, membership and structure, succession planning and corporate governance. In addition, our Board receives periodic detailed operating performance reviews from management. The Privacy, Security and Technology Committee, represents the Board by periodically reviewing and discussing with Company management the Company's major risk exposures relating to privacy, cybersecurity, and technology, and the steps the Company takes to detect, monitor, and actively manage such exposures.

242.    Regarding the Code of Conduct, the 2024 Proxy Statement stated the following: We maintain a Code of Business Conduct and Ethics that is applicable to all of our directors, officers and employees, including our Chairman and Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and other senior officers. The Code of Business Conduct & Ethics sets forth our policies and expectations on a number of topics, including conflicts of interest, corporate opportunities, confidentiality, compliance with laws (including insider trading laws), use of our assets and business conduct and fair dealing. This Code of Business Conduct and Ethics also satisfies the requirements for a code of ethics, as defined by Item 406 of Regulation S-K promulgated by the SEC. The Code of Business Conduct and Ethics may be found on our website at *ir.zoominfo.com* under Governance: Governance Highlights: Governance Documents: Code of Business Conduct and Ethics.

We will disclose within four business days any substantive changes in or waivers of the Code of Business Conduct and Ethics granted to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, by posting such information on our website as set forth above rather than by filing a Form 8-K. In the case of a waiver for an executive officer or a director, the required disclosure also will be made available on our website within four business days of the date of such waiver.

243.    The 2024 Proxy Statement was also materially false and misleading because,

despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

244.    The 2024 Proxy Statement was also false and misleading because it failed to disclose that: (1) the Company's financial results had been temporarily inflated by the effects of the COVID-19 pandemic; (2) as the pandemic began to subside, the Company's customers had less need for its platform; (3) as a result, material portions of the existing customer base attempted to significantly reduce their use of the Company's platform, or completely stop using the platform; (4) to avoid this mass loss of retention, the Company began a series of manipulative and coercive auto-renewal policies that required clients to give at least 60 days' notice prior to the end of a contract term for non-renewal; (5) as a result, the Company's customer relations were irreparably harmed to the detriment of future contract renewals; and (6) the Company lacked internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

245.    As a result of Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, and Winn causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Schuck and Enright to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve executive officer compensation on an advisory, non-binding basis.

***May 7, 2024 Earnings Call***

246.    On May 7, 2024, the Company hosted an earnings call with investors and analysts

COMPLAINT - 73

to discuss the financial and operational results of the first quarter of the 2024 Fiscal Year (the "Q1 2024 Earnings Call"). On the Q1 2024 Earnings Call, Defendant Hyzer admitted that the Company had a large amount of small business customers who showed signs of "weakness" during the renewal process, which caused the Company's NRR to decline from 87% the previous quarter to 85%. Defendant Hyzer also announced that the amount of new business received by small business customers had also declined as ZoomInfo began to be "more selective" on deals made within that group. This caused the Company to reduce its annual revenue guidance from an initial range of $1.26 billion to $1.28 billion to a range of $1.255 billion to $1.27 billion.

247.    On this news, the price of the Company's common stock fell $3.88 per share, or approximately 24%, from its closing price of $16.02 per share on May 7, 2024, to close at $12.14 per share on May 8, 2024. However, the Individual Defendants continued to obfuscate the truth about its customer retention issues.

248.    For example, on the Q1 2024 Earnings Call, Defendant Schuck discussed how the Company was experiencing "stabilization trends," stating:

> Software retention also stayed flat sequentially for the first time since Q1 of '22. ***These stabilization trends have continued into Q2 and are promising signs that suggest we have reached a bottom, which we view as a precursor to a potential inflection to growth***. We also had a number – we also had another quarter of strong win-back performance. Customers continue to come back in record numbers after trying low-cost, low-quality providers. In Q1, we again saw hundreds of customers come back to ZoomInfo, maintaining the record levels from Q4 and Q3 2023.

***May 7, 2024 Press Release***

249.    That same day, the Company issued a press release announcing its financial and operational results for the first quarter of the 2024 Fiscal Year (the "Q1 2024 Earnings Release"). The Q1 2024 Earnings Release announced the Company's quarterly revenues increased year-over-year, from $301 million in the prior year's first quarter up 3% to $310 million. Additionally, the Company's operating income for the first quarter was $43 million.

250.    Regarding customers, the Company announced that it ended the first quarter with 1,760 customers who had ACVs of at least $100,000.

COMPLAINT - 74

1    *May 7, 2024 Form 10-Q*

2    251.    On May 7, 2024, the Company filed its quarterly report for the first quarter of the

3    2024 Fiscal Year on Form 10-Q with the SEC (the "Q1 2024 10-Q"). The Q1 2024 10-Q was

4    signed by Defendant Hyzer and attached SOX certifications signed by Defendants Schuck and

5    Hyzer attesting to the accuracy of the Q1 2024 10-Q and that the "information included in this [Q1

6    2024 10-Q], fairly present in all material respects the financial condition, results of operations and

7    cash flows of the [Company]."

8    252.    The Q1 2024 10-Q reiterated the financial and operational results of the Q1 2024

9    Earnings Release. The Q1 2024 10-Q also revealed that the Company's quarterly RPO total was

10    $1.13 billion, and current RPO total was $838 million.

11    253.    Regarding accounts receivable, the Q1 2024 10-Q revealed the Company finished

12    the quarter with $223.5 million, and that the Company "maintain[s] an allowance for credit losses

13    based upon the expected collectability of accounts receivable" and that reported accounts

14    receivable were the "net" of such allowance. The Q1 2024 10-Q continued that the Company's

15    management had evaluated the adequacy of these allowances based on ""historical collection

16    experience, changes in customer payment profiles, the aging of receivable balances, as well as

17    current economic conditions," and, as of the end of the first quarter, the allowance established for

18    expected credit losses was "not significant."

19    254.    The statements referenced in ¶¶248-254 were materially false and misleading and

20    failed to disclose material facts necessary to make the statements made not false and misleading.

21    Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's

22    financial results had been temporarily inflated by the effects of the COVID-19 pandemic; (2) as

23    the pandemic began to subside, the Company's customers had less need for its platform; (3) as a

24    result, material portions of the existing customer base attempted to significantly reduce their use

25    of the Company's platform, or completely stop using the platform; (4) to avoid this mass loss of

26    retention, the Company began a series of manipulative and coercive auto-renewal policies that

27

28    COMPLAINT - 75

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

required clients to give at least 60 days' notice prior to the end of a contract term for non-renewal; (5) as a result, the Company's customer relations were irreparably harmed to the detriment of future contract renewals; and (6) the Company lacked internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Fully Emerges

***August 5, 2024 Press Release***

255.    The truth fully emerged on August 5, 2024, when the Company issued the Q2 2024 Earnings Release, announcing the Company's financial results for the second quarter of the 2024 Fiscal Year.

256.    The Q2 2024 Earnings Release revealed that the Company was suffering from a $33 million charge as the result of clients being unable to make payments. As a result, the Q2 2024 Earnings Release announced the Company would be implementing a "new business risk model" to reduce its write-offs. This new risk model would amend the Company's operational procedures to now require payment up-front from clients who are small businesses.

257.    The Q2 2024 Earnings Release also revealed another reduction to the Company's annual guidance, from a range of $1.255 billion to $1.27 billion down *$65 million at the midpoint* to a range of $1.19 billion to $1.205 billion.

***August 5, 2024 Earnings Call***

258.    That same day, the Company hosted an earnings call with analysts and investors to discuss the second quarter's financial and operational results (the "Q2 2024 Earnings Call"). On the Q2 2024 Earnings Call, Defendant Hyzer revealed that the $33 million charge was related to revenues that had originally been recognized in the 2023 Fiscal Year. As such, this cast doubt on tens of millions of dollars in revenue and the legitimacy of the thousands of Company clients.

259.    On this news, the price of the Company's common stock fell $1.79 per share, or approximately 18%, from its closing price of $9.80 per share on August 5, 2024, to close at $8.01

COMPLAINT - 76

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

per share on August 6, 2024.

## SUBSEQUENT DEVELOPMENT

260.    The day after the Q2 2024 Earnings Release and Earnings Call, the Company announced in a press release that Defendant Hyzer was resigning from the Company.

## REPURCHASES DURING THE RELEVANT PERIOD

261.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $729.4 million to repurchase approximately 45 million shares of its own common stock at artificially inflated prices from December 2020 through July 2024.

262.    According to the 2020 10-K, between December 1, 2020 and December 31, 2020 the Company repurchased 20,617 shares of its own common stock at an average price per share of approximately $46.06, for a total cost to the Company of approximately $949,619.

263.    As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $784,477 for repurchases of its own stock between December 1, 2020 and December 31, 2020.

264.    According to the Q3 2021 10-Q, between September 1, 2021 and September 30, 2021, the Company repurchased 20,636 shares of its own common stock at an average price per share of approximately $65.19, for a total cost to the Company of approximately $1.3 million.

265.    As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $1.2 million for repurchases of its own stock between September 1, 2021 and September 30, 2021.

266.    According to the 2021 10-K, between November 1, 2021 and November 30, 2021, the Company repurchased 6,023 shares of its own common stock at an average price per share of approximately $69.71, for a total cost to the Company of approximately $419,863.

267.    As the Company's stock was actually worth only $8.01, the price at closing on

COMPLAINT - 77

August 6, 2024, the Company overpaid by approximately $371,619 for repurchases of its own stock between November 1, 2021 and November 30, 2021.

268. According to the 2021 10-K, between December 1, 2021 and December 31, 2021, the Company repurchased 7,522 shares of its own common stock at an average price per share of approximately $61.70, for a total cost to the Company of approximately $464,107.

269. As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $403,856 for repurchases of its own stock between December 1, 2021 and December 31, 2021.

270. According to the Q1 2022 10-Q, between February 1, 2022 and February 28, 2022, the Company repurchased 18,935 shares of its own common stock at an average price per share of approximately $56.22, for a total cost to the Company of approximately $1.1 million.

271. As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $912,856 for repurchases of its own stock between February 1, 2022 and February 28, 2022.

272. According to the Q1 2022 10-Q, between March 1, 2022 and March 31, 2022, the Company repurchased 8,292 shares of its own common stock at an average price per share of approximately $54.69, for a total cost to the Company of approximately $453,489.

273. As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $387,071 for repurchases of its own stock between March 1, 2022 and March 31, 2022.

274. According to the Q2 2022 10-Q, between May 1, 2022 and May 31, 2022, the Company repurchased 6,395 shares of its own common stock at an average price per share of approximately $51.99, for a total cost to the Company of approximately $332,476.

275. As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $281,252 for repurchases of its own stock between May 1, 2022 and May 31, 2022.

COMPLAINT - 78

276. According to the Q2 2022 10-Q, between June 1, 2022 and June 30, 2022, the Company repurchased 6,121 shares of its own common stock at an average price per share of approximately $40.39, for a total cost to the Company of approximately $247,227.

277. As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $198,198 for repurchases of its own stock between June 1, 2022 and June 30, 2022.

278. According to the Q3 2022 10-Q, between August 1, 2022 and August 31, 2022, the Company repurchased 6,333 shares of its own common stock at an average price per share of approximately $41.97, for a total cost to the Company of approximately $265,796.

279. As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $215,069 for repurchases of its own stock between August 1, 2022 and August 31, 2022.

280. According to the Q3 2022 10-Q, between September 1, 2022 and September 30, 2022, the Company repurchased 8,332 shares of its own common stock at an average price per share of approximately $45.42, for a total cost to the Company of approximately $378,439.

281. As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $311,700 for repurchases of its own stock between September 1, 2022 and September 30, 2022.

282. According to the 2022 10-K, between November 1, 2022 and November 30, 2022, the Company repurchased 6,186 shares of its own common stock at an average price per share of approximately $30.81, for a total cost to the Company of approximately $190,591.

283. As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $141,041 for repurchases of its own stock between November 1, 2022 and November 30, 2022.

284. According to the 2022 10-K, between December 1, 2022 and December 31, 2022, the Company repurchased 8,164 shares of its own common stock at an average price per share of

COMPLAINT - 79

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1  approximately $28.60, for a total cost to the Company of approximately $233,490.

2  285.    As the Company's stock was actually worth only $8.01, the price at closing on

3  August 6, 2024, the Company overpaid by approximately $168,097 for repurchases of its own

4  stock between December 1, 2022 and December 31, 2022.

5  286.    According to the Q1 2023 10-Q, between February 1, 2023 and February 28, 2023,

6  the Company repurchased 9,133 shares of its own common stock at an average price per share of

7  approximately $30.24, for a total cost to the Company of approximately $276,182.

8  287.    As the Company's stock was actually worth only $8.01, the price at closing on

9  August 6, 2024, the Company overpaid by approximately $203,027 for repurchases of its own

10  stock between February 1, 2023 and February 28, 2023.

11  288.    According to the Q1 2023 10-Q, between March 1, 2023 and March 31, 2023, the

12  Company repurchased 1,067,234 shares of its own common stock at an average price per share of

13  approximately $23.00, for a total cost to the Company of approximately $24.5 million.

14  289.    As the Company's stock was actually worth only $8.01, the price at closing on

15  August 6, 2024, the Company overpaid by approximately $16 million for repurchases of its own

16  stock between March 1, 2023 and March 31, 2023.

17  290.    According to the Q2 2023 10-Q, between April 1, 2023 and April 30, 2023, the

18  Company repurchased 1,477,121 shares of its own common stock at an average price per share of

19  approximately $22.56, for a total cost to the Company of approximately $32.6 million.

20  291.    As the Company's stock was actually worth only $8.01, the price at closing on

21  August 6, 2024, the Company overpaid by approximately $21.1 million for repurchases of its own

22  stock between April 1, 2023 and April 30, 2023.

23  292.    According to the Q2 2023 10-Q, between May 1, 2023 and May 31, 2023, the

24  Company repurchased 1,404,890 shares of its own common stock at an average price per share of

25  approximately $21.41, for a total cost to the Company of approximately $30.1 million.

26  293.    As the Company's stock was actually worth only $8.01, the price at closing on

27

28  COMPLAINT - 80

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1  August 6, 2024, the Company overpaid by approximately $18.8 million for repurchases of its own

2  stock between May 1, 2023 and May 31, 2023.

3      294.    According to the Q2 2023 10-Q, between June 1, 2023 and June 30, 2023, the

4  Company repurchased 6,166 shares of its own common stock at an average price per share of

5  approximately $24.73, for a total cost to the Company of approximately $152,485.

6      295.    As the Company's stock was actually worth only $8.01, the price at closing on

7  August 6, 2024, the Company overpaid by approximately $103,096 for repurchases of its own

8  stock between June 1, 2023 and June 30, 2023.

9      296.    According to the Q3 2023 10-Q, between August 1, 2023 and August 31, 2023, the

10  Company repurchased 8,408,022 shares of its own common stock at an average price per share of

11  approximately $18.18, for a total cost to the Company of approximately $152.9 million.

12      297.    As the Company's stock was actually worth only $8.01, the price at closing on

13  August 6, 2024, the Company overpaid by approximately $85.5 million for repurchases of its own

14  stock between August 1, 2023 and August 31, 2023.

15      298.    According to the Q3 2023 10-Q, between September 1, 2023 and September 30,

16  2023, the Company repurchased 407,152 shares of its own common stock at an average price per

17  share of approximately $18.42, for a total cost to the Company of approximately $7.5 million.

18      299.    As the Company's stock was actually worth only $8.01, the price at closing on

19  August 6, 2024, the Company overpaid by approximately $4.2 million for repurchases of its own

20  stock between September 1, 2023 and September 30, 2023.

21      300.    According to the 2023 10-K, between October 1, 2023 and October 31, 2023, the

22  Company repurchased 5,902,722 shares of its own common stock at an average price per share of

23  approximately $16.61, for a total cost to the Company of approximately $98 million.

24      301.    As the Company's stock was actually worth only $8.01, the price at closing on

25  August 6, 2024, the Company overpaid by approximately $50.8 million for repurchases of its own

26  stock between October 1, 2023 and October 31, 2023.

27

28  COMPLAINT - 81

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

302.   According to the 2023 10-K, between November 1, 2023 and November 30, 2023, the Company repurchased 3,325,528 shares of its own common stock at an average price per share of approximately $13.37, for a total cost to the Company of approximately $44.5 million.

303.   As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $17.8 million for repurchases of its own stock between November 1, 2023 and November 30, 2023.

304.   According to the 2023 10-K, between December 1, 2023 and December 31, 2023, the Company repurchased 704,434 shares of its own common stock at an average price per share of approximately $15.30, for a total cost to the Company of approximately $10.8 million.

305.   As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $5.1 million for repurchases of its own stock between December 1, 2023 and December 31, 2023.

306.   According to the Q1 2024 10-Q, between January 1, 2024 and January 31, 2024, the Company repurchased 5,330,167 shares of its own common stock at an average price per share of approximately $16.13, for a total cost to the Company of approximately $86 million.

307.   As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $43.3 million for repurchases of its own stock between January 1, 2024 and January 31, 2024.

308.   According to the Q1 2024 10-Q, between February 1, 2024 and February 28, 2024, the Company repurchased 2,399,072 shares of its own common stock at an average price per share of approximately $15.45, for a total cost to the Company of approximately $37.1 million.

309.   As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $17.8 million for repurchases of its own stock between February 1, 2024 and February 28, 2024.

310.   According to the Q1 2024 10-Q, between March 1, 2024 and March 31, 2024, the Company repurchased 1,906,662 shares of its own common stock at an average price per share of

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1    approximately $15.86, for a total cost to the Company of approximately $30.2 million.

2    311.    As the Company's stock was actually worth only $8.01, the price at closing on

3    August 6, 2024, the Company overpaid by approximately $15 million for repurchases of its own

4    stock between March 1, 2024 and March 31, 2024.

5    312.    According to the Q2 2024 10-Q, between April 1, 2024 and April 30, 2024, the

6    Company repurchased 2,952,427 shares of its own common stock at an average price per share of

7    approximately $15.80, for a total cost to the Company of approximately $46.6 million.

8    313.    As the Company's stock was actually worth only $8.01, the price at closing on

9    August 6, 2024, the Company overpaid by approximately $23 million for repurchases of its own

10    stock between April 1, 2024 and April 30, 2024.

11    314.    According to the Q2 2024 10-Q, between May 1, 2024 and May 31, 2024, the

12    Company repurchased 4,705,212 shares of its own common stock at an average price per share of

13    approximately $13.22, for a total cost to the Company of approximately $62.2 million.

14    315.    As the Company's stock was actually worth only $8.01, the price at closing on

15    August 6, 2024, the Company overpaid by approximately $24.5 million for repurchases of its own

16    stock between May 1, 2024 and May 31, 2024.

17    316.    According to the Q2 2024 10-Q, between June 1, 2024 and June 30, 2024, the

18    Company repurchased 3,155,285 shares of its own common stock at an average price per share of

19    approximately $12.27, for a total cost to the Company of approximately $38.7 million.

20    317.    As the Company's stock was actually worth only $8.01, the price at closing on

21    August 6, 2024, the Company overpaid by approximately $13.4 million for repurchases of its own

22    stock between June 1, 2024 and June 30, 2024.

23    318.    According to the quarterly report on Form 10-Q the Company filed with the SEC

24    on November 12, 2024, between July 1, 2024 and July 31, 2024, the Company repurchased

25    1,750,537 shares of its own common stock at an average price per share of approximately $11.93,

26    for a total cost to the Company of approximately $20.9 million.

27

28    COMPLAINT - 83

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

319.    As the Company's stock was actually worth only $8.01, the price at closing on August 6, 2024, the Company overpaid by approximately $6.9 million for repurchases of its own stock between July 1, 2024 and July 31, 2024.

320.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by **over $368.9 million**.

## DAMAGES TO ZOOMINFO

321.    As a direct and proximate result of the Individual Defendants' misconduct, ZoomInfo has lost and expended, and will continue to lose and expend, many millions of dollars.

322.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

323.    Such expenditures include the amounts that the Individual Defendants caused the Company to overpay for repurchases of its own stock while the stock price was artificially inflated as a result of the false and misleading statements alleged herein.

324.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

325.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

326.    Such losses include the Company's overpayment of over $368.9 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

327.    Additionally, these expenditures include, but are not limited to, unjust

COMPLAINT - 84

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1  compensation, benefits, and other payments provided to the Individual Defendants who breached

2  their fiduciary duties to the Company.

3      328.    As a direct and proximate result of the Individual Defendants' conduct, ZoomInfo

4  has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's

5  discount" that will plague the Company's stock in the future due to the Company's and their

6  misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust

7  enrichment.

8                              **DERIVATIVE ALLEGATIONS**

9      329.    Plaintiff brings this action derivatively and for the benefit of ZoomInfo to redress

10  injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

11  fiduciary duties as directors and/or officers of ZoomInfo, violations of the Exchange Act, unjust

12  enrichment, abuse of control, gross mismanagement, and waste of corporate assets.

13      330.    ZoomInfo is named solely as a nominal party in this action. This is not a collusive

14  action to confer jurisdiction on this Court that it would not otherwise have.

15      331.    Plaintiff is, and has been at all relevant times, a shareholder of ZoomInfo. Plaintiff

16  will adequately and fairly represent the interests of ZoomInfo in enforcing and prosecuting his

17  rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to

18  enforce and prosecute this action.

19                            **DEMAND FUTILITY ALLEGATIONS**

20      332.    Plaintiff incorporates by reference and realleges each and every allegation stated

21  above as if fully set forth herein.

22      333.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of

23  filing of this action, the Board consists of the following nine individuals: Defendants Schuck,

24  Enright, Evans, Gleeson, Mader, McCarter, and Winn (the "Director-Defendants") and non-parties

25  Domenic Maida and Owen Wurzbacher (collectively with the Director-Defendants, the

26  "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are

27

28  COMPLAINT - 85

1    on the Board at the time this action is commenced.

2        334.    Demand is excused as to all of the Director-Defendants because each one of them

3    faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

4    they engaged in knowingly or recklessly to make and/or cause the Company to make false and

5    misleading statements and omissions of material facts, and, at the same time, to cause the Company

6    to overpay by over $368.9 million for repurchases of its own stock, all of which renders the

7    Director-Defendants unable to impartially investigate the charges and decide whether to pursue

8    action against themselves and the other perpetrators of the scheme.

9        335.    In complete abdication of their fiduciary duties, the Director-Defendants either

10   knowingly or recklessly caused or permitted ZoomInfo to issue materially false and misleading

11   statements. Specifically, the Director-Defendants caused ZoomInfo to issue false and misleading

12   statements which were intended to make ZoomInfo appear more profitable and attractive to

13   investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal

14   controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face

15   a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus

16   excused.

17       336.    Additional reasons that demand on Defendant Schuck is futile follow. Defendant

18   Schuck has served as the CEO and Chairman of the Board of the Company since co-founding the

19   Company in November 2019. The Company provides Defendant Schuck with his principal

20   occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a

21   non-independent director. Defendant Schuck solicited the false and misleading 2022 Proxy

22   Statement, which led to the reelection of Defendant Mader to the Board, allowing him to continue

23   breaching his fiduciary duties to the Company. Defendant Schuck also solicited the false and

24   misleading 2023 Proxy Statement, which led to the reelection of Defendants Crockett, McCarter,

25   and Winn to the Board, allowing them to continue breaching their fiduciary duties to the Company.

26   Further, Defendant Schuck solicited the false and misleading 2024 Proxy Statement, which led to

27

28   COMPLAINT - 86

1    the reelection of Defendant Enright and himself to the Board, allowing them to continue breaching

2    their fiduciary duties to the Company. As the trusted CEO, he conducted little, if any, oversight of

3    the Company's engagement in the scheme to make false and misleading statements, consciously

4    disregarded his duties to monitor such controls over reporting and engagement in the scheme, and

5    consciously disregarded his duties to protect corporate assets. In addition, during the Relevant

6    Period, he failed to correct the false and misleading statements alleged herein and personally made

7    many of the false and misleading statements alleged herein. He is also a defendant in the Securities

8    Class Action. Moreover, Defendant Schuck's insider sales made while the Company's stock price

9    was artificially inflated as a result of the false and misleading statements alleged herein further

10   demonstrates his motive to participate in the scheme. For these reasons, too, Defendant Schuck

11   breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or

12   disinterested, and thus demand upon him is futile and, therefore, excused.

13        337.    Additional reasons that demand on Defendant Enright is futile follow. Defendant

14   Enright has served as a Company director since March 2020 and also serves as the Chair of the

15   Privacy, Security and Technology Committee and as a member of the Audit Committee. Defendant

16   Enright received and continues to receive handsome compensation for his role as a Company

17   director. Defendant Enright solicited the false and misleading 2022 Proxy Statement, which led to

18   the reelection of Defendant Mader to the Board, allowing him to continue breaching his fiduciary

19   duties to the Company. Defendant Enright also solicited the false and misleading 2023 Proxy

20   Statement, which led to the reelection of Defendants Crockett, McCarter, and Winn to the Board,

21   allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant

22   Enright solicited the false and misleading 2024 Proxy Statement, which led to the reelection of

23   Defendant Schuck and himself to the Board, allowing them to continue breaching their fiduciary

24   duties to the Company. As a trusted-long time Company director, he conducted little, if any,

25   oversight of the Company's engagement in the scheme to make false and misleading statements,

26   consciously disregarded his duties to monitor such controls over reporting and engagement in the

27

28   COMPLAINT - 87

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Enright's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrates his motive to participate in the scheme. For these reasons, too, Defendant Enright breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

338.    Additional reasons that demand on Defendant Evans is futile follow. Defendant Evans has served as a Company director since February 2020 and also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Evans received and continues to receive handsome compensation for her role as a Company director. Defendant Evans solicited the false and misleading 2022 Proxy Statement, which led to the reelection of Defendant Mader to the Board, allowing him to continue breaching his fiduciary duties to the Company. Defendant Evans also solicited the false and misleading 2023 Proxy Statement, which led to the reelection of Defendants Crockett, McCarter, and Winn to the Board, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Evans solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Enright and Schuck to the Board, allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Evans breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

339.    Additional reasons that demand on Defendant Gleeson is futile follow. Defendant Gleeson has served as a Company director since July 2022. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Gleeson received and continues to

COMPLAINT - 88

receive handsome compensation for her role as a Company director. Defendant Gleeson also solicited the false and misleading 2023 Proxy Statement, which led to the reelection of Defendants Crockett, McCarter, and Winn to the Board, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Gleeson solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Enright and Schuck to the Board, allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Gleeson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

340.    Additional reasons that demand on Defendant Mader is futile follow. Defendant Mader has served as a Company director since February 2020. He also serves as a member of the Audit Committee. Defendant Mader received and continues to receive handsome compensation for his role as a Company director. Defendant Mader solicited the false and misleading 2022 Proxy Statement, which led to his reelection to the Board, allowing him to continue breaching his fiduciary duties to the Company. Defendant Mader also solicited the false and misleading 2023 Proxy Statement, which led to the reelection of Defendants Crockett, McCarter, and Winn to the Board, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Mader solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Enright and Schuck to the Board, allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1   Moreover, Defendant Mader's insider sales made while the Company's stock price was artificially

2   inflated as a result of the false and misleading statements alleged herein further demonstrates his

3   motive to participate in the scheme. For these reasons, too, Defendant Mader breached his

4   fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and

5   thus demand upon him is futile and, therefore, excused.

6       341.    Additional reasons that demand on Defendant McCarter is futile follow. Defendant

7   McCarter has served as a Company director since February 2020 and also serves as the Chair of

8   the Nominating and Corporate Governance Committee and as a member of the Compensation

9   Committee. Defendant McCarter received and continues to receive handsome compensation for

10  his role as a Company director. Defendant McCarter also solicited the false and misleading 2023

11  Proxy Statement, which led to the reelection of Defendants Crockett, Winn, and himself to the

12  Board, allowing them to continue breaching their fiduciary duties to the Company. Further,

13  Defendant McCarter solicited the false and misleading 2024 Proxy Statement, which led to the

14  reelection of Defendants Enright and Schuck to the Board, allowing them to continue breaching

15  their fiduciary duties to the Company. As a trusted-long time Company director, he conducted

16  little, if any, oversight of the Company's engagement in the scheme to make false and misleading

17  statements, consciously disregarded his duties to monitor such controls over reporting and

18  engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For

19  these reasons, too, Defendant McCarter breached his fiduciary duties, faces a substantial likelihood

20  of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore,

21  excused.

22      342.    Additional reasons that demand on Defendant Winn is futile follow. Defendant

23  Winn has served as a Company director since February 2020 and also serves as the Chair of the

24  Compensation Committee and as a member of the Privacy, Security and Technology Committee.

25  Defendant Winn received and continues to receive handsome compensation for his role as a

26  Company director. Defendant Winn solicited the false and misleading 2022 Proxy Statement,

27

28  COMPLAINT - 90

which led to the reelection of Defendant Mader to the Board, allowing him to continue breaching his fiduciary duties to the Company. Defendant Winn also solicited the false and misleading 2023 Proxy Statement, which led to the reelection of Defendants Crockett, McCarter, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Winn solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Enright and Schuck to the Board, allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Winn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

343.    Additional reasons that demand on the Board is futile follow.

344.    Defendants Evans (as current Chair), Enright, and Mader (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

345.    All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

346.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

347.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

348.    ZoomInfo has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to

COMPLAINT - 92

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

recover for ZoomInfo any part of the damages ZoomInfo suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

349.    The acts complained of herein constitute violations of fiduciary duties owed by ZoomInfo's officers and directors, and these acts are incapable of ratification.

350.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the shareholders of ZoomInfo. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of ZoomInfo, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

351.    If there is no directors' and officers' liability insurance, then the Directors will not cause ZoomInfo to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

352.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

353.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

354.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall

COMPLAINT - 93

1  be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

2  commerce or of any facility of a national securities exchange or otherwise, in contravention of

3  such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

4  interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

5  proxy or consent or authorization in respect of any security (other than an exempted security)

6  registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

7  355.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no

8  proxy statement shall contain "any statement which, at the time and in the light of the

9  circumstances under which it is made, is false or misleading with respect to any material fact, or

10  which omits to state any material fact necessary in order to make the statements therein not false

11  or misleading." 17 C.F.R. § 240.14a-9.

12  356.    The 2022 Proxy Statement was materially false and misleading and failed to

13  disclose, *inter alia*, that: (1) the Company's financial results had been temporarily inflated by the

14  effects of the COVID-19 pandemic; (2) as the pandemic began to subside, the Company's

15  customers had less need for its platform; (3) as a result, material portions of the existing customer

16  base attempted to significantly reduce their use of the Company's platform, or completely stop

17  using the platform; (4) to avoid this mass loss of retention, the Company began a series of

18  manipulative and coercive auto-renewal policies that required clients to give at least 60 days'

19  notice prior to the end of a contract term for non-renewal; (5) as a result, the Company's customer

20  relations were irreparably harmed to the detriment of future contract renewals; and (6) the

21  Company lacked internal controls. As a result of the foregoing, the Company's public statements

22  were materially false and misleading at all relevant times.

23  357.    Moreover, 2022 Proxy Statement was also materially false and misleading because,

24  despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced

25  by the Individual Defendants (1) making and/or causing the Company to make the numerous false

26  and misleading statements and omissions alleged herein; and (2) failing to report violations of the

27

28  COMPLAINT - 94

Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

358.   Defendants Schuck, Crockett, Dhruv, Enright, Evans, Mader, and Winn knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading.  The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the re-election of directors.

359.   As a result of Defendants Schuck, Crockett, Dhruv, Enright, Evans, Mader, and Winn causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendant Mader to the Board, thereby allowing him to continue breaching their fiduciary duties to the Company.

360.   The Company was damaged as a result of Defendants Schuck, Crockett, Dhruv, Enright, Evans, Mader, and Winn's material misrepresentations and omissions in the 2022 Proxy Statement.

361.   The 2023 Proxy Statement was materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's financial results had been temporarily inflated by the effects of the COVID-19 pandemic; (2) as the pandemic began to subside, the Company's customers had less need for its platform; (3) as a result, material portions of the existing customer base attempted to significantly reduce their use of the Company's platform, or completely stop using the platform; (4) to avoid this mass loss of retention, the Company began a series of manipulative and coercive auto-renewal policies that required clients to give at least 60 days' notice prior to the end of a contract term for non-renewal; (5) as a result, the Company's customer relations were irreparably harmed to the detriment of future contract renewals; and (6) the Company lacked internal controls. As a result of the foregoing, the Company's public statements

COMPLAINT - 95

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

were materially false and misleading at all relevant times.

362.    Moreover, 2023 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

363.    Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, and Winn knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading.  The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of directors.

364.    As a result of Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, and Winn causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Crockett, McCarter, and Winn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

365.    The Company was damaged as a result of Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, and Winn's material misrepresentations and omissions in the 2023 Proxy Statement.

366.    The 2024 Proxy Statement was materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's financial results had been temporarily inflated by the effects of the COVID-19 pandemic; (2) as the pandemic began to subside, the Company's customers had less need for its platform; (3) as a result, material portions of the existing customer base attempted to significantly reduce their use of the Company's platform, or completely stop

COMPLAINT - 96

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

using the platform; (4) to avoid this mass loss of retention, the Company began a series of manipulative and coercive auto-renewal policies that required clients to give at least 60 days' notice prior to the end of a contract term for non-renewal; (5) as a result, the Company's customer relations were irreparably harmed to the detriment of future contract renewals; and (6) the Company lacked internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

367.    Moreover, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

368.    Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, and Winn knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to, the re-election of directors.

369.    As a result of Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, and Winn causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Enright and Schuck to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

370.    The Company was damaged as a result of Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, and Winn's material misrepresentations and omissions in the 2024 Proxy Statement.

371.    Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act

372.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

COMPLAINT - 97

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

373.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding ZoomInfo. Not only is ZoomInfo now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon ZoomInfo by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares on the open market at artificially inflated prices, damaging ZoomInfo.

374.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

375.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about ZoomInfo not misleading.

376.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by ZoomInfo. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The

COMPLAINT - 98

Individual Defendants were the top executives of the Company, or received briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

377.   In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executives and/or directors of the Company, as members of the Board, the Individual Defendants then serving as directors signed the Company's false and misleading statements filed with the SEC during the Relevant Period.

378.   By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

379.   Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

**THIRD CLAIM**

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

380.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

381.   The Individual Defendants, by virtue of their positions with ZoomInfo and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of ZoomInfo within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause the Defendants to engage in the illegal conduct and practices complained of herein.

382.   Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

**FOURTH CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

383.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

384.   Each Individual Defendant owed to the Company the duty to exercise candor, good

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

faith, and loyalty in the management and administration of ZoomInfo's business and affairs.

385.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

386.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of ZoomInfo.

387.   In breach of their fiduciary duties owed to ZoomInfo, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's financial results had been temporarily inflated by the effects of the COVID-19 pandemic; (2) as the pandemic began to subside, the Company's customers had less need for its platform; (3) as a result, material portions of the existing customer base attempted to significantly reduce their use of the Company's platform, or completely stop using the platform; (4) to avoid this mass loss of retention, the Company began a series of manipulative and coercive auto-renewal policies that required clients to give at least 60 days' notice prior to the end of a contract term for non-renewal; (5) as a result, the Company's customer relations were irreparably harmed to the detriment of future contract renewals; and (6) the Company lacked internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

388.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

389.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

of its own common stock at artificially inflated prices before the fraud was exposed, while five of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $4.5 billion.

390.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

391.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ZoomInfo's securities and disguising insider sales.

392.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

393.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ZoomInfo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

394.    Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Unjust Enrichment

395.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

396.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, ZoomInfo.

397.    The Individual Defendants either benefitted financially from the improper conduct,

COMPLAINT - 101

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

or received bonuses, stock options, or similar compensation from ZoomInfo that was tied to the performance or artificially inflated valuation of ZoomInfo, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

398.     Plaintiff, as a shareholder and representative of ZoomInfo, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

399.     Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

400.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

401.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence ZoomInfo, for which they are legally responsible.

402.     As a direct and proximate result of the Individual Defendants' abuse of control, ZoomInfo has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

403.     Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

404.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

COMPLAINT - 102

405.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of ZoomInfo in a manner consistent with the operations of a publicly-held corporation.

406.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, ZoomInfo has sustained and will continue to sustain significant damages.

407.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

408.   Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

409.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

410.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees to the detriment of the shareholders and the Company.

411.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused ZoomInfo to waste valuable corporate assets while ZoomInfo suffered from undisclosed issues. The Individual Defendants' misconduct has caused the Company to incur many millions of dollars of legal liability and/or costs to defend unlawful actions and investigations and the Securities Class Action, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

412.   In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

COMPLAINT - 103

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

413.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

414.   Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

### NINTH CLAIM

**Against Defendants Schuck and Hyzer for Contribution Under Sections 10(b) and 21D of the Exchange Act**

415.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

416.   ZoomInfo and Defendants Schuck and Hyzer are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Schuck's and Hyzer's willful and/or reckless violations of their obligations as officers and/or directors of ZoomInfo.

417.   Defendants Schuck and Hyzer, because of their positions of control and authority as officers and/or directors of ZoomInfo, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of ZoomInfo, including the wrongful acts complained of herein and in the Securities Class Action.

418.   Accordingly, Defendants Schuck and Hyzer are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

419.   As such, ZoomInfo is entitled to receive all appropriate contribution or indemnification from Defendants Schuck and Hyzer.

COMPLAINT - 104

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1

**<u>PRAYER FOR RELIEF</u>**

2       FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all

3   Individual Defendants as follows:

4           (a)     Declaring that Plaintiff may maintain this action on behalf of ZoomInfo,

5   and that Plaintiff is an adequate representative of the Company;

6           (b)     Declaring that the Individual Defendants have breached and/or aided and

7   abetted the breach of their fiduciary duties to ZoomInfo;

8           (c)     Determining and awarding to ZoomInfo the damages sustained by it as a

9   result of the violations set forth above from each of the Individual Defendants, jointly and

10  severally, together with pre-judgment and post-judgment interest thereon;

11          (d)     Directing ZoomInfo and the Individual Defendants to take all necessary

12  actions to reform and improve ZoomInfo's corporate governance and internal procedures to

13  comply with applicable laws and to protect ZoomInfo and its shareholders from a repeat of the

14  damaging events described herein, including, but not limited to, putting forward for shareholder

15  vote the following resolutions for amendments to the Company's Bylaws or Certificate of

16  Incorporation and the following actions as may be necessary to ensure proper corporate

17  governance policies:

18              1. a proposal to strengthen the Board's supervision of operations and develop

19              and implement procedures for greater shareholder input into the policies and

20              guidelines of the Board;

21              2. a provision to permit the shareholders of ZoomInfo to nominate at least

22              five candidates for election to the Board;

23              3. a proposal to ensure the establishment of effective oversight of compliance

24              with applicable laws, rules, and regulations;

25          (e)     Awarding ZoomInfo restitution from Individual Defendants, and each of

26  them;

27

28  COMPLAINT - 105

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1      (f)      Awarding Plaintiff the costs and disbursements of this action, including

2  reasonable attorneys' and experts' fees, costs, and expenses; and

3      (g)      Granting such other and further relief as the Court may deem just and

4  proper.

5  **JURY TRIAL DEMANDED**

6  Plaintiff hereby demands a trial by jury

7

8  DATED: December 2, 2024          Respectfully submitted,

9  **BADGLEY MULLINS TURNER PLLC**

10  */s/ Duncan C. Turner*

11  Duncan C. Turner, WSBA No. 20597
   19910 50th Avenue W., Suite 103

12  Lynnwood, WA 98036
   Tel: (206) 621-6566

13  Email: dturner@badgleymullins.com

14  **THE BROWN LAW FIRM, P.C.**

15  Timothy Brown (*pro hac vice forthcoming*)
   767 Third Avenue, Suite 2501

16  New York, NY 10017
   Tel: (516) 922-5427

17  Facsimile: (516) 344-6204
   Email: tbrown@thebrownlawfirm.net

18

19  ***Attorneys for Plaintiffs***

20

21

22

23

24

25

26

27

28  COMPLAINT - 106