**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| IN RE ZOOMINFO TECHNOLOGIES INC. DERIVATIVE LITIGATION | Case No. 3:24-cv-05987-TMC<br>(Consolidated with 3:25-cv-05088-TMC)<br>**CONSOLIDATED AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| This Document Relates to: ALL ACTIONS | **DEMAND FOR JURY TRIAL**<br>**FILED UNDER SEAL** |

**CONSOLIDATED AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiffs Nick Harley ("Harley") and Joshua Steffens ("Steffens," and together with Harley, "Plaintiffs"), by and through their undersigned attorneys, file this Consolidated Amended Verified Shareholder Derivative Complaint for the benefit of nominal defendant ZoomInfo Technologies, Inc. ("ZoomInfo" or the "Company"), against current and former members of the Company's board of directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiffs' allegations are based on personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by their counsel, which includes, among other things, a review of: (i) publicly available information regarding the Company; (ii) the Company's filings with the United States Securities and Exchange Commission (the "SEC"); (iii) press releases published by, and regarding, ZoomInfo; (iv) the Company's conference calls, transcripts, and announcements; (v) legal filings, news reports, and securities analysts' reports about the Company; (vi) non-public Company



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

documents produced to Plaintiffs by ZoomInfo (the "Books and Records");[1] (vii) the filings in the securities class action captioned *State Teachers Retirement System of Ohio, et al., v. ZoomInfo Technologies, Inc., et al.*, Case No. 3:24-cv-05739-TMC (W.D. Wash.) (the "Securities Class Action"); and (viii) other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiffs on behalf of ZoomInfo against certain of its officers and current and former members of the Company's Board (the "Individual Defendants")[2] for breaches of their fiduciary duties between at least November 10, 2020, and August 5, 2024, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2. Founded in 2007, ZoomInfo is a software and data company that provides services for sales, marketing, operations, and recruiting teams. ZoomInfo's flagship product, SalesOS, provides sales and marketing professionals with organizational and contact information to help them identify, connect with, and engage prospective customers. ZoomInfo's primary customers are other businesses as the Company typically works in the business-to-business (the "B2B") market rather than selling directly to consumers.

3. ZoomInfo's revenue depends heavily on a subscription-based model that requires the Company to attract new subscribers and keep those subscribers as customers through renewals, typically on an annual basis. ZoomInfo's subscriptions can range from one to three years in length and are generally non-cancelable when subscribed to.

4. Subscription-based business models, like those employed by ZoomInfo, are highly attractive to investors due to their recurring and predictable revenue generation. Thus, the

---

[1] References to "WDWA_Consol-Deriv_00####" are to the Books and Records.

[2] The Individual Defendants are Henry Schuck ("Schuck"), Peter Cameron Hyzer ("Hyzer"), Joseph Christopher Hays ("Hays"), Keith Enright ("Enright"), Ashley Evans ("Evans"), Alison Gleeson ("Gleeson"), Mark Mader ("Mader"), Patrick McCarter ("McCarter"), D. Randall Winn ("Winn"), Todd Crockett ("Crockett"), and Mitesh Dhruv ("Dhruv"). "Defendants" means ZoomInfo and the Individual Defendants.



BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

Individual Defendants understood that attracting subscriptions and maintaining renewals were critical to ZoomInfo's success since they accounted for nearly all of the Company's revenue.

5. Leading up to ZoomInfo's initial public offering ("IPO") and the beginning of the Relevant Period, the Individual Defendants sought to drive up ZoomInfo's customer volume as quickly as possible at any cost. By increasing ZoomInfo's subscribing customers in advance of the IPO, the Company would create the illusion of a sustainable and recurring subscriber base that would increase the Company's valuation and drive stable future revenue growth. To achieve this rapid growth, the Company directed and incentivized its salespeople to close as many deals as possible with potential customers, without conducting any due diligence into whether those customers had the ability to pay for these subscriptions or whether they were likely to renew said subscriptions.

6. On June 4, 2020, ZoomInfo went public with its IPO of $21 per share. The IPO was a success with ZoomInfo's stock rising more than 60% to $34 per share on the first day of trading.

7. Now a public company, ZoomInfo was required to comply with strict reporting guidelines as set forth by the SEC and Generally Accepted Accounting Principles ("GAAP"). Importantly, GAAP required ZoomInfo to perform a robust assessment of its likelihood of collecting on its subscription contracts as part of its calculation of Remaining Performance Obligations ("RPO"). However, up to and during the Relevant Period, the Individual Defendants misleadingly and materially overstated the Company's RPO by not accounting for the likelihood of nonpayment when reporting this important metric to investors.

8. Moreover, throughout the Relevant Period, the Individual Defendants made materially false and misleading statements touting the strength of ZoomInfo's customer base and growth, alleging, among other things, that its customer base spanned a "wide variety of industry verticals," and that, as of 2024, ZoomInfo's software was used by over 35,000 companies. The Company alleged that this strong customer base resulted in strong financial results throughout the Relevant Period.

9. However, in reality, ZoomInfo's customer base was not as strong as it had alleged,



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

with non-payments from customers that ZoomInfo failed to adequately vet ultimately causing the Company's financial performance to suffer. Furthermore, in an attempt to retain customers to keep up the appearance of a strong customer base and customer retention capabilities, ZoomInfo implemented coercive auto-renewal policies during the Relevant Period which required clients to notify the Company of non-renewal at least sixty days before the end of their contract term and which ultimately harmed the Company further.

10. Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make these statements not misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the COVID-19 pandemic had temporarily inflated the demand for the Company's platform, and this increased demand was unsustainable; (ii) the Company's reported RPO was inconsistent with GAAP and was inflated due to the lack of due diligence and variable constraint analysis; (iii) there were increased risks of nonpayment from the Company's customers; (iv) a significant amount of the debts owed to the Company remained in accounts receivable despite ongoing delinquency, and the Company was unable to collect on many of these debts; (v) in order to retain its diminishing customer base, the Company instituted deceptive and coercive auto-renewal policies; (vi) as a result of coercive auto-renewal policies, lack of due diligence, and inactive customers, the Company's reported revenues, operating income, and customer retention metrics were materially overstated; (vii) ZoomInfo's financial decline and adverse economic conditions were caused by the Company's own actions and not extraneous factors; (viii) the Company failed to maintain adequate oversight and internal controls over its financial reporting; and (ix) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

11. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

12. [redacted]

13. Beginning in late 2022, the truth slowly began to emerge as the Individual Defendants could no longer obfuscate the drastically diminished demand for ZoomInfo's products, coupled with mounting collectability problems that were triggered by droves of subscription contracts with risky business customers that ZoomInfo had targeted and signed up without conducting any due diligence beforehand on their ability to pay for the subscriptions. On November 1, 2022, the Company disclosed, that at the end of the third quarter of 2022, it "saw a greater level of financial scrutiny from buyers, which further elongated sales cycles."

14. On this news, the price of ZoomInfo stock declined $12.69 per share, or approximately 29.2%, to close at $30.81 per share on November 2, 2022.

15. Later, on November 16, 2022, ZoomInfo's stock declined further when Defendant Hyzer disclosed more of the headwinds the Company faced, including, among other things,


BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

"increased pressure with respect to macro headwinds and more scrutiny from buyers that really impacted the capacity of our sales team."

16. On this news, the price of ZoomInfo stock declined a further $5.52 per share, or approximately 17.4%, over a two-day trading period to close at $26.17 per share on November 17, 2022, on abnormally high trading volume.

17. Nonetheless, the Individual Defendants continued to issue materially false and misleading statements regarding the strength of ZoomInfo and its ability to secure payments from its customers, despite knowing their statements were inaccurate. [redacted]

18. The truth was finally fully revealed on August 5, 2024, when the Company issued a press release announcing financial results for the second quarter of 2024 (the "2Q24 Earnings Release"). The 2Q24 Earnings Release announced that the Company was incurring a $33 million charge because "[d]uring the quarter, the company made a change in estimates related to the collectability of receivable from customers and changed operational procedures to require upfront pre-payment for services from certain smaller customers." Following this disclosure, ZoomInfo decreased its revenue guidance by approximately $65 million.

19. On this news, the price of ZoomInfo stock declined $1.79 per share, or approximately 18.3%, to close at $8.01 on August 6, 2024.

20. Collectively, over the course of the Company's multiple disclosures, ZoomInfo's stock fell from $45.90 per share on November 1, 2022, to $8.01 per share by the end of the Relevant Period on August 5, 2024, a decline of $37.89 per share, or approximately 82.5% of the stock's value.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

21. Additionally, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing ZoomInfo to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Between December 2020 and July 2024, the Individual Defendants caused ZoomInfo to repurchase over 45 million shares of its own stock, costing the Company roughly $729.4 million. As ZoomInfo's stock's true value was $8.01 per share following the corrective disclosures, the Company overpaid approximately $368.9 million to repurchase its own stock.

22. Moreover, six of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping personal profits exceeding $1.2 billion.

23. Furthermore, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls and risk oversight.

24. As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Schuck, Hyzer, and Hays, among others, exposing the Company to massive class-wide liability and costs related to defending itself in the Securities Class Action.

25. In light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiffs did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

27. Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

28. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

29. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

30. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

31. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because ZoomInfo is headquartered in this District, Defendants have conducted business in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

***Plaintiffs***

32. Plaintiff Harley is, and has been at all relevant times, a continuous shareholder of ZoomInfo common stock.

33. Plaintiff Steffens is, and has been at all relevant times, a continuous shareholder of ZoomInfo common stock.

***Nominal Defendant***

34. Nominal Defendant ZoomInfo is a Delaware corporation with its principal


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

executive offices located at 330 W Columbia Way, Floor 8, Vancouver, Washington 98660.[3] ZoomInfo's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "GTM."[4]

***Individual Defendants***

35. Defendant Schuck is a co-founder of the Company and has served as Chairman of the Board and as Chief Executive Officer ("CEO") of the Company since its formation in November 2019. Schuck has also served as CEO and a director of ZoomInfo Holdings LLC[5] since 2007. Defendant Schuck is named as a defendant in the Securities Class Action. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Schuck received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2021 | $1,309,234 |
| 2022 | $834,971 |
| 2023 | $4,973,764 |
| 2024 | $6,253,865 |

36. Defendant Hyzer served as Chief Financial Officer ("CFO") of the Company from November 2019 until October 2024. Hyzer also served as CFO of ZoomInfo Holdings LLC. Defendant Hyzer is named as a defendant in the Securities Class Action. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Hyzer received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2021 | $4,057,761 |
| 2022 | $17,936,399 |
| 2023 | $573,250 |
| 2024 | $5,442,281 |

37. Defendant Hays served as President and Chief Operating Officer of the Company from July 2021 until October 2023 when he transitioned into the Executive Vice President,

---

[3] At the time this Action commenced, ZoomInfo was headquartered at 805 Broadway Street, Suite 900, Vancouver, Washington 98660.

[4] ZoomInfo previously traded on the NASDAQ under the ticker symbol "ZI."

[5] ZoomInfo Holdings LLC, formerly known as DiscoverOrg Holdings, LLC, is a subsidiary of the Company.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

International Expansion role with the Company and ceased to be an executive officer. Defendant Hays is named as a defendant in the Securities Class Action. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Hays received the following compensation from the Company during the Relevant Period:

| **Year** | **Total Compensation** |
|---|---|
| 2021 | $7,448,561 |
| 2022 | $13,295,213 |
| 2023 | $9,829,049 |

38. Defendant Enright has served as a director of the Company since March 2020. Defendant Enright also serves as Chair of the Board's Privacy, Security and Technology Committee and as a member of the Board's Audit Committee. Defendant Enright previously served on the board of managers of ZoomInfo Holdings LLC from March 2020 until June 2020. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Enright received the following compensation from the Company during the Relevant Period:

| **Year** | **Total Compensation** |
|---|---|
| 2021 | $265,014 |
| 2022 | $272,541 |
| 2023 | $277,316 |
| 2024 | $275,013 |

39. Defendant Evans has served as a director of the Company since February 2020. Defendant Evans also serves as a member of the Board's Audit Committee and Compensation Committee. Defendant Evans previously served on the board of managers of ZoomInfo Holdings LLC from 2018 until June 2020. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Evans received the following compensation from the Company during the Relevant Period:

| **Year** | **Total Compensation** |
|---|---|
| 2022 | $189,686 |
| 2023 | $262,316 |
| 2024 | $270,013 |

40. Defendant Gleeson has served as a director of the Company since July 2022. Defendant Gleeson also serves as the Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Board's Compensation Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Gleeson received the following


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $210,352 |
| 2023 | $256,316 |
| 2024 | $254,013 |

41. Defendant Mader has served as a director of the Company since February 2020. Mader also serves as a member of the Board's Audit Committee. Defendant Mader previously served on the board of managers of ZoomInfo Holdings LLC from February 2020 until June 2020. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Mader received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2021 | $260,014 |
| 2022 | $260,041 |
| 2023 | $262,316 |
| 2024 | $260,013 |

42. Defendant McCarter served as a director of the Company from February 2020 to February 2025. Defendant McCarter also served as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Board's Compensation Committee. Defendant McCarter previously served on the board of managers of ZoomInfo Holdings LLC from 2018 until June 2020.

43. Defendant Winn has served as a director of the Company since February 2020. Defendant Winn also serves as a member of the Board's Compensation Committee and the Board's Privacy, Security and Technology Committee. Defendant Winn previously served on the board of managers at ZoomInfo Holdings LLC from 2014 until June 2020. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Winn received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $273,166 |
| 2023 | $274,816 |
| 2024 | $272,513 |

44. Defendant Crockett served as a director of the Company from February 2020 until July 2024. Defendant Crockett also served as a member of the Board's Compensation Committee


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

and Nominating and Corporate Governance Committee. Defendant Crockett previously served on the board of managers at ZoomInfo Holdings LLC from 2014 until June 2020.

45. Defendant Dhruv served as a director of the Company from February 2020 until 2024. Defendant Dhruv also served as Chair of the Board's Audit Committee. Defendant Dhruv previously served as a member of the board of managers of ZoomInfo Holdings LLC from February 2020 until June 2020. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Dhruv received the following compensation from the Company during the Relevant Period:

| **Year** | **Total Compensation** |
|---|---|
| 2021 | $270,014 |
| 2022 | $270,041 |
| 2023 | $272,316 |
| 2024 | $25,250 |

***Relevant Non-Parties***

46. In addition to Plaintiffs' review of the Books and Records, this action is based on Plaintiffs' review, by and through their counsel, of an extensive record of public documents, including the Corrected Amended Complaint for Violations of the Federal Securities Law in the Securities Class Action (the "Corrected AC"). Securities Class Action, Dkt. 81. The Corrected AC contains detailed allegations based on interviews with thirteen former ZoomInfo employees ("FEs"). The FEs provided information on a confidential basis which was described in the Corrected AC with sufficient detail to establish their reliability and personal knowledge. All FEs are described in the feminine to protect their identities.

47. FE-1 was employed by ZoomInfo as a Manager, Sales UK & EMEA from July 2022 until January 2024. Corrected AC ¶ 95. FE-1 explained that she was responsible for a Sales Team that fluctuated between six and eight sales representatives and was focused on SMB and Mid-Market customers. *Id.* According to FE-1, she directly reported to current Director, Sales Ryan Ooesterveld and former SVP, International Revenue & Emerging Products Ray Mariano Jr. *Id.*

48. FE-2 was employed by ZoomInfo as a Senior Sales Manager, Mid-Market from



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

July 2018 to December 2019 and as a Sales Director from January 2020 to November 2021. *Id.* ¶ 96. FE-2 advised that as a Sales Director, she served as a first line manager and oversaw sales teams ranging from six to ten sales representatives. *Id.*

49. FE-3 was employed by DiscoverOrg, and subsequently ZoomInfo, as a Revenue Accountant prior to and leading up to the Relevant Period. *Id.* ¶ 97. FE-3 was later employed by ZoomInfo as a Revenue Accountant during and through the end of the Relevant Period, during which time she was involved in working on complex revenue issues, including contract modifications. *Id.* FE-3 attended meetings with a consulting firm engaged by ZoomInfo to advise on the problem around the application of variable constraints. *Id.*

50. FE-4 was employed by ZoomInfo as a Senior Account Executive from October 2019 through March 2024. *Id.* ¶ 98. FE-4 transitioned to an Account Management role focusing on Commercial customers in mid-2023, which FE-4 described as one step above mom-and-pop shops. *Id.* FE-4 recalled quarterly All Hands Meetings typically led by Defendant Schuck and Defendant Hyzer that also served as a "State of the Union" regarding customer account health. *Id.*

51. FE-5 began her tenure at ZoomInfo working as a New Business Inbound Sales Development Representative ("SDR") in October 2022 and was responsible for customers across various segments (Enterprise, Mid-Market, and SMB). *Id.* ¶ 99. FE-5 transitioned to a Customer Inbound SDR in May 2023 and joined the Renewals Support Team in September 2023 and remained there for the remainder of her employment until July 2024. *Id.*

52. FE-7[6] was employed by ZoomInfo as an Enterprise Account Executive from November 2020 until September 2023. *Id.* ¶ 101. FE-7 reported to a direct manager, who reported to a director and vice president and that the structure eventually reached former Chief Revenue Officer Dave Justice (previously Strickland and Defendant Hays) and Defendant Schuck. *Id.* According to FE-7, her group had two organizations, "New Business" and "Retain and Grow" or "R&G." *Id.* FE-7 was a member of the R&G group and had newly signed up accounts transitioned

[6] FE-6's statements are not included.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

to her from the New Business group. *Id.*

53. FE-8 was employed by ZoomInfo as a Customer Success Manager from December 2021 until September 2024. *Id.* ¶ 102.

54. FE-9 was employed by ZoomInfo as a former Senior Account Executive, Talent Solutions from July 2022 until January 2023. *Id.* ¶ 103.

55. FE-10 was employed by ZoomInfo in a variety of roles from June 2018 until March 2023. *Id.* ¶ 104. According to FE-10, she initially joined the Company as a Client Success Specialist in June 2018 and transitioned to an Enterprise Customer Success Manager in January 2019. *Id.* FE-10 began her final role as a Revenue Operations Product Manager in November 2019, during which she reported to a manager, who reported up two levels in the corporate hierarchy to former Chief Business Officer (previously Senior Vice President Operations and Interim CMO) Scott Sutton, who reported to Defendant Hays. *Id.*

56. FE-11 is a former employee in the Marketing Department at ZoomInfo who was employed during the Relevant Period for over three quarters during 2021. *Id.* ¶ 105.

57. FE-12 was employed by ZoomInfo from June 2022 until December 2023, first as an Inbound SDR from June 2022 until February 2023, and then as an Outbound SDR until her departure. *Id.* ¶ 106. In FE-12's role as an Inbound SDR, she focused on new business, and in her role as an Outbound SDR, she worked exclusively on renewals. *Id.*

58. FE-13 was employed by DiscoverOrg from November 2015 until September 2019 and then joined the Company in September 2019 following DiscoverOrg's acquisition of ZoomInfo, holding the position of Vice President, Customer Experience – Head of Customer Onboarding and Education at the Company from September 2019 until March 2023. *Id.* ¶ 107. In this role, FE-13 oversaw various customer-related functions, including customer experience, customer support, and customer onboarding. *Id.* FE-13 reported to Chief Customer Officer, Dominic Constandi ("Constandi"), who reported to Defendant Hays. *Id.*

**<u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>**

59. By reason of their positions as officers and/or directors of ZoomInfo, and because



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

of their ability to control the business and corporate affairs of ZoomInfo, the Individual Defendants owed ZoomInfo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ZoomInfo in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of ZoomInfo and its shareholders so as to benefit all shareholders equally.

60. Each director and officer of the Company owes to ZoomInfo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

61. The Individual Defendants, because of their positions of control and authority as directors and/or officers of ZoomInfo, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

62. To discharge their duties, the officers and directors of ZoomInfo were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

63. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of ZoomInfo, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

64. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to ensure that ZoomInfo implemented and



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

65. To discharge their duties, the officers and directors of ZoomInfo were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of ZoomInfo were required to, among other things:

(i) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Washington, and the United States, and pursuant to ZoomInfo's own Code of Business Conduct and Ethics (the "Code of Conduct");

(ii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) remain informed as to how ZoomInfo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv) establish and maintain systematic and accurate records and reports of the business and internal affairs of ZoomInfo and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

investigation to be made of, said reports and records;

(v) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that ZoomInfo's publicly disclosed financial information would be accurate;

(vi) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

66. Each of the Individual Defendants further owed to ZoomInfo and the shareholders the duty of loyalty requiring that each favor ZoomInfo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

67. At all times relevant hereto, the Individual Defendants were the agents of each other and of ZoomInfo and were at all times acting within the course and scope of such agency.

68. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ZoomInfo.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

69. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

70. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

71. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

72. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of ZoomInfo, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

73. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

74. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ZoomInfo and at all times acted within the course and scope of such agency.

## ZOOMINFO'S CODE OF CONDUCT

75. ZoomInfo's Code of Conduct begins by stating "Integrity, honesty and sound judgment are fundamental to the reputation and success of ZoomInfo Technologies Inc. ('ZoomInfo') and its subsidiaries (collectively, the 'Company')."


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

76. The Code of Conduct further states that it applies to "all directors, officers (including the principal executive officer, principal financial officer, principal accounting officer, controller and persons performing similar functions) and employees of the Company (collectively, "Covered Parties")."

77. In a section titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

> It is the Company's policy that all Covered Parties avoid any conflict between their personal interests and those of the Company. The purpose of this policy is to ensure that the Company's honesty and integrity, and therefore its reputation, are not compromised. The fundamental principle guiding this policy is that no Covered Party should have, or appear to have, personal interests or relationships that actually or potentially conflict with the best interests of the Company. In the case of the Company's non-employee directors, compliance with this Code is subject to provisions of the Company's certificate of incorporation, bylaws, and any stockholders agreement with the Company.

78. In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states:

> Obeying the law, both in letter and in spirit, is one of the foundations on which the Company's ethical standards are built. In conducting the business of the Company, Covered Parties must respect and obey the laws of the jurisdictions in which we operate. Although not all Covered parties are expected to know the details of these laws, it is important to know enough about the applicable local, state and national laws to determine when to seek advice from the Company's General Counsel or other appropriate personnel. If a law conflicts with any Company policy or this Code, you must comply with the law. There are serious consequences for failing to follow any applicable laws, rules and regulations, including termination of service and potential criminal and civil penalties.

79. In a section titled "Inappropriate Trading," the Code of Conduct states the following, in pertinent part:

> *Prohibition Against Insider Trading*
>
> The federal securities laws prohibit any person who is in possession of material, non-public information from engaging in securities transactions on the basis of such information and from communicating such information to any other person for such use. Transacting in securities of the Company, or any other company, while you possess material, nonpublic information is known as "insider trading." "Tipping," which is also prohibited, means communicating such material, nonpublic information to another for their or its use. Any of these actions may amount to


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

"insider trading" and are strictly prohibited.

80. In a section titled "Accuracy of Records," the Code of Conduct states, in relevant part, that:

> It is the Company's policy to make full, fair, accurate, timely and understandable disclosures in compliance with applicable laws and regulations in all reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission, state agencies, and in all other public communications made by the Company.
>
> The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements are fundamental to the Company's continued and future business success. In addition, as a company whose stock is publicly traded, the Company is subject to a number of laws and regulations that govern our business records, including U.S. securities laws. The Company must record its financial activities in compliance with all applicable laws and accounting practices and provide current, complete and accurate information to any and all government agencies. No Covered Party may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no Covered Party may create any false or artificial documentation or book entry for any transaction entered into by the Company. Similarly, Covered Parties who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on the Company's books and records.

81. In a section titled "Waivers of the Code," the Code of Conduct states:

> Any waiver of any provision of this Code for executive officers or directors of the Company must be approved by the Board of Directors or a committee of the Board of Directors of the Company and will be promptly disclosed as required by applicable securities law and/or stock exchange rules.

82. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct and law.

## ZOOMINFO'S AUDIT COMMITTEE CHARTER

83. Pursuant to ZoomInfo's Audit Committee Charter, the Audit Committee's purpose



BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

is to:

A. Provide assistance to the Board of Directors (the "Board of Directors") of ZoomInfo Technologies Inc. (the "Company") with respect to its oversight of:

(i) The quality and integrity of the Company's financial statements, including oversight of the Company's accounting and financial reporting processes and financial statement audits;

(ii) The Company's compliance with legal and regulatory requirements applicable to financial statements and accounting and financial reporting processes;

(iii) The independent registered public accounting firm's qualifications, performance and independence;

(iv) The performance of the Company's internal audit function;

(v) Risk assessment and management, particularly with respect to financial risk exposure; and

(vi) The Company's environmental, social, and governance ("ESG") related strategy, policies, practices, risk assessment and management, and public disclosures.

B. Prepare the audit committee report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

84. In a section titled "Responsibilities and Duties," the Audit Committee Charter tasks the Audit Committee with the following responsibilities and duties, among others:

<u>Documents/Reports Review</u>

1. Review and discuss with management and the independent registered public accounting firm prior to public dissemination the Company's annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

2. Discuss with the independent registered public accounting firm the matters required to be discussed by the applicable auditing standards adopted by the PCAOB and approved by the SEC from time to time, including any critical audit matters.

3. Review and discuss with management and the independent registered public accounting firm the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information and measures), as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (e.g., discussion of the types of information to be disclosed



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

4. Review and discuss with management and the independent registered public accounting firm any major issues arising as to the adequacy and effectiveness of the Company's internal controls, any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

5. Review and discuss with the independent registered public accounting firm a draft of the auditor's report.

Independent Registered Public Accounting Firm

6. Be solely and directly responsible for the appointment, compensation, retention, oversight and, when necessary, termination of any independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (including the resolution of disagreements between management and such firm regarding financial reporting). . . .

Accounting and Financial Reporting Process

12. In consultation with the independent registered public accounting firm, management and the internal auditors (or other personnel or service providers responsible for the internal audit function), review the integrity of the Company's financial reporting processes. In that regard, the Committee must obtain, review and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding:

- all critical accounting policies and practices to be used by the Company;
- analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments on the Company's financial statements and the treatment preferred by the independent registered public accounting firm;
- major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;
- major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; and
- any other material written communications between the independent registered public accounting firm and the Company's management,


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

such as any management letter or schedule of unadjusted differences.

13. Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures (if any), on the financial statements of the Company.

14. Review with the independent registered public accounting firm (i) any problems or difficulties encountered by such firm in the course of the review or audit work, including any restrictions on the scope of its activities or on access to requested information, and any significant disagreements with management and (ii) management's responses to such matters. Without excluding other possibilities, the Committee may wish to review with the independent registered public accounting firm (i) any accounting adjustments that were noted or proposed by such firm but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and such firm's national office respecting auditing or accounting issues presented by the engagement and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Company.

Internal Audit

15. Oversee the Company's internal audit function, which may be outsourced to a third-party service provider.

16. Review the significant reports to management prepared by the internal auditors (or other personnel or service providers responsible for the internal audit function) and management's responses.

17. Review and discuss with management, and if appropriate, the independent registered public accounting firm and/or any service provider providing internal audit services to the Company, the responsibilities, budget and staffing of the Company's internal audit function.

Legal Compliance/General

18. Periodically review and discuss with the Company's General Counsel, or their designee, any legal matters that have been brought to the Committee's attention and that could have a significant impact on the Company's financial statements.

19. Review and discuss with management and the independent registered public accounting firm the Company's guidelines and policies with respect to risk assessment and risk management. The Committee should discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

20. Set clear policies for the Company's hiring of partners or employees or former partners or former employees of the independent registered public accounting firm. At a minimum, these policies must provide that any independent registered public accounting firm may not provide audit services to the Company if the chief executive officer, controller, chief financial officer, chief accounting officer or any person serving in an equivalent capacity for the Company was employed by the independent registered public accounting firm and participated in any capacity in the audit of the Company during the one-year period preceding the date of the initiation of the audit.


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

21. Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

22. Oversee, review and periodically update the Company's Code of Business Conduct and Ethics (the "Code") (including review of requests of waivers thereof by executive officers and directors) and the Company's system to monitor compliance with and enforce the Code.

23. Unless otherwise approved or ratified pursuant to the Board's "Related Person Transaction Policy," the Committee shall review and approve or ratify all transactions between the Company and any Related Person that are required to be disclosed pursuant to Item 404(a) of Regulation S-K ("Item 404(a)"). "Related Person" shall have the meaning given to such term in Item 404(a), as amended from time to time. Discuss with the independent registered public accounting firm its evaluation of the Company's identification of, accounting for, and disclosure of its relationships with related parties as set forth under the standards of the PCAOB.

24. Review and approve at least on an annual basis the decisions by management to enter into derivative transactions on a cleared or non-cleared basis, and the policies and processes of the Company related thereto, and review and recommend to the Board of Directors on matters pertaining to the Company's derivative transactions and hedging strategy. . . .

<u>Reports</u>

28. Prepare the Audit Committee report required by the SEC to be included in the Company's annual proxy statement.

29. Report regularly to the Board of Directors including:

(i) with respect to any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the qualification, performance and independence of the Company's independent registered public accounting firm or the performance of the internal audit function;

(ii) following meetings of the Committee; and

(iii) with respect to such other matters as are relevant to the Committee's discharge of its responsibilities

The Committee shall provide such recommendations to the Board of Directors as the Committee may deem appropriate. The report to the Board of Directors may take the form of an oral report by the Chairperson or any other member of the Committee designated by the Committee to make such report.

30. Maintain minutes or other records of meetings and activities of the Committee.


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

85. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## SUBSTANTIVE ALLEGATIONS

***Background***

86. Founded in 2007, ZoomInfo is a technology company that offers digital sales and marketing tools to businesses. ZoomInfo's flagship product, SalesOS, is a commercial database that provides sales and marketing professionals with organizational and contact information to help them identify, connect with, and engage prospective customers (i.e., a digital lead list). ZoomInfo's other products, MarketingOS and TalentOS, similarly help businesses by enhancing a businesses' ability to run advertisements and recruit employee candidates, respectively.

87. Defendant Schuck co-founded ZoomInfo's predecessor DiscoverOrg as a marketing and sales startup that provided its B2B clients with a database of business information and contracts. DiscoverOrg was managed by Defendants Schuck, Hyzer, and Hays. On February 4, 2019, Defendants Schuck, Hyzer, and Hays acquired competitor Zoom Information, Inc., which was also a sales and marketing software company providing business contact information to its customers. Following the acquisition, Defendants Schuck, Hyzer, and Hays rebranded the combined company as ZoomInfo.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

88. ZoomInfo primarily operates in the B2B market with its sales and marketing tools adding value to B2B customers by offering detailed information about organizational structures, decision makers, and consumer buying behaviors. ZoomInfo's customers fall into three broad categories: (i) Enterprise, (ii) Mid-Market, and (iii) SMB.

89. ZoomInfo primarily derives its revenue from a subscription-based model, offering subscriptions to ZoomInfo's products at various price points based on customer usage. Specifically, the price points offered by the Company, or "subscription tiers," allow customers to purchase licenses or "seats" to access various products offered by ZoomInfo, as well as units or "credits" to access specific information within ZoomInfo's database. The Company measures its subscription-based revenue through ARR, RPO, and renewal and retention metrics. Such subscription-based revenue models are highly attractive to investors due to their potentially recurring, predictable revenue streams.

***Pre-IPO Activities***

90. Leading up to the Relevant Period, the Individual Defendants sought to rapidly increase ZoomInfo's stock price and conduct an IPO. The Individual Defendants' scheme, which necessitated the rapid increase in subscriber customers, required ZoomInfo to quickly sign-up new customers to the Company's services without performing any due diligence as to whether those customers had the requisite ability to pay for their subscription contracts. Specifically, ZoomInfo's failure to vet its SMB and Mid-Market business customers weakened the Company's ability to collect on its contracts.

91. For example, leading up to the IPO, Defendant Schuck personally directed ZoomInfo employees to sell to as many customers as possible for the express purpose of increasing the Company's pre-IPO stock price.

92. FE-2 confirmed that Defendant Schuck both directed employees to sell to as many customers as possible to increase the Company's stock price prior to the IPO and spearheaded the directive to not perform due diligence into customers' ability to pay their subscription contracts. For example, FE-2 detailed monthly meetings beginning approximately eight months prior to


BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

going public, where Defendant Schuck began talking about the IPO and the Company's "exit plan." Corrected AC ¶ 114. FE-2 explained that during monthly meetings leading up to the IPO, Defendant Schuck told employees that the Company needs "all-hands-on-deck" to sign up as many customers as possible. *Id.* FE-2 added that the Company also began distributing equity in ZoomInfo to employees who previously did not have it to incentivize them to sell to as many customers as possible because the Company's stock price would increase if they were successful in signing up new customers. *Id.* Moreover, according to FE-2, ZoomInfo did not conduct any due diligence on potential clients to ensure that the Company was bringing in high quality and solvent customers, which FE-2 stated was unusual since her experience at other companies she worked for saw those companies conduct due diligence on customers before signing them to contracts. *Id.* ¶ 115.

93. The Individual Defendants' scheme of signing on massive numbers of unvetted customers was initially successful, and when the Company went public on June 4, 2020, ZoomInfo's IPO became the largest public debut by a software company in a decade, as well as the first technology IPO during the COVID-19 pandemic.

94. Given the volatility of the economy in the early days of the COVID-19 pandemic, ZoomInfo's decision to go public drew initial skepticism, especially within the tech sector. Nonetheless, through the IPO, the Company sold 44.5 million shares of stock at a price of $21 per share, with shares rising in value by 60% on the first day of trading to close at $34 per share. From this IPO, ZoomInfo raised nearly $1 billion, marking the largest new technology listing in the United States at that point in time.

***The Individual Defendants Continue to Direct the Rapid Signing On of Risky Customers into the Relevant Period***

95. Numerous FEs confirm that up to and during the Relevant Period that, as part of ZoomInfo's aggressive push to increase sales and inflate the price of its stock, the Company did not perform due diligence into its new customers' ability to pay their subscription contracts. Specifically, FEs confirmed that SMB and Mid-Market customers carried the highest risk of



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

nonpayment and specified specific instances where the Company's accounting department recognized revenue they knew they were unlikely to collect.

96. For example, according to FE-1, there were no discussions around due diligence and vetting prospective customers, and the Company lacked credit control procedures. Corrected AC ¶ 120. FE-1 elaborated that, unlike other similar companies she previously worked for, ZoomInfo did not conduct checks for credit or existing debts held by prospective customers. *Id.* FE-1 stated that the mentality was "get it done, we'll deal with that [any problems] later." FE-1 further recalled the pressure on sales to get revenue and a lack of concern about customer legitimacy from superiors. *Id.*

97. Similarly, FE-10, described the lack of care towards SMB customers and stated that the mentality towards SMB customers in her group was "we don't care, just sign them on and achieve renewals." *Id.* ¶ 121. FE-10 added that ZoomInfo lacked credit checks and described a lack of concern regarding whether a customer was a good company or not. *Id.*

98. FE-3 also detailed how ZoomInfo's aggressive sales tactics and lack of due diligence led to problems with non-payments from customers. *Id.* ¶ 122. FE-3 described that the Company failed to conduct credit checks on potential customers, did not require upfront payment from customers, and only required a business name and a business address to get a deal signed. *Id.* FE-3 further stated that ZoomInfo's sales teams had "no barriers" and "no constraints" on which potential customers they could sell to and noted that ZoomInfo "sold to anyone with a pulse, basically." *Id.* According to FE-3, "[t]he entire length of the company, a decade, the entire thing is just sell – just sell, get that deal signed. Does it mean we're going to collect the money? No. That's what was happening at a large scale here. But it got out of control." *Id.*

99. FEs also discussed how the Individual Defendants promoted internal policies incentivizing the Company's sales teams to forgo due diligence and sign customers with no payment upfront. For example, FE-4 described how the Company had a "Heater" system. *Id.* ¶ 123. The Heater system increased a salesperson's commission by 7 to 10% on any additional sales beyond their quota. *Id.* FE-4 added that once salespeople reached "Heater" they would sell



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

anything at any price point to take advantage. *Id.*

100. FE-3 stated that it was very hard for the Company to fully implement a policy of collecting payments upfront from customers. *Id.* ¶ 124. Moreover, according to FE-3, this was partly due to the company's sales culture. *Id.* For example, FE-3 said, the Company would give services to a mom-and-pop businesses that did not have the money to pay up front. *Id.* FE-3 further discussed that most companies require payment up front for average contract sizes between $15,000-20,000. *Id.* ¶ 125. FE-3 and her team would still recognize the deal as revenue because there was a "contract," "But we're rolling our eyes – when we see this stuff, we're like, 'Are we ever going to see that money?'" *Id.*

***The Individual Defendants Take Advantage of the COVID-19 Pandemic to Sign On Risky Customers***

101. At the same time, as the COVID-19 pandemic was fully setting in, the Individual Defendants used the pandemic as an opportunity for ZoomInfo to sign up even riskier customers that they knew were unvetted and who would likely not renew subscriptions after the COVID-19 pandemic finished.

102. Many smaller and midsize organizations also underwent budget restructuring or obtained temporary funding during the COVID-19 pandemic, including, for example, federal Paycheck Protection Program loans which accommodated the shift to virtual work and volatile market conditions. Notably, ZoomInfo's platform provided this budgetary information to its customers to help them determine whether their potential customers had the ability to pay for their products or services.

103. Accordingly, the Individual Defendants knew that some of its customers would not generate stable, continuous revenue growth, contrary to what ZoomInfo portrayed to its investors. As the COVID-19 pandemic continued, many of these SMBs lost funding or went out of business, eliminating their need for ZoomInfo's products. FEs describe how the Company knew and understood internally of this inevitable reduction of SMB customers. FE-13 explained that as the COVID-19 pandemic continued and as employees returned to the office across the country, it


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

became increasingly difficult for ZoomInfo to retain business, and that a lot of customers were reducing spend and many smaller businesses went out of business. *Id.*

104. Similarly, FE-11 discussed how the Company had difficulties maintaining growth with SMB customers with contract values of $20,000 to $25,000, as FE-11 stated SMBs went to competitors' products unless they were trapped by the Company's auto-renewal policy. *Id.* ¶ 131.

105. ZoomInfo's issues worsened as numerous low-cost competitors began to further diminish demand for ZoomInfo's products.

***The Individual Defendants Overstated ZoomInfo's Metrics Following the IPO***

106. Following ZoomInfo's IPO, the Company was required to comply with SEC and GAAP regulations regarding its financial statements, including reporting the amount of revenue the Company expected to receive on its subscription contracts. However, in the face of mounting payment and collection problems, the Individual Defendants manipulated key accounting metrics and falsely overstated key accounting metrics without incorporating the likelihood of non-collection of payments from subscriber-customers, as required by GAAP.

107. Financial analysts who covered ZoomInfo focused on the Company's RPO metric as a proxy for how the Company was performing as it represented the aggregate value of all outstanding contracts the Company had yet to recognize revenue from. ZoomInfo reported RPO on a quarterly basis and included it as part of its income statement. Accordingly, ZoomInfo was required to report RPO based on GAAP requirements, yet the Company failed to comply with GAAP. Specifically, Accounting Standards Codification ("ASC") 606 of GAAP required ZoomInfo to perform a robust assessment of its likelihood of collecting on its contracts as part of its RPO. Crucially, pursuant to ASC 606, ZoomInfo was required to evaluate the total consideration that was probable to be received as part of an initial contract review prior to day one of the contract's inception. Thus, an improper overestimation of total consideration expected to be received over the life of the contract would thus ***overstate*** the Company's RPO and revenue.[7]

---

[7] Unless otherwise stated, all emphasis is added.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

108. Analysts in particular paid close attention to ZoomInfo's RPO metric because it was meant to give meaningful insight into the revenue that ZoomInfo collected on its subscription contracts. For example, on August 11, 2020, Morgan Stanley described ZoomInfo's current RPO bookings as "***a proxy for annual contract value.***" Barclays similarly stated, "in addition to revenue, RPO can provide some more context as it includes deferred revenue, unbilled backlog from multi-year contracts, and capacity contracts billed arrears. . . . A combination of revenue [] and RPO give a full picture of consumption revenue model." Barclays further stated that "we believe that ***the best approach to model consumption-based revenue models is to start with RPO***."

109. The Company overstated RPO throughout the Relevant Period by not accounting for any failure-to-pay possibilities from, in particular, its risky SMB contracts who were almost certain to not fulfill their subscription contract obligations. For example, FE-3 stated the Company failed to follow very specific accounting rules on the need to predict the collectability of accounts by conducting a proper variable constraint analysis, referring to the accounting practice known as variable consideration. Corrected AC ¶ 137. FE-3 explained that, although the $33 million charge due to non-payments from customers that ZoomInfo revealed in August 2024 came out of the blue, the underlying causes of the charge had been an issue at the Company for multiple years and should have been addressed earlier. *Id.*

110. Additionally, ZoomInfo did not even have a variable constraint model (which provides the likelihood of a Company to actually receive payment on a given analysis) in place to assess collectability. Indeed, ZoomInfo did not use any variable constraint model analysis—as required by GAAP—during the Relevant Period.

111. According to FE-3, the Accounts Receivable team was not applying the proper accounting guidelines, such as failing to develop a variable constraint model to understand the likelihood of collecting on the Company's contracts. *Id.* ¶ 139. Specifically, FE-3 stated that "variable constraint" was "not being applied correctly" and that the Company had been dealing with the issue "for years." *Id.* FE-3 further stated that ZoomInfo was selling to accounts that had a high risk of collectability, which should have been included in a variable constraint calculation.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

*Id.* ¶ 140. Additionally, FE-3 stated that no one at the Company was paying attention to collecting the cash from the contracts. *Id.* According to FE-3, a rule of thumb when you're dealing with that much money of collections is that you need to be able to very accurately predict down to 1 or 2 percent, plus or minus, what you are going to get in the actual door. *Id.*

112. Furthermore, the Individual Defendants inflated RPO by not including bad debt for accounts they knew were uncollectable or delinquent. Instead, the Individual Defendants misleadingly counted revenue from accounts that were hundreds of days into delinquency—and certain not to be collected—in the RPO figures it reported to investors. Specifically, ZoomInfo allowed delinquent accounts to remain on the Company's books as accounts receivable for multiple months without additional action, demonstrating that the Company would never collect revenue on these contracts.

113. According to FE-3, for each account there was accounts receivable information available for "different buckets" in relation to the age of the accounts receivable balance associated with that account. *Id.* ¶ 142. FE-3 stated that there were buckets for account receivables that increased in 30-day increments, and once an account reached 60 days delinquent, it became "much more concerning" and there was an increase in doubtfulness around collectability. *Id.* FE-3 recalled that there were no timely updates into the delinquency of payments which was a problem because customers accessed ZoomInfo's products without needing to make upfront payments. *Id.* According to FE-3, ZoomInfo kept customers on the books as accounts receivable even when they were extremely delinquent on payments, in some cases up to 360 days delinquent. *Id.* FE-3 indicated that such customers should have been written off as uncollectable. *Id.*

114. Throughout the Relevant Period the Individual Defendants manipulated the Company's RPO, misleading investors regarding the risks associated with ZoomInfo's purported sales growth quarter-over-quarter. By reporting robust, overstated RPO metrics, ZoomInfo painted a picture of a healthy company with predictable future revenue when, in reality, that revenue was based on customers with known significant collectability risks that were signed on without any due diligence, much of which should have been identified in ZoomInfo's RPO metrics.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

115. Furthermore, investors understood RPO to be a meaningful "proxy" for ZoomInfo's growing annual contract value ("ACV") and, therefore, reflective of positive business health. Indeed, as reported by analyst Morgan Stanley on June 29, 2020, speaking of ZoomInfo's customers with high dollar ACVs, this number "***will primarily indicate ZoomInfo's ability to get into larger and more complex sales organizations***." Morgan Stanley also stated that ZoomInfo's strong ACV reporting is "***indicative that existing customers are sticking around***." Another analyst, Wells Fargo, described ZoomInfo's high-dollar value ACVs, what investors understood RPO to be connected to, as "***relatively good indicators of the health of the business***." Thus, throughout the Relevant Period, the Individual Defendants manipulated the Company's RPO figures and omitted and/or concealed from investors substantial risks that the Company was required to divulge.

116. The Individual Defendants also knew of ZoomInfo's financial performance. For example, during a podcast on March 14, 2024, Defendant Hyzer was asked about the financial figures that ZoomInfo reports (i.e., RPO), and stated that "[t]hose are the metrics that I wake up every day and like think about, that Henry [Schuck] wakes up every day and thinks about." Moreover, on February 26, 2021, Defendant Schuck was designated as the Chief Operating Decision Maker who "reviews financial information for purpose of making operating decisions, assessing financial performance and allocating resources." Numerous FEs also confirmed that they saw the Individual Defendants review and report on various internal Company metrics including account health and market share.

***The Company's Internal Tracking System Confirmed Customers Were Not Using ZoomInfo's Platforms***

117. During the Relevant Period, the Individual Defendants knew of the risks regarding collectability issues because they closely tracked the Company's customer usage. Critically, due to ZoomInfo's "consumption-based revenue" model for its subscription contracts, investors also understood that ZoomInfo's profitability depended on customers using the Company's products.

118. By 2021, unbeknownst to investors, ZoomInfo's declining demand had become a



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

pervasive and threatening problem. Indeed, ZoomInfo's senior leadership concealed marketing survey results that revealed the Company's market share erosion. Specifically, FE-11 stated that a marketing survey she commissioned showed that ZoomInfo had been surpassed in certain areas by competitors. Corrected AC ¶ 159. Additionally, according to FE-11, she attended meetings every Thursday with Defendant Hays and former Chief Marketing Officer Shane Murphy-Reuter to discuss status updates on demand generation. *Id*. FE-11 further stated that the results of the marketing survey were presented during a Thursday meeting, but it was "buried because it did not tell the story they wanted to tell." *Id*.

119. FE-11 further discussed how the survey showed that ZoomInfo no longer had the best data, which was the Company's competitive advantage. Corrected AC ¶ 160. FE-11 also stated that the Company had "scaled too big," which caused issue maintaining datasets. *Id*. FE-11 explained that she also had meetings with Defendant Hays, Shane Murphy-Reuter, and Defendant Schuck that occurred every few weeks during her 2021 tenure where she expressed that ZoomInfo's "gravy train of growth" was slowing down and that the Company's "hyper growth" was temporary. *Id*.

120. FE-7 explained that the Company's low utilization rates were a "clear sign of trouble" and once seeing these figures she could tell if the New Business group had signed up customers for "a lot" of products that they were not going to use. Corrected AC ¶ 171. Indeed, ZoomInfo's robust internal tracking systems confirmed that fewer customers were using the Company's platforms. For example, numerous FEs recalled that ZoomInfo's representatives had access to account health information through an online system called Gainsight. *Id.* ¶ 172. FEs explained that the figures from Gainsight were made visible to senior leadership through other internal systems including Salesforce. *Id.* Critically, this reporting assigned ZoomInfo's customers scores and color coding based predominantly on how often the customer was logging in and using ZoomInfo, which provided an unmistakable signal to the Individual Defendants that the Company was experiencing significant declining usage rates and collectability challenges. *Id*. FE-8 corroborated the report of the color-coding system in Gainsight and further stated that the


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

customer's health score was determined by looking at the number of inactive licenses and customer sentiment. Corrected AC ¶ 173-174. FE-8 added that customer sentiment was manually inputted by Company representatives. *Id*. ¶ 174. FE-12 also stated that she was able to see metrics in Salesforce regarding customer health. *Id*.

121. FEs also confirmed that Defendants Schuck and Hyzer engaged with the Gainsight information by presenting the color-coded scores in internal meetings. For example, FE-4, recalled quarterly all hands meeting, typically led by Defendant Schuck and Defendant Hyzer, that also served as a "State of the Union" regarding customer account health. *Id.* ¶ 175. FE-4 stated that the color-coded customer health scores were presented during these meetings, and she thought to herself that it was "not where we [ZoomInfo] wanted to be." *Id*. FE-4 also stated that there were some customers who went one month or longer without logging into the Company's platforms, and that plenty of customers had not done the basics. *Id*. FE-4 stated that it was likely that more than 35-40% of users were not logging into their ZoomInfo account. *Id*.

***The Company Coerced Subscription Renewals from Its Customers***

122. As ZoomInfo began losing SMB customers during the Relevant Period, the Company changed its course from boosting sales to forcing existing customers to renew their subscriptions. These subscription renewals were critical to ZoomInfo in maintaining the appearance of a successful company and creating the impression of continuing growth.

123. The Individual Defendants began to implement coercive renewal policies because they knew that the Company's SMB customer base posed serious demand risks since the Company did not conduct due diligence into its ability to collect from these customers. The Company's new auto renewal provisions caused customers to renew their contract at drastically increased prices as well as paying full price for extensions and add-ons from the prior year. However, FEs described how the Company's SMB customer base gave the Company a great deal of push back, as they could not pay under these terms.

124. The forced renewals would entrap customers in an autorenewal cycle, and, if the customer did not pay or tried to end their renewal, then the Company would threaten its captive



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

customers with litigation or turning them over to collection agencies. For example, FE-5 recalled that the Company's deadline for customers to opt-out of their contract was 60 days, but she was instructed by Account Managers to not contact customers until their contract was 59 days away from ending. Corrected AC ¶ 180. FE-5 explained that, by waiting the extra day, it ensured the customer was locked into their renewal, which assisted Account Managers in meeting their quotas. *Id.* FE-10 added that she saw the copy used for renewal emails, and it appeared to her that the Company purposely structured them with the hope it would go to the customer's spam filter. *Id.*

125. The Individual Defendants utilized these tactics even though they harmed relationships with SMBs and even when it was clear that customers could not pay for the autorenewal. For example, FE-10 described conversations with coworkers where they said they felt like a collections agency for customers that did not want to continue their contract with ZoomInfo. *Id.* ¶ 181. FE-9 added that SMB customers would "ghost[]" ZoomInfo because of these autorenewal policies. *Id.* FE-9 further states that issues with the auto-renewal policy contributed to "a lot of people not paying." *Id.*

126. Although these coercive autorenewal practices were successful with some SMB customers, these actions only delayed the inevitable consequences of the Company's failures to perform due diligence into ZoomInfo's customer's abilities to pay for their subscriptions.

127. Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose, *inter alia*, that: (i) the COVID-19 pandemic had temporarily inflated the demand for the Company's platform, and this increased demand was unsustainable; (ii) the Company's reported RPO was inconsistent with GAAP and was inflated due to the lack of due diligence and variable constraint analysis; (iii) there were increased risks of nonpayment from the Company's customers; (iv) a significant amount of the debts owed to the Company remained in accounts receivable despite ongoing delinquency, and the Company was unable to collect on many of these debts; (v) in order to retain its diminishing customer base, the Company instituted deceptive and coercive auto-renewal policies; (vi) as a


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

result of coercive auto-renewal policies, lack of due diligence, and inactive customers, the Company's reported revenues, operating income, and customer retention metrics were materially overstated; (vii) ZoomInfo's financial decline and adverse economic conditions were caused by the Company's own actions and not extraneous factors; (viii) the Company failed to maintain adequate oversight and internal controls over its financial reporting; and (ix) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Individual Defendants' False and Misleading Statements***

***November 9, 2020 Earnings Call***

128. On November 9, 2020, the Company held an earnings call for investors and analysts to discuss its financial results for the third quarter of 2020 (the "3Q20 Earnings Call"). On the 3Q20 Earnings Call, Defendant Schuck touted the Company's increase in sales, stating, in relevant part:

> ***Because of the strength that we're seeing across all areas of the business, including record quarterly new sales, record engagement levels and a new high watermark for our customers spending over $100,000 a year with us, we are raising our financial guidance for the full year.***

129. During the question-and-answer portion of the 3Q20 Earnings Call, when asked about what drove the Company's growth during the quarter, Defendant Hyzer stated, in relevant part:

> And, I ***think one of the things that that we continued to see throughout was that the tension or expansion among our customers continue to accelerate month-over-month, throughout the year. So you know, again, broad-based on both new sales and retention and across all of the different segments of customer segment that we serve***.

130. Moreover, during the 3Q20 Earnings Call, Defendant Hyzer discussed the Company's liabilities and overstated ZoomInfo's RPO, stating that "***With respect to liabilities and future performance obligations***, unearned revenue at the end of the quarter was $176 million ***and remaining performance obligations were $458 million, of which, $349 million are expected to***



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

***be delivered in the next 12 months*.”**

***November 13, 2020 Form 10-Q/A***

131. On November 13, 2020, the Company filed an amended quarterly report for the period ended June 30, 2020, on a Form 10-Q/A with the SEC (the "2Q20 10-Q/A"). The 2Q20 10-Q/A reported the Company's RPO, which was overstated due to ZoomInfo's undisclosed, increased risk of nonpayment from large amounts of customers, particularly SMB and Mid-Market customers, as follows:

The remaining performance obligations consisted of the following (in millions):

| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of June 30, 2020 | $ 319.5 | $ 94.0 | $ 413.5 |

132. The 2Q20 10-Q/A was signed by Defendant Hyzer and was accompanied by certifications made by Defendants Schuck and Hyzer pursuant to Sections 13a-14(a) and 15d-15(e) of the Exchange Act and Section 302 of the Sarbanes-Oxley Act of 2002 (the "SOX Certifications"). In the SOX Certifications, Defendants Schuck and Hyzer attested to the accuracy of the 2Q20 10-Q/A.

***November 13, 2020 Form 10-Q***

133. On November 13, 2020, the Company filed a quarterly report for the period ended September 30, 2020, on Form 10-Q with the SEC (the "3Q20 10-Q"). The 3Q20 10-Q reported the Company's RPO, which was overstated due to ZoomInfo's undisclosed, increased risk of nonpayment from large amounts of customers, particularly SMB and Mid-Market customers, as follows:

The remaining performance obligations consisted of the following (unaudited):

| *(in millions)* | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of September 30, 2020 | $ 349.0 | $ 108.6 | $ 457.6 |

134. The 3Q20 10-Q was signed by Defendant Hyzer, and was accompanied by SOX


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

Certifications from Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 3Q20 10-Q.

***November 18, 2020 RBC Capital Markets Conference***

135. On November 18, 2020, Defendant Schuck represented the Company at the RBC Capital Markets, Global Technology, Internet, Media and Telecommunications Conference (the "RBC Conference 2020"). When asked by an analyst at the RBC Conference 2020 to discuss the "COVID impacts" affecting ZoomInfo and how vaccines stand to cause a "change in business trends for 2021," Defendant Schuck stated, in relevant part:

> And so, ***we don't view a world where customers kind of like come out of – get vaccines and go, oh, well, let's just go back to this really inefficient way to go-to-market where we're not leveraging data and insights and technology to do that. So, we feel pretty confident that shift is here to stay***.

***February 22, 2021 Earnings Call***

136. On February 22, 2021, the Company held an earnings call for investors and analysts to discuss the financial results for the fourth quarter of 2020 (the "4Q20 Earnings Call"). During the 4Q20 Earnings Call, Defendant Hyzer again touted the Company's customer base, stating, in relevant part:

> ***We saw record new customer additions and strong retention in upsell activity in the fourth quarter. As of December 31, we have more than 20,000 customers representing greater than 35% growth relative to 2019***, and more than 850 customers . . . with $100,000 or more in ACV representing greater than 45% growth.

137. Defendant Hyzer also discussed the Company's RPO, stating, in relevant part, that "***[w]ith respect to liabilities and future performance obligations***, unearned revenue at the end of quarter was $233 million [and] [t]he ***remaining performance obligations or RPO were $559 million, of which, $432 million are expected to be delivered in the next 12 months***."

***February 26, 2021 Form 10-K***

138. On February 26, 2021, the Company filed its annual report for the fiscal year 2020 on a Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K overstated the Company's RPO,



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

stating, in relevant part:

The remaining performance obligations consisted of the following (in millions):

| | Current | Noncurrent | Total |
|---|---|---|---|
| As of December 31, 2020 | $ 432.2 | $ 126.8 | $ 559.0 |
| As of December 31, 2019 | $ 266.6 | $ 74.1 | $ 340.7 |

139. The 2020 10-K was signed by Defendants Schuck, Crockett, Dhruv, Enright, Evans, Mader, McCarter, Winn, and Hyzer. The 2020 10-K was also accompanied by SOX Certifications from Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 2020 10-K.

***March 2, 2021 JMP Conference***

140. On March 2, 2021, Defendant Schuck represented the Company at the JMP Securities Technology Conference (the "JMP Conference"). During the JMP Conference, when asked by an analyst about ZoomInfo's momentum in the fourth quarter of 2020, Defendant Schuck stated, in relevant part:

> Yeah, I mean I think what 2020 was by and large was a tale of two halves. So you had the first half of the year which you know you felt a pretty significant headwind and in the second half of the year where ***you felt improvement throughout the second half. And I think Q4, what you saw was that trend continuing***. And so we saw broad improvements in performance across the business. ***And so you had a record new sales number, you had record retention activity, we had record international revenue, we had record engaged revenue and so you really felt that all of the things that you invested in since the acquisition of ZoomInfo and through 2020 really paid off in Q4 and so that the results were pretty broad-based improvements across the business***.

***May 3, 2021 Earnings Call and Form 10-Q***

141. On May 3, 2021, the Company held an earnings call for investors and analysts to discuss the first quarter financial results for 2021 (the "1Q21 Earnings Call"). During the 1Q21 Earnings Call, Defendant Schuck highlighted the Company's strong financial results, stating:

> ***The first quarter was marked by strong accelerating growth across all of our business lines***. We delivered GAAP revenue of $153 million, representing 50%


BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

> year-over-year growth and 12% sequentially when adjusted for the number of days in the quarter. Adjusted operating income was $66 million, representing an operating margin of 43%. These results were driven by dependable execution across the entire company from new business to product development to retention. Our focus on continuous improvement as a core cultural value and the execution we build on top of that has allowed us to deliver our near-term financial results consistently while setting us up for long-term durable growth.
>
> We had strong results across all areas of the business, and ***I want to specifically call out that we achieved our best-ever Q1 results this quarter on three dimensions: new business, new customer additions, and retention activity.*** We doubled the number of new customers added this quarter compared to Q1 2020. ***We also had record renewals*** and upsells as a percentage of beginning ACV for a first quarter as we saw demand for our products continue to accelerate, with company looking to drive a digital, data-driven go-to-market motion.

142. Defendant Hyzer similarly touted the Company's strong quarter and RPO, attributing the Company's success, in part, to the increase in customers, stating:

> ***With respect to liabilities and future performance obligations***, unearned revenue at the end of the quarter was $262 million. ***And the remaining performance obligations, or RPO, were $592 million, of which $461 million are expected to be delivered in the next 12 months***.

143. Also on May 3, 2021, the Company filed its quarterly report for the period ended March 31, 2021, on a Form 10-Q with the SEC (the "1Q21 10-Q"). The 1Q21 10-Q reported the misleading RPO metric as follows:

> The remaining performance obligations consisted of the following (in millions):

| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of March 31, 2021 | $ 461.3 | $ 130.3 | $ 591.6 |

144. The 1Q21 10-Q was signed by Defendant Hyzer and contained SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 1Q21 10-Q.

***May 25, 2021 JP Morgan Conference***

145. On May 25, 2021, Defendant Schuck represented the Company at the JP Morgan Global Virtual Technology, Media and Communications Conference (the "JP Morgan Conference"). When asked by an analyst about the reasons for ZoomInfo's successes in the first


BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

quarter at the JP Morgan Conference, Defendant Schuck praised the Company's execution stating, in relevant part:

> I think the best answer to this question is, we saw an incredibly balanced set of execution across our go-to-market motion. And so you saw new business have a record quarter. You saw enterprise customer who was spending over $100,000 a year with us brought in over 950 customers. We saw our international continue to gain momentum. We saw our Engage Solution continue to gain momentum. ***We saw the highest retention and renewal activity on our existing customer base that we ever saw***.

***June 14, 2021 Analyst Day***

146. On June 14, 2021, the Company hosted its annual Analyst Day (the "Analyst Day"). During the Analyst Day, in response to a question about the demand environment the Company was experiencing post-COVID-19, Defendant Schuck stated, in relevant part:

> Yes. So, I think, first, ***we are seeing an incredibly healthy demand environment***. I think what you saw as COVID came on in March was a bit of a pullback and a slowdown in the decision-making process especially in the enterprise. And we really saw Q3 and Q4 really accelerating the comeback. ***And we really do feel today that the pandemic environment is very far behind us and we rebounded to sort of the pre-pandemic demand environment which is fueled by a secular tailwind around digitization of the go-to-market effort***.

***August 2, 2021 Earnings Call and Form 10-Q***

147. On August 2, 2021, the Company held an earnings call for investors and analysts to discuss the second quarter financial results for 2021 (the "2Q21 Earnings Call"). During the 2Q21 Earnings Call, Defendant Hyzer spoke on the Company's RPO stating, that "***[w]ith respect to liabilities and future performance obligations***, unearned revenue at the end of the quarter was $276 million and ***remaining performance obligations or RPO were $648 million, of which, $505 million are expected to be delivered in the next 12 months***."

148. Additionally, during the 2Q21 Earnings Call, Defendant Schuck spoke on the historical levels of retention activity and customer engagement stating, in relevant part:

> ***This was our best ever second quarter for new customer additions, and, we recorded the highest levels ever for both retention activity and customer engagement***.

149. Also on August 2, 2021, the Company filed its quarterly report for the period ended



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

June 30, 2021 on a Form 10-Q with the SEC (the "2Q21 10-Q"). The 2Q21 10-Q reported the Company's RPO as follows:

The remaining performance obligations consisted of the following (in millions):

| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of June 30, 2021 | $ 505.2 | $ 142.9 | $ 648.1 |

150. The 2Q21 10-Q was signed by Defendant Hyzer. The 2Q21 10-Q also contained SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 2Q21 10-Q.

***November 1, 2021 Earnings Call and Form 10-Q***

151. On November 1, 2021, the Company held an earnings call for investors and analysts to discuss the financial results for the third quarter of 2021 (the "3Q21 Earnings Call"). During the 3Q21 Earnings Call, Defendant Hyzer touted the Company's RPO stating, in relevant part:

> ***With respect to liabilities and future performance obligations***, unearned revenue at the end of the quarter was $288 million and ***remaining performance obligations, or RPO, were $712 million, of which $552 million are expected to be delivered in the next 12 months***.

152. Also on November 1, 2021, the Company filed its quarterly report for the period ended September 30, 2021 with the SEC (the "3Q21 10-Q"). The 3Q21 10-Q reported ZoomInfo's RPO as follows:

The remaining performance obligations consisted of the following (in millions):

| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of September 30, 2021 | $ 552.2 | $ 160.0 | $ 712.3 |

153. The 3Q21 10-Q was signed by Defendant Hyzer and was accompanied by SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 3Q21 10-Q.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

***February 15, 2022 Earnings Call***

154. On February 15, 2022, the Company held an earnings call for analysts and investors to discuss the financial results for the fourth quarter and full fiscal year of 2021 (the "4Q21 Earnings Call"). During the 4Q21 Earnings Call, Defendant Schuck discussed the Company's room for expansion, indicating that the demand from the COVID-19 pandemic was not unique stating, in relevant part:

> I'll tell you, we're constantly looking at the data, the historical data. We look at win rates, funnel conversion, top of funnel activity. And we spent a real amount of time looking for anomalies that we could tie back to some relation to COVID. ***And we didn't see anything that [would cause us to] believe that the current strong demand trends we're seeing wouldn't continue or one-offy or a pull-forward***. And we wanted to be confident about that because it would affect the way we operate the business. We didn't see any anomalies like that that made us think that COVID caused a pull-forward in the demand environment that we're seeing today wouldn't continue.

155. Moreover, during the 4Q21 Earnings Call, Defendant Hyzer discussed the Company's RPO stating, in relevant part:

> ***With respect to liabilities and future performance obligations***, unearned revenue at the end of the quarter was $364 million and ***remaining performance obligations, or RPO, were $864 million, of which $672 million are expected to be delivered in the next 12 months***.

***February 16, 2022 Yahoo Interview***

156. On February 16, 2022, Defendant Schuck participated in an interview with Yahoo Finance (the "Yahoo Interview"). During the Yahoo Interview, in response to a question on the macro factors causing slowdowns, Defendant Schuck falsely denied any slowdown due to COVID-19 and against indicated that the COVID-19 pandemic did not cause a "pull forward" in demand for the Company's products stating, in relevant part:

> Yeah, we're really not, Brian. And, you know, one thing that's interesting about our company is that there's a lot of talk about whether COVID and the pandemic had a pull forward in demand for us. And really, what we've realized are two things. ***One, we went back and we looked at all of our numbers-- win rates, funnel conversion, top of the funnel pipeline generation-- from before the pandemic today, and we looked for any anomalies that could have indicated that we had this pull forward in demand that came from COVID. And we didn't see anything in the data that would help-- that would make us think that***.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

***February 24, 2022 Form 10-K***

157. Shortly thereafter, on February 24, 2022, the Company filed its annual report for 2021 on a Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K reported the Company's RPO as follows:

The remaining performance obligations consisted of the following (in millions):

| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of December 31, 2021 | $ 671.5 | $ 192.9 | $ 864.4 |
| As of December 31, 2020 | $ 432.2 | $ 126.8 | $ 559.0 |

158. The 2021 10-K was signed by Defendants Schuck, Crockett, Dhruv, Enright, Evans, Mader, McCarter, Winn, and Hyzer. The 2021 10-K was also accompanied by SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 2021 10-K.

***March 29, 2022 Proxy Statement***

159. On March 29, 2022, the Company filed its annual proxy statement on a Schedule 14A with the SEC (the "2022 Proxy"). Defendants Dhruv, Schuck, Enright, Evans, Crockett, Mader, and Winn each solicited the 2022 Proxy.

160. The 2022 Proxy called for shareholders to approve, *inter alia*, the reelection of Defendant Mader to the Board.

161. In a section titled "Oversight of Risk Management," the 2022 Proxy stated:

> The Board has extensive involvement in the oversight of risk management related to us and our business. The Board accomplishes this oversight both directly, including as it relates to ESG risk exposures, and through its Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Privacy, Security and Technology Committee, each of which assists the Board in overseeing a part of our overall risk management and regularly reports to the Board. The Audit Committee represents the Board by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the oversight of administrative and financial controls, our compliance with legal and regulatory requirements and our policies with respect to risk assessment and risk management. Through its regular meetings with management, including the finance, legal and internal audit functions, the Audit Committee


BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

> reviews and discusses significant areas of our business and related risks and summarizes for the Board areas of risk and any mitigating factors. The Compensation Committee considers, and discusses with management, management's assessment of certain risks, including whether any risks arising from our compensation policies and practices for our employees are reasonably likely to have a material adverse effect on us. The Nominating and Corporate Governance Committee oversees and evaluates programs and risks associated with Board organization, membership and structure, succession planning and corporate governance. In addition, our Board receives periodic detailed operating performance reviews from management. The Privacy, Security and Technology Committee, represents the Board by periodically reviewing and discussing with Company management the Company's major risk exposures relating to privacy, cybersecurity, and technology, and the steps the Company takes to detect, monitor, and actively manage such exposures.

162. Regarding the Code of Conduct, the 2022 Proxy stated the following:

> We maintain a Code of Business Conduct and Ethics that is applicable to all of our directors, officers and employees, including our Chairman and Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and other senior officers. The Code of Business Conduct & Ethics sets forth our policies and expectations on a number of topics, including conflicts of interest, corporate opportunities, confidentiality, compliance with laws (including insider trading laws), use of our assets and business conduct and fair dealing. This Code of Business Conduct and Ethics also satisfies the requirements for a code of ethics, as defined by Item 406 of Regulation S-K promulgated by the SEC. The Code of Business Conduct and Ethics may be found on our website at *ir.zoominfo.com* under Governance: Governance Highlights: Governance Documents: Code of Business Conduct and Ethics.
>
> We will disclose within four business days any substantive changes in or waivers of the Code of Business Conduct and Ethics granted to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, by posting such information on our website as set forth above rather than by filing a Form 8-K. In the case of a waiver for an executive officer or a director, the required disclosure also will be made available on our website within four business days of the date of such waiver.

163. The 2022 Proxy was materially false and misleading because it failed to disclose that: (i) the Board was not adequately performing its risk oversight function; and (ii) the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (a) making and/or causing the Company to make the numerous false and misleading statements; (b) causing the Company to institute deceptive and coercive auto-renewal policies and omissions alleged herein; and (c) failing to report violations of the Code of Conduct.

***May 2, 2022 Earnings Call and Form 10-Q***

164. On May 2, 2022, the Company held an earnings call for investors and analysts to


BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

discuss the financial results for the first quarter of 2022 (the "1Q22 Earnings Call"). During the 1Q22 Earnings Call, Defendant Hyzer discussed the Company's RPO stating, in relevant part:

> ***With respect to liabilities and future performance obligations***, unearned revenue at the end of the quarter was $406 million and ***remaining performance obligations or RPO were $918 million, of which $715 million are expected to be delivered in the next 12 months***.

165. Also on May 2, 2022, the Company filed its quarterly report for the period ended March 31, 2022, on a Form 10-Q with the SEC (the "1Q22 10-Q"). The 1Q22 10-Q reported the Company's RPO as follows:

The remaining performance obligations consisted of the following (in millions):

| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of March 31, 2022 | $ 715.0 | $ 202.6 | $ 917.6 |

166. The 1Q22 10-Q was signed by Defendant Hyzer and was accompanied by SOX Certifications executed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 1Q22 10-Q.

***August 1, 2022 Earnings Call and Form 10-Q***

167. On August 1, 2022, the Company held an earnings call with investors and analysts to discuss the Company's financial results for the second quarter of 2022 (the "2Q22 Earnings Call"). During the 2Q22 Earnings Call, Defendant Hyzer discussed the Company's RPO stating, in relevant part:

> ***With respect to liabilities and future performance obligations***, unearned revenue at the end of the quarter was $412 million and ***[our] remaining performance obligations, or RPO, were $985 million, of which $764 million are expected to be delivered in the next 12 months***.

168. Also on August 1, 2022, the Company filed its quarterly report for the period ended June 30, 2022 on a Form 10-Q with the SEC (the "2Q22 10-Q"). The 2Q22 10-Q reported the Company's RPO as follows:



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

The remaining performance obligations consisted of the following (in millions):

| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of June 30, 2022 | $ 764.2 | $ 220.5 | $ 984.7 |

169. The above statements were materially false and misleading because they failed to disclose, *inter alia*, that: (i) the COVID-19 pandemic had temporarily inflated the demand for the Company's platform, and this increased demand was unsustainable; (ii) the Company's reported RPO was inconsistent with GAAP and was inflated due to the lack of due diligence and variable constraint analysis; (iii) there were increased risks of nonpayment from the Company's customers; (iv) a significant amount of the debts owed to the Company remained in accounts receivable despite ongoing delinquency, and the Company was unable to collect on many of these debts; (v) in order to retain its diminishing customer base, the Company instituted deceptive and coercive auto-renewal policies; (vi) as a result of coercive auto-renewal policies, lack of due diligence, and inactive customers, the Company's reported revenues, operating income, and customer retention metrics were materially overstated; (vii) ZoomInfo's financial decline and adverse economic conditions were caused by the Company's own actions and not extraneous factors; (viii) the Company failed to maintain adequate oversight and internal controls over its financial reporting; and (ix) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Begins to Emerge***

***November 1, 2022 Earnings Call and Form 10-Q***

170. On November 1, 2022, the Company hosted an earnings call for investors and analysts to discuss the financial results for the third quarter of 2022 (the "3Q22 Earnings Call"). During the 3Q22 Earnings Call, it was revealed for the first time that the Company's customer base was not as strong as the Company had led on. Defendant Schuck indicated during the 3Q22 Earnings Call that ZoomInfo was facing "a challenging macroeconomic environment."



BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

Additionally, during the 3Q22 Earnings Call, Defendant Hyzer revealed that the Company was experiencing a greater level of scrutiny from customers, stating, in relevant part:

> While we are more insulated from macro challenges relative to many companies and we benefit from long-term secular trends toward digitization, we are not immune to the macroeconomic environment in the short term. Towards the end of Q3 and as we entered Q4***, we saw a greater level of financial scrutiny from buyers, which further elongated sales cycles***. All deals, including straight renewals are requiring more effort to reach an outcome, which stretches our sales team and capacity. As reps are spending more time on renewals, we see that their capacity to drive incremental upsells is becoming a limiting factor to growth of existing customers. ***As a result of the more challenging environment, we now expect dollar-based net retention in 2022 to retrace the gains that we were able to achieve in 2021***.

171. On this news, the price of ZoomInfo stock declined $12.69 per share, or approximately 29.2%, from a close of $43.50 per share on November 1, 2022, to close at $30.81 per share on November 2, 2022.

172. Analysts were surprised by the sudden negative news announced by ZoomInfo. For example, analysts form Canaccord Genuity expressed concern, stating, "[w]ell, this wasn't the update that we were expecting to get from ZoomInfo. . . . where ZI seems to be seeing more pronounced headwinds is on seat count and data expansion growth, which played a key role in the net revenue retention gains that the business enjoyed in 2021." Canaccord Genuity further noted that "[t]aking a step back, ZoomInfo's lackluster Q3 came as a surprise, and we're therefore not shocked to see the stock down 20%+. After all, management was pretty bullish at our conference in mid-August, and as late as mid-September at the Goldman event, the suggestion was that Q3 was not looking any worse than Q2."

173. Nevertheless, despite these partial disclosures, the Individual Defendants continued to make false and misleading statements, suggesting the Company's poor results were caused by factors beyond its control. For example, during the 3Q22 Earnings Call, Defendant Hyzer tried to reassure investors that ZoomInfo would be adjusting "cash flow expectations in the short term ***to reflect the potential for more flexibility in payment terms related to a worsening macro environment***." Defendant Hyzer also assured investors that "***gross retention continues to be really strong, over 90%***," and Defendant Schuck touted that ZoomInfo was "***continuing to see really***


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

***strong demand. . . . [W]hat we're seeing is even though we're really a strong demand environment, those deals are just taking longer to get to close***."

174. Additionally, during the 3Q22 Earnings Call, Defendant Hyzer reported on the Company's inflated RPO stating, in relevant part:

> ***With respect to liabilities and future performance obligations***, unearned revenue at the end of the quarter was $381 million and ***remaining performance obligations or RPO were $979 million, of which $757 million are expected to be delivered in the next 12 months***.

175. The Company also filed its quarterly report for the period ended September 30, 2022, on a Form 10-Q with the SEC on November 1, 2022 (the "3Q22 10-Q"). The 3Q22 10-Q reported the Company's RPO as follows:

> The remaining performance obligations consisted of the following (in millions):

| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of September 30, 2022 | $ 756.9 | $ 221.9 | $ 978.8 |

176. The 3Q22 10-Q was signed by Defendant Hyzer and was accompanied by SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 3Q22 10-Q.

***November 16, 2022 RBC Global Technology Conference***

177. The truth continued to emerge on November 16, 2022, when Defendant Hyzer participated in the RBC Global Technology, Internet, Media & Telecom Conference (the "RBC Conference 2022"). During the RBC Conference 2022, Defendant Hyzer again revealed that the Company was experiencing increased customer scrutiny, stating that "we did see increased pressure with respect to macro headwinds and more scrutiny from buyers that really impacted the capacity of our sales team, and we don't see that – and we continue to see that scrutiny in Q4." Defendant Hyzer also emphasized that "we don't see any evidence currently that the macroeconomic pressure is going to subside or turn around quickly . . . in the short term . . . . [I]f you look at doing 4% to 5% sequential growth each quarter in 2023 [] that would get you into


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

something that's more like a high-teens growth rate."

178. On this news, the Company's stock price dropped $5.52 per share over the course of two days, or approximately 17.4%, from a close of $31.69 on November 16, 2022, to close at $26.17 per share on November 17, 2022.

179. Analysts were again surprised by these disclosures, with analysts from Wolfe Research noting that "ZoomInfo's CFO, Cameron Hyzer, . . . shocked many investors as he indicated 'high-teens growth' for FY23 makes sense vs. the mid-20%+ many on the Street were modeling." Likewise, analysts from Bank of America Global Research reported that "[w]e find the timing of the new disclosure odd given the company reported its 3Q22 results just two weeks ago on 11/2/22, which raises the question if the selling environment has deteriorated further since."

180. Despite these partial disclosures, the Individual Defendants continued to make false and misleading statements. For example, during the RBC Conference 2022, Defendant Hyzer concealed the full extent of the financial impact flowing from ZoomInfo's lack of due diligence into its customers' payment capabilities, stating that "as we started talking about in Q2, ***we are seeing macro headwinds that are impacting the business and manifesting itself in terms of longer sales cycles***."

***February 6, 2023 Earnings Call***

181. On February 6, 2023, the Company held an earnings call for investors and analysts to discuss the Company's financial results for the fourth quarter of 2022 (the "4Q22 Earnings Call"). During the 4Q22 Earnings Call, Defendant Hyzer reported the Company's RPO stating, in relevant part:

> ***With respect to liabilities and future performance obligations***, unearned revenue at the end of the year was $420 million. And ***remaining performance obligations, or RPO, were $1.1 billion, of which $842 million are expected to be delivered in the next 12 months***.

***February 16, 2023 Form 10-K***

182. Shortly thereafter, on February 16, 2023, the Company filed its annual report for 2022 on a Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K reported the Company's



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

RPO as follows:

The remaining performance obligations consisted of the following (in millions):

| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of December 31, 2022 | $ 842.2 | $ 264.5 | $ 1,106.7 |
| As of December 31, 2021 | $ 671.5 | $ 192.9 | $ 864.4 |

183. The 2022 10-K was signed by Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, Winn, and Hyzer. The 2022 10-K was also accompanied by SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 2022 10-K.

***March 29, 2023 Proxy Statement***

184. On March 29, 2023, the Company filed its annual proxy statement on a Schedule 14A with the SEC (the "2023 Proxy"). Defendants Dhruv, Schuck, Enright, Evans, Mader, Gleeson, Crockett, and Winn each solicited the 2023 Proxy.

185. The 2023 Proxy called for shareholders to approve, *inter alia*, the reelection of Defendants Crockett, McCarter, and Winn to the Board.

186. In a section titled "Oversight of Risk Management," the 2023 Proxy stated:

> The Board has extensive involvement in the oversight of risk management related to us and our business. The Board accomplishes this oversight both directly and through its Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Privacy, Security and Technology Committee, each of which assists the Board in overseeing a part of our overall risk management and regularly reports to the Board. The Audit Committee represents the Board by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the oversight of administrative and financial controls, our compliance with legal and regulatory requirements and our policies with respect to risk assessment and risk management. Through its regular meetings with management, including the finance, legal and internal audit functions, the Audit Committee reviews and discusses significant areas of our business and related risks and summarizes for the Board areas of risk and any mitigating factors. The Compensation Committee considers, and discusses with management, management's assessment of certain risks, including whether any risks arising from our compensation policies and practices for our employees are reasonably likely to have a material adverse effect on us. The Nominating and Corporate Governance Committee oversees and evaluates programs and risks


BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

> associated with Board organization, membership and structure, succession planning and corporate governance. In addition, our Board receives periodic detailed operating performance reviews from management. The Privacy, Security and Technology Committee, represents the Board by periodically reviewing and discussing with Company management the Company's major risk exposures relating to privacy, cybersecurity, and technology, and the steps the Company takes to detect, monitor, and actively manage such exposures.

187. Regarding the Code of Conduct, the 2023 Proxy stated:

> We maintain a Code of Business Conduct and Ethics that is applicable to all of our directors, officers and employees, including our Chairman and Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and other senior officers. The Code of Business Conduct & Ethics sets forth our policies and expectations on a number of topics, including conflicts of interest, corporate opportunities, confidentiality, compliance with laws (including insider trading laws), use of our assets and business conduct and fair dealing. This Code of Business Conduct and Ethics also satisfies the requirements for a code of ethics, as defined by Item 406 of Regulation S-K promulgated by the SEC. The Code of Business Conduct and Ethics may be found on our website at *ir.zoominfo.com* under Governance: Governance Highlights: Governance Documents: Code of Business Conduct and Ethics.
>
> We will disclose within four business days any substantive changes in or waivers of the Code of Business Conduct and Ethics granted to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, by posting such information on our website as set forth above rather than by filing a Form 8-K. In the case of a waiver for an executive officer or a director, the required disclosure also will be made available on our website within four business days of the date of such waiver.

188. The 2023 Proxy was materially false and misleading because it failed to disclose that: (i) the Board was not adequately performing its risk oversight function; and (ii) the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (a) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; (b) causing the Company to institute deceptive and coercive auto-renewal policies and omissions alleged herein; and (c) failing to report violations of the Code of Conduct.

***May 1, 2023 Earnings Call and Form 10-Q***

189. On May 1, 2023, the Company held an earnings call for investors and analysts to discuss the Company's financial results for the first quarter of 2023 (the "1Q23 Earnings Call"). During the 1Q23 Earnings Call, Defendant Hyzer reported the Company's RPO stating, in relevant part:



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

> ***With respect to liabilities and future performance obligations***, unearned revenue at the end of the quarter was $451 million; and ***remaining performance obligations, or RPO, were $1.1 billion, of which $839 million are expected to be delivered in the next 12 months***.

190. Also on May 1, 2023, the Company filed its quarterly report for the period ended March 31, 2023 on a Form 10-Q with the SEC (the "1Q23 10-Q"). The 1Q23 10-Q reported the Company's RPO as follows:

> The remaining performance obligations consisted of the following (in millions):

| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of March 31, 2023 | $ 839.2 | $ 253.3 | $ 1,092.5 |

191. The 1Q23 10-Q was signed by Defendant Hyzer and was accompanied by SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 1Q23 10-Q.

***July 31, 2023 Earnings Call and Form 10-Q***

192. The truth continued to emerge on July 31, 2023, when the Company issued a press release announcing its financial results for the second quarter of 2023 (the "2Q23 Earnings Release"). The 2Q23 Earnings Release announced a decline in ZoomInfo's customers with high-value ACVs, for which RPO was a proxy.

193. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of 2023 (the "2Q23 Earnings Call"), wherein Defendant Shuck revealed, in relevant part:

> Our customers, sales leaders who sit disproportionately in the software vertical are reducing spending in the context of a lower growth environment. For high growth companies in particular, where the demand has been reduced and investors are expecting higher levels of profitability, these cuts have proved substantial . . . .

194. Likewise, Defendant Hyzer noted during the 2Q23 Earnings Call that ZoomInfo "saw continued elevated write-offs for our smaller customers."

195. On this news, the Company's stock price dropped $7.17 per share over the course



BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

of two days, or approximately 28%, from a close of $25.57 on July 31, 2023, to close at $18.40 per share on August 2, 2023.

196. Analysts reacted negatively to this news with analysts from UBS Research noting that "ZI's 16% 2QF23 revs growth missed the guide (~1% short of mid-point) & it lowered its FY23 revs growth guide to 12% from 17% (implying a 3% 4QF23 exit growth rate vs. 12% prior). This was well below investor expectations & even short of the bear case for a modest guide down."

197. Despite these partial disclosures, the Individual Defendants continued to make false and misleading statements. During the 2Q23 Earnings Call, Defendant Hyzer reported the Company's misleading RPO stating, in relevant part:

> ***With respect to liabilities and future performance obligations***, unearned revenue at the end of the quarter was $443 million and ***remaining performance obligations, or RPO, were $1.1 billion, of which $849 million are expected to be delivered in the next 12 months***.

198. Defendant Schuck also falsely reassured investors during the 2Q23 Earnings Call that increased cancellations of the Company's subscriptions resulted from "***budgetary pressures and their corresponding downward pressure on renewals***." Defendant Schuck specifically assured investors that "***[i]n the SMB segment, where we see lower price and lower quality competitors, we still see strong performance, with more pipeline created, higher win rates, faster close times, and higher ASPs. Metrics that also indicate our value competition when compared to our competition remains obvious***."

199. Additionally, during the 2Q23 Earnings Call, Defendant Hyzer assured that the Company was retaining customers and that "we do expect gross retention to tick down a little, but more of the net retention in terms of our expectation is being impacted by fewer upsells and more downsells. ***So it's more we're keeping those customers, but we're seeing the renewals being more challenging***. And so yes, I think that's the real focus with respect to gross retention in 2023."

200. Furthermore, on the same day, July 31, 2023, the Company filed its quarterly report on a Form 10-Q with the SEC for the second quarter of 2023 (the "2Q23 10-Q"). The 2Q23 10-Q reported the Company's RPO as follows:



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

The remaining performance obligations consisted of the following (in millions):

| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of June 30, 2023 | $ 848.7 | $ 262.2 | $ 1,110.9 |

201. The 2Q23 10-Q was signed by Defendant Hyzer and was accompanied by SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 2Q23 10-Q.

***October 30, 2023 Earnings Call and Form 10-Q***

202. On October 30, 2023, the Company held an earnings call for investors and analysts to discuss the financial results for the third quarter of 2023 (the "3Q23 Earnings Call"). During the 3Q23 Earnings Call, Defendant Hyzer reported the Company's RPO stating, in relevant part:

> ***With respect to liabilities and future performance obligations***, unearned revenue at the end of Q3 was $403 million and ***remaining performance obligations or RPO were $1.1 billion, of which $795 million are expected to be delivered in the next 12 months***.

203. Also on October 30, 2023, the Company filed its quarterly report for the period ended September 30, 2023, on a Form 10-Q with the SEC (the "3Q23 10-Q"). The 3Q23 10-Q reported the Company's inflated RPO as follows:

The remaining performance obligations consisted of the following (in millions):

| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of September 30, 2023 | $ 795.2 | $ 261.5 | $ 1,056.7 |

204. The 3Q23 10-Q was signed by Defendant Hyzer and was accompanied by SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 3Q23 10-Q.

***March 29, 2024 Proxy Statement***

205. On March 29, 2024, the Company filed its annual proxy statement for 2024 on a



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

Schedule 14A with the SEC (the "2024 Proxy"). Defendants Schuck, Enright, Evans, Mader, Crockett, Winn, Gleeson, and McCarter each solicited the 2024 Proxy.

206. The 2024 Proxy called for shareholders to approve, *inter alia*, the reelection of Defendants Schuck and Enright to the Board.

207. In a section titled "Oversight of Risk Management," the 2024 Proxy stated:

> The Board has extensive involvement in the oversight of risk management related to us and our business. The Board accomplishes this oversight both directly and through its Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Privacy, Security and Technology Committee, each of which assists the Board in overseeing a part of our overall risk management and regularly reports to the Board. The Audit Committee represents the Board by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the oversight of administrative and financial controls, our compliance with legal and regulatory requirements and our policies with respect to risk assessment and risk management. Through its regular meetings with management, including the finance, legal and internal audit functions, the Audit Committee reviews and discusses significant areas of our business and related risks and summarizes for the Board areas of risk and any mitigating factors. The Compensation Committee considers, and discusses with management, management's assessment of certain risks, including whether any risks arising from our compensation policies and practices for our employees are reasonably likely to have a material adverse effect on us. The Nominating and Corporate Governance Committee oversees and evaluates programs and risks associated with Board organization, membership and structure, succession planning and corporate governance. In addition, our Board receives periodic detailed operating performance reviews from management. The Privacy, Security and Technology Committee, represents the Board by periodically reviewing and discussing with Company management the Company's major risk exposures relating to privacy, cybersecurity, and technology, and the steps the Company takes to detect, monitor, and actively manage such exposures.

208. Regarding the Code of Conduct, the 2024 Proxy stated:

> We maintain a Code of Business Conduct and Ethics that is applicable to all of our directors, officers and employees, including our Chairman and Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and other senior officers. The Code of Business Conduct & Ethics sets forth our policies and expectations on a number of topics, including conflicts of interest, corporate opportunities, confidentiality, compliance with laws (including insider trading laws), use of our assets and business conduct and fair dealing. This Code of Business Conduct and Ethics also satisfies the requirements for a code of ethics, as defined by Item 406 of Regulation S-K promulgated by the SEC. The Code of Business Conduct and Ethics may be found on our website at *ir.zoominfo.com* under Governance: Governance Highlights: Governance Documents: Code of Business Conduct and Ethics.
>
> We will disclose within four business days any substantive changes in or waivers of the Code of Business Conduct and Ethics granted to our principal executive



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

> officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, by posting such information on our website as set forth above rather than by filing a Form 8-K. In the case of a waiver for an executive officer or a director, the required disclosure also will be made available on our website within four business days of the date of such waiver.

209. The 2024 Proxy was materially false and misleading because it failed to disclose that: (i) the Board was not adequately performing its risk oversight function; and (ii) the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (a) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; (b) causing the Company to institute deceptive and coercive auto-renewal policies and omissions alleged herein; and (c) failing to report violations of the Code of Conduct.

***May 7, 2024 Earnings Call***

210. The truth continued to emerge on May 7, 2024, when the Company held an earnings call for analysts and investors to discuss its financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Schuck revealed that ZoomInfo had a large pool of small business customers that exhibited "weakness" during renewals stating, in relevant part, that "[a]s it relates to net revenue retention, in the quarter our SMB business continued to be challenged and performed worse than prior periods." Defendant Hyzer also revealed that the Company's net revenue retention ("NRR"), a metric that measures how much revenue a company keeps from its existing customers over a specific period of time, declined 2%, from 87% to 85%. Defendant Hyzer also revealed that SMB weakness impacted ZoomInfo due to "higher or larger pool of renewals coming in." Defendant Hyzer also disclosed that the Company had made a "shift to be more selective in the deals that we're pulling in" within the SMB cohort to "help us remove some of the headwinds and write-offs."

211. As a result, ZoomInfo reduced its annual revenue guidance from a range of $1.26 billion to $1.28 billion to a range of $1.255 billion to $1.27 billion.

212. On this news, ZoomInfo's stock price dropped $3.88 per share, or approximately 24.2%, from a close of $16.02 on May 7, 2024, to close at $12.14 per share on May 8, 2024.


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

213. Analysts were shocked by these revelations, with analysts from Piper Sandler Research commenting that "[o]ur patience has worn thin in waiting for a fundamental recovery at ZI on further erosion across the cohort of SMB and mid-market customers that has been spotty for the past two years but is now showing further signs of another leg down."

214. Despite these partial disclosures, the Individual Defendants continued to issue materially false and misleading statements to the public regarding the Company's business, operations, and financial results. For example, during the 1Q24 Earnings Call, Defendant Hyzer continued to mislead investors by attempting to cabin the Company's problems with its SMB cohort to a more recent timeline, stating "***SMB actually held in reasonably well as we went through 2023, but really in Q1, we've seen a change in that trend. It does feel like the SMB cohort is more sensitive to the higher rates for longer discussion that we've seen over the last few months***." This statement was made despite the fact that, as FEs explained, ZoomInfo knew of the problems stemming from its failure to vet customers when onboarding numerous SMB and Mid-Market customers years prior.

215. The statements contained in ¶¶ 173-175, 180-183, 186-187, 189-191, 197-204, 207-208, and 214 materially false and misleading because they failed to disclose, *inter alia*, that: (i) the COVID-19 pandemic had temporarily inflated the demand for the Company's platform, and this increased demand was unsustainable; (ii) the Company's reported RPO was inconsistent with GAAP and was inflated due to the lack of due diligence and variable constraint analysis; (iii) there were increased risks of nonpayment from the Company's customers; (iv) a significant amount of the debts owed to the Company remained in accounts receivable despite ongoing delinquency, and the Company was unable to collect on many of these debts; (v) in order to retain its diminishing customer base, the Company instituted deceptive and coercive auto-renewal policies; (vi) as a result of coercive auto-renewal policies, lack of due diligence, and inactive customers, the Company's reported revenues, operating income, and customer retention metrics were materially overstated; (vii) ZoomInfo's financial decline and adverse economic conditions were caused by the Company's own actions and not extraneous factors; (viii) the Company failed to maintain



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

adequate oversight and internal controls over its financial reporting; and (ix) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Fully Emerges***

216. The truth fully emerged on August 5, 2024, when the Company issued the 2Q24 Earnings Release and revealed that it incurred a $33 million charge due to non-payments from customers, and that, as a result, the Company was implementing a new business risk model. The 2Q24 Earnings Release stated, in relevant part:

> "In the second quarter, we implemented a number of initiatives to position the company for long-term success," said Henry Schuck, ZoomInfo founder and CEO. "Having successfully launched ZoomInfo Copilot, our AI-powered go-to-market platform, we are further accelerating a shift upmarket. To that end, in the quarter we grew our $100k ACV customer cohort sequentially, had our best new business quarter in the mid-market and enterprise, while we stabilized net revenue retention.
>
> Schuck continued, "We deployed a new business risk model to reduce write-offs and made a change in estimates related to the collectibility of receivables. I am confident that this will strengthen our future financial position and enable the company to deliver strong and growing free cash flow."
>
> During the quarter, the company made a change in estimates related to the collectibility of receivables from customers and changed operational procedures to require upfront pre-payment for services from certain smaller customers. As a result, the company recorded incremental charges of $33 million primarily related to the change in estimates. Of the $33 million, $15 million was recorded against revenue, $14 million was recorded as bad debt expense, and $4 million was related to other discrete items.

217. The 2Q24 Earnings Release also revealed that the Company again reduced its annual revenue guidance to a range of $1.190 billion to $1.205 billion from the previously reported range of $1.255 billion to $1.27 billion.

218. On the same day, the Company held an earnings call for investors and analysts to discuss the Company's financial results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Hyzer reported the reasoning behind the $33 million charge, stating, in relevant part:

> We were disappointed and surprised to determine that our prior estimates for nonpayment from customers needed to be increased in order to account for



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

> escalating write-offs that we incurred in June as well as additional write-offs that we now expect. This change in estimates, combined with other discrete charges, resulted in a total $33 million charge in Q2, of which $15 million reduced revenue, $14 million increased our bad debt expense, and $4 million increased other expenses. The change in estimate relates to previously recognized revenue primarily from 2023 and includes sufficient reserves to cover potential nonpayment on our current receivables and related revenue recognized to date.

219. Defendant Schuck further explained during the 2Q24 Earnings Call that the elevated level of write-offs was the driver behind the $33 million charge stating that "***in 2022 and 2023, [ZoomInfo] extended credit to higher mix of SMB customers***, and the rate of non-payment by these customers increased throughout the past 24 months."

220. On the same day, the Company announced the abrupt departure of Defendant Hyzer, who had been with the Company for over six years and was instrumental to the Company's early growth. According to the Company's Form 8-K filed with the SEC, Defendant Hyzer would "transition to serve in an advisory capacity until October 7, 2024 to facilitate a seamless transition."

221. On this news, the price of ZoomInfo stock declined $1.79 per share, or approximately 18.3%, from a close of $9.80 on August 5, 2024, to close at $8.01 on August 6, 2024.

***Post-Relevant Period Developments***

222. Following the end of the Relevant Period on August 13, 2024, after the Individual Defendants' final corrective disclosure, Defendant Schuck and ZoomInfo's new CFO Michael O'Brien ("O'Brien") attended the Canaccord Genuity Growth Conference (the "Canaccord Conference"). During the Canaccord Conference, Defendant Schuck admitted that the root cause of the $33 million charge reported in the 2Q24 Earnings Release was that "***[ZoomInfo] extended credit historically to customers who weren't creditworthy***."

223. Similarly, during the Canaccord Conference, O'Brien acknowledged, in relevant part:

> ***In June [2023], the receivable cohort that began to progress through actually had a higher risk of non-payment than we had previously estimated*** . . . [A]nd we applied that increased estimate to all the other cohorts that were progressing though the aging at that time. That's what led to the revenue and bad debt charges you saw in our results in Q2.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

224. Later, on November 12, 2024, ZoomInfo held an earnings call to discuss its third quarter results for 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Schuck explained that the new business risk model "will remain a headwind to the optics of our growth in the coming quarters" and "[the Company] still [has] an elevated level of processing write-offs in Q3." Defendant Schuck added that "[t]he SMB segment, particularly the lowest end of the SMB, continues to be challenged, particularly from a net retention perspective." On the same day, the Company disclosed that there would be a 3% decrease in the full year guidance for revenue.

225. Moreover, on December 3, 2024, during the UBS Global Technology & AI Conference, O'Brien commented that, for 2025, "I'd expect the SMB pressure from lower retention levels, we've historically seen and kind of the intentional disqualification of some of that higher risk to weigh on or potentially impair growth when you look at RPO or bookings perspective."

***The Individual Defendants' Knowledge***

226. Throughout the Relevant Period, the Individual Defendants were aware of the unsustainability of ZoomInfo's lack of due diligence when acquiring its SMB customers, such that they knew or recklessly disregarded the true extent of the materially false and/or misleading statements regarding the Company's retention and renewal rates.

227. Throughout the Relevant Period, the Board met regularly [redacted]

228. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

229. [redacted][8] [redacted]

230. [redacted]

231. [redacted]

[8] [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

232. [redacted]

233. [redacted]

234. [redacted]

235. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

236. [redacted] [redacted][9] [redacted]

237. [redacted]

238. [redacted]

[9] [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

239. [redacted]

240. [redacted]

241. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

242. [redacted]

243. [redacted]

244. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

245. [redacted]

246. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

247. [redacted]

248. [redacted]

249. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

250. [redacted][10] [redacted]

---

[10] [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

251. A[redacted][11] [redacted]

---

[11] [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

252. [redacted][12] [redacted]

253. [redacted]

254. [redacted][13]

[redacted]

---

[12] [redacted]

[13] [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

255. [redacted]

256. [redacted]

257. [redacted]

258. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

259. [redacted]

260. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

261. [redacted]

262. [redacted]

263. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

264. [redacted]

265. [redacted]

266. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

267. [redacted]

268. [redacted]

269. [redacted]

270. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

271. [redacted]

272. [redacted]

273. [redacted]

274. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

275. [redacted][14] [redacted]

276. [redacted]

[14] [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

277. [redacted]

278. [redacted]

279. [redacted]

280. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

281. [redacted]

282. [redacted]

283. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

284. [redacted]

285. [redacted]

***The Securities Class Action***

286. As a result of the misconduct detailed herein, the Securities Class Action was filed against the Company and Defendants Schuck and Hyzer in the United States District Court for the Western District of Washington on September 4, 2024. Securities Class Action, Dkt. 1.

287. On March 11, 2025, plaintiffs in the Securities Class Action filed an amended complaint against ZoomInfo and Defendants Schuck and Hyzer. *Id.*, Dkt. 76. On April 1, 2025, the plaintiffs filed the Corrected AC adding as defendants TA Associates Management LP, The Carlyle Group Inc., DO Holdings (WA), LLC, and Defendant Hays in addition to ZoomInfo and


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

Defendants Schuck and Hyzer. *Id.*, Dkt. 81.

288. On May 26, 2025, defendants TA Associates Management LP and The Carlyle Group Inc. filed a motion to dismiss the Corrected AC. *Id.*, Dkt. 87. On May 27, 2025, ZoomInfo, Defendants Schuck, Hyzer and Hays and DO Holdings (WA), LLC, filed a motion to dismiss the Corrected AC. *Id.*, Dkt. 91.

289. On October 28, 2025, the Court in the Securities Class Action issued an Order granting in part and denying in part the motions to dismiss (the "MTD Order"). *Id.*, Dkt. 105.

290. In the MTD Order, the Court held, among other things, that (i) "at minimum, Plaintiffs have adequately plead the falsity of Defendants' RPO estimates." MTD Order at 28; (ii) "Plaintiffs allege specific details provided by over a dozen witnesses regarding ZoomInfo's sales strategy, data monitoring, and accounting practices [and] [a]t this stage [] need not engage in a rigorous analysis—likely requiring ZoomInfo's internal documents—to estimate a hypothetical 'true' RPO." *Id.* at 34; (iii) "Plaintiffs have alleged with particularity that ZoomInfo made false statements when it reported its RPO estimates. These statements are also attributable to Schuck and Hyzer, who signed ZommInfo's financial statements and are therefore the 'makers' of the allegedly false RPO estimates." *Id.* at 35; and (iv) "Hays's alleged misconduct—inflating ZoomInfo's RPO and share price by abandoning due diligence to sell to risky customers, suppressing unpleasant market data, and coercing renewals from customers unlikely to pay—certainly constitutes a manipulative scheme." *Id.* at 36.

291. The MTD Order also found that the plaintiffs had sufficiently alleged scienter, stating that "a holistic review of the facts . . . gives rise [to] a strong inference of scienter with respect to ZoomInfo and the Individual Defendants [Schuck, Hyzer, and Hays]." *Id.* at 38.

292. Specifically, the MTD Order held that (i) "several FE [former employee] statements . . . evince scienter." *Id.* at 42; (ii) "Schuck's statements [on signing up many customers before the IPO] indicate he knew about ZoomInfo's aggressive sales strategy and lack of due diligence controls and may have even directed these policies himself . . . ." *Id.* at 43; (iii) the "facts indicate Schuck and Hays knew ZoomInfo was losing its competitive edge and that growth would slow."



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

*Id.*; (iv) the "facts suggest the Individual Defendants were aware of collectability issues, customer nonpayment, and low likelihood of renewal." *Id.*; (v) "while the [SOX] certifications are not dispositive, they slightly support a finding that Plaintiffs had adequately pled scienter at this stage." *Id.* at 44; and (vi) "[t]aken together, the core operations doctrine and the statements by Individual Defendants suggesting they closely monitored company data support an inference of scienter." *Id.* at 46.

293. Moreover, the MTD Order held that the Securities Class Action plaintiffs satisfied the loss causation requirement of their fraud allegations. *See id.* at 49–50.

294. Furthermore, the MTD Order found that "Plaintiff's Section 20(a) claim against the Individual Defendants survives the motion to dismiss" since "Plaintiffs have alleged that specific facts showing that the Individual Defendants were either the authors of the alleged misstatements or heavily involved with day-to-day affairs of the company, or both." *Id.* at 54.

295. Accordingly, the Securities Class Action is proceeding, and the Company will continue to lose and expend millions of dollars in legal fees associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection therewith. Moreover, the Securities Class Action has exposed the Company to massive class-wide liability.

***Insider Sales***

296. During the Relevant Period, Defendants Schuck, Hyzer, Winn, Enright, Mader, and Hays made sales of ZoomInfo's common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

297. While the Company's stock price was artificially inflated, Defendant Schuck sold approximately 21.4 million shares of ZoomInfo common stock, totaling proceeds of over $1 billion. Defendant Schuck made the following sales of ZoomInfo stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 12/15/2020 | 400,000 | $41.41 | $16,564,000 |
| 1/15/2021 | 291,708 | $45.67 | $13,322,304 |



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

| | | | |
|---|---|---|---|
| 1/19/2021 | 108,292 | $46.70 | $5,507,236 |
| 1/26/2021 | 20,633 | $50.04 | $1,032,475 |
| 1/27/2021 | 71,599 | $50.02 | $3,581,382 |
| 2/1/2021 | 407,768 | $50.69 | $20,669,759 |
| 2/24/2021 | 19,752 | $51.57 | $1,018,611 |
| 2/24/2021 | 69,287 | $52.57 | $3,642,418 |
| 2/24/2021 | 13,200 | $53.48 | $705,936 |
| 2/24/2021 | 25,229 | $54.67 | $1,379,269 |
| 2/24/2021 | 73,387 | $55.47 | $4,070,777 |
| 2/24/2021 | 177,439 | $56.63 | $10,048,371 |
| 2/24/2021 | 21,715 | $57.34 | $1,245,138 |
| 3/15/2021 | 225,750 | $47.56 | $10,735,670 |
| 3/16/2021 | 174,250 | $49.09 | $8,553,933 |
| 4/15/2021 | 262,665 | $47.81 | $12,558,014 |
| 4/16/2021 | 137,336 | $47.38 | $6,506,980 |
| 5/14/2021 | 400,000 | $40.10 | $16,040,000 |
| 6/15/2021 | 400,000 | $45.04 | $18,016,000 |
| 7/15/2021 | 264,580 | $49.30 | $13,043,794 |
| 7/16/2021 | 135,420 | $50.17 | $6,794,021 |
| 8/4/2021 | 786,607 | $60.26 | $47,400,938 |
| 8/5/2021 | 213,393 | $61.35 | $13,091,661 |
| 8/6/2021 | 3,286,639 | $54.75 | $179,943,485 |
| 8/11/2021 | 2,545,328 | $62.00 | $157,810,336 |
| 8/16/2021 | 400,000 | $59.70 | $23,880,000 |
| 9/2/2021 | 386,020 | $62.00 | $23,933,240 |
| 9/15/2021 | 400,000 | $66.67 | $26,668,000 |
| 11/16/2021 | 929,327 | $76.00 | $70,628,852 |
| 11/17/2021 | 370,673 | $76.73 | $28,441,739 |
| 11/23/2021 | 1,300,000 | $68.32 | $88,816,000 |
| 11/30/2021 | 1,127,028 | $63.05 | $71,059,115 |
| 3/18/2022 | 31,328 | $60.00 | $1,879,773 |
| 3/23/2022 | 114,584 | $60.15 | $6,892,228 |
| 3/31/2022 | 20,380 | $60.02 | $1,223,208 |
| 4/1/2022 | 25,588 | $60.08 | $1,537,327 |
| 4/4/2022 | 188,120 | $60.23 | $11,330.468 |
| 5/18/2022 | 254,102 | $42.89 | $10,989,435 |
| 5/19/2022 | 45,898 | $42.24 | $1,938,732 |
| 6/3/2022 | 48,264 | $42.05 | $2,029,501 |
| 6/6/2022 | 143,761 | $42.36 | $6,089,716 |
| 12/19/2022 | 1,000,000 | $28.16 | $28,160,000 |
| 1/9/2023 | 1,000,000 | $25.54 | $25,540,000 |
| 2/8/2023 | 1,041,667 | $28.28 | $29,458,343 |
| 6/16/2023 | 2,083,334 | $26.52 | $55,250,018 |

298. While the Company's stock price was artificially inflated, Defendant Hyzer sold approximately 609,343 shares of ZoomInfo common stock, totaling proceeds of over $35.1 million. Defendant Hyzer made the following sales of ZoomInfo stock during the Relevant Period:

| **Transaction Date** | **Number of Shares Sold** | **Average Price Per Share** | **Total Transaction** |
|---|---|---|---|
| 12/22/2020 | 90,950 | $45.32 | $4,121,854 |



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

| | | | |
|---|---|---|---|
| 3/1/2021 | 18,497 | $55.79 | $1,032,002 |
| 3/2/2021 | 9,290 | $56.22 | $522,284 |
| 6/1/2021 | 18,174 | $42.73 | $776,575 |
| 8/4/2021 | 9,292 | $58.11 | $539,958 |
| 8/9/2021 | 28,140 | $61.21 | $1,722,449 |
| 9/15/2021 | 300,000 | $66.89 | $20,067,000 |
| 11/17/2021 | 15,000 | $76.71 | $1,150,650 |
| 12/17/2021 | 15,000 | $60.35 | $950,250 |
| 3/18/2023 | 35,893 | $60.00 | $2,153,580 |
| 3/23/2022 | 9,107 | $60.02 | $546,602 |
| 9/7/2022 | 5,000 | $41.50 | $207,500 |
| 9/9/2022 | 5,000 | $43.70 | $218,500 |
| 10/10/2022 | 5,000 | $43.39 | $216,950 |
| 5/3/2023 | 10,000 | $22.09 | $220,900 |
| 6/5/2023 | 10,000 | $26.46 | $264,576 |
| 7/5/2023 | 10,000 | $25.46 | $254,600 |
| 6/13/2024 | 7,500 | $12.78 | $95,850 |
| 7/9/2024 | 7,500 | $12.37 | $92,775 |

299. While the Company's stock price was artificially inflated, Defendant Winn sold approximately 570,626 shares of ZoomInfo common stock, totaling proceeds of approximately $33.2 million. Defendant Winn made the following sales of ZoomInfo stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 12/4/2020 | 83,260 | $43.88 | $3,653,449 |
| 2/24/2021 | 55,391 | $55.25 | $3,060,353 |
| 8/6/2021 | 132,598 | $54.75 | $7,259,741 |
| 8/11/2021 | 102,690 | $62.00 | $6,366,780 |
| 9/2/2021 | 15,404 | $62.00 | $955,048 |
| 9/13/2021 | 49,781 | $64.68 | $3,219,885 |
| 9/13/2021 | 10,901 | $65.41 | $713,037 |
| 9/14/2021 | 120,601 | $65.75 | $7,929,516 |

300. While the Company's stock price was artificially inflated, Defendant Enright sold approximately 2,200 shares of ZoomInfo common stock, totaling proceeds of approximately $130,352. Defendant Enright made the following sales of ZoomInfo stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 8/16/2021 | 555 | $62.00 | $34,410 |
| 11/15/2021 | 555 | $74.92 | $41,581 |
| 3/5/2022 | 555 | $52.95 | $29,387 |
| 8/3/2022 | 555 | $45.00 | $24,975 |


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

301. While the Company's stock price was artificially inflated, Defendant Mader sold approximately 15,691 shares of ZoomInfo common stock, totaling proceeds of approximately $753,338. Defendant Mader made the following sales of ZoomInfo stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 12/15/2021 | 7,500 | $60.49 | $453,675 |
| 5/4/2022 | 5,079 | $51.17 | $259,892 |
| 6/13/2024 | 3,112 | $12.78 | $39,771 |

302. While the Company's stock price was artificially inflated, Defendant Hays sold approximately 1.3 million shares of ZoomInfo common stock, totaling proceeds of approximately $74.8 million. Defendant Hays made the following sales of ZoomInfo stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 12/11/2020 | 13,836 | $41.07 | $568,245 |
| 12/11/2020 | 16,164 | $41.72 | $674,362 |
| 2/5/2021 | 32,448 | $55.02 | $1,785,289 |
| 2/5/2021 | 14,000 | 56.00 | $784,000 |
| 2/11/2021 | 5,042 | $55.74 | $281,041 |
| 2/11/2021 | 8,893 | $56.62 | $503,522 |
| 3/11/2021 | 5,680 | $47.78 | $271,390 |
| 3/11/2021 | 8,040 | $48.61 | $390,824 |
| 4/8/2021 | 13,152 | $48.32 | $635,505 |
| 4/8/2021 | 600 | $49.14 | $29,484 |
| 5/13/2021 | 6,803 | $39.77 | $270,555 |
| 5/13/2021 | 2,894 | $40.46 | $117,091 |
| 5/13/2021 | 3,269 | $41.66 | $136,187 |
| 5/13/2021 | 606 | $42.26 | $25,609 |
| 6/10/2021 | 3,900 | $45.17 | $176,163 |
| 6/10/2021 | 1,300 | $46.61 | $60,593 |
| 6/10/2021 | 8,463 | $45.93 | $388,705.59 |
| 7/8/2021 | 1,500 | $49.86 | $74,783 |
| 7/8/2021 | 3,844 | $50.96 | $195,896.77 |
| 7/8/2021 | 8,492 | $51.90 | $440,748.39 |
| 8/12/2021 | 2,250 | $61.36 | $138,063.60 |
| 8/12/2021 | 11,774 | $62.32 | $733,713.29 |
| 9/9/2021 | 10,234 | $64.43 | $659,419.60 |
| 9/9/2021 | 3,820 | $65.02 | $248,368.76 |
| 9/10/2021 | 156,000 | $63.34 | $9,881,679.60 |
| 9/14/2021 | 70,000 | $67.01 | $4,690,812.00 |
| 11/15/2021 | 26,504 | $74.38 | $1,971,343.67 |
| 11/15/2021 | 37,405 | $75.07 | $2,807,907.32 |
| 11/22/2021 | 9,655 | $73.18 | $706,532.62 |


BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

| | | | |
|---|---|---|---|
| 11/22/2021 | 27,368 | $74.08 | $2,027,303.76 |
| 11/22/2021 | 6,958 | $74.85 | $520,828.57 |
| 11/22/2021 | 15,441 | $76.20 | $1,176,619.64 |
| 11/22/2021 | 8,200 | $76.86 | $630,229.86 |
| 11/29/2021 | 48,441 | $70.00 | $3,390,991.10 |
| 11/29/2021 | 12,311 | $70.55 | $868,552.13 |
| 12/6/2021 | 2,000 | $56.44 | $112,871.40 |
| 12/6/2021 | 3,700 | $57.54 | $212,905.03 |
| 12/6/2021 | 3,400 | $58.37 | $198,445.08 |
| 12/6/2021 | 22,899 | $59.65 | $1,365,833.75 |
| 12/6/2021 | 28,753 | $60.17 | $1,730,068.01 |
| 12/13/2021 | 13,360 | $61.97 | $827,925.88 |
| 12/13/2021 | 31,065 | $62.62 | $1,945,330.68 |
| 12/13/2021 | 12,385 | $63.63 | $788,081.08 |
| 12/13/2021 | 3,942 | $64.53 | $254,365.83 |
| 12/20/2021 | 27,595 | $60.85 | $1,679,125.40 |
| 12/20/2021 | 32,657 | $61.42 | $2,005,851.72 |
| 12/20/2021 | 500 | $62.16 | $31,081.00 |
| 12/27/2021 | 42,173 | $66.70 | $2,812,951.75 |
| 12/27/2021 | 18,579 | $67.36 | $1,251,498.16 |
| 12/13/2021 | 13,360 | $61.97 | $827,925.88 |
| 12/13/2021 | 31,065 | $62.62 | $1,945,330.68 |
| 12/13/2021 | 12,385 | $63.63 | $788,081.08 |
| 12/13/2021 | 3,942 | $64.53 | $254,365.83 |
| 12/20/2021 | 27,595 | $60.85 | $1,679,125.40 |
| 12/20/2021 | 32,657 | $61.42 | $2,005,851.72 |
| 12/20/2021 | 500 | $62.16 | $31,081.00 |
| 12/27/2021 | 42,173 | $66.70 | $2,812,951.75 |
| 12/27/2021 | 18,579 | $67.36 | $1,251,498.16 |
| 5/16/2022 | 33,968 | $43.07 | $1,462,916.84 |
| 5/16/2022 | 22,345 | $43.67 | $975,884.36 |
| 5/16/2022 | 900 | $44.57 | $40,116.96 |
| 6/2/2022 | 36,888 | $42.39 | $1,563,811.43 |
| 8/3/2022 | 3,236 | $43.39 | $140,410.04 |
| 8/3/2022 | 11,172 | $43.08 | $481,328.86 |
| 8/3/2022 | 14,919 | $43.95 | $655,670.66 |
| 8/3/2022 | 16,374 | $44.82 | $733,845.02 |
| 8/3/2022 | 2,100 | $45.19 | $94,906.56 |
| 8/3/2022 | 4,900 | $46.22 | $226,496.62 |
| 8/3/2022 | 960 | $46.69 | $44,823.46 |
| 9/1/2022 | 3,493 | $42.35 | $147,921.91 |
| 9/1/2022 | 12,841 | $42.15 | $541,209.63 |
| 9/1/2022 | 4,908 | $42.88 | $210,439.33 |
| 9/1/2022 | 1,100 | $44.28 | $48,707.01 |
| 9/1/2022 | 200 | $44.79 | $8,957.00 |
| 9/1/2022 | 2,266 | $41.50 | $94,032.66 |
| 9/1/2022 | 300 | $42.67 | $12,801.00 |
| 10/3/2022 | 17,797 | $41.97 | $746,852.88 |
| 5/22/2023 | 30,000 | $25.03 | $750,972.00 |
| 6/20/2023 | 30,000 | $26.49 | $794,733.00 |



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

303. As a result of these insider sales, Defendants Schuck, Hays, Hyzer, Winn, Enright, and Mader were unjustly enriched.

***Stock Repurchases During the Relevant Period***

304. According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed above, the Individual Defendants caused the Company to repurchase approximately 45 million shares of its own stock, for a total of approximately $729.4 million, between December 2020 and July 2024.

305. According to the Company's public filings, ZoomInfo made the following repurchases of its own stock during the Relevant Period:

| Dates of Stock Repurchase | Number of Shares Repurchased | Average Price Per Share on Date of Repurchase | Total Cost of Repurchase |
|---|---|---|---|
| December 1, 2020 to December 31, 2020 | 20,617 | $46.06 | $949,619 |
| September 1, 2021 to September 30, 2021 | 20,636 | $65.19 | $1,345,261 |
| November 1, 2021 to November 30, 2021 | 6,023 | $69.71 | $419,863 |
| December 1, 2021 to December 31, 2021 | 7,522 | $61.70 | $464,107 |
| February 1, 2022 to February 28, 2022 | 18,935 | $56.22 | $1,064,526 |
| March 1, 2022 to March 31, 2022 | 8,292 | $54.69 | $453,489 |
| May 1, 2022 to May 31, 2022 | 6,395 | $51.99 | $332,476 |
| June 1, 2022 to June 30, 2022 | 6,121 | $40.39 | $247,227 |
| August 1, 2022 to August 31, 2022 | 6,333 | $41.97 | $265,796 |
| September 1, 2022 to September 30, 2022 | 8,332 | $45.42 | $378,439 |
| November 1, 2022 to November 30, 2022 | 6,186 | $30.81 | $190,591 |
| December 1, 2022 to December 31, 2022 | 8,164 | $28.60 | $233,490 |
| February 1, 2023 to February 28, 2023 | 9,133 | $30.24 | $276,182 |
| March 1, 2023 to March 31, 2023 | 1,067,234 | $23.00 | $24,546,382 |
| April 1, 2023 to April 30, 2023 | 1,447,121 | $22.56 | $32,647,050 |
| May 1, 2023 to May 31, 2023 | 1,404,890 | $21.41 | $30,078,694 |


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

| | | | |
|---|---|---|---|
| June 1, 2023 to June 30, 2023 | 6,166 | $24.73 | $152,485 |
| August 1, 2023 to August 31, 2023 | 8,408,022 | $18.18 | $152,857,840 |
| September 1, 2023 to September 30, 2023 | 407,152 | $18.42 | $7,499,740 |
| October 1, 2023 to October 31, 2023 | 5,902,722 | $16.61 | $98,044,212 |
| November 1, 2023 to November 30, 2023 | 3,325,528 | $13.37 | $44,462,309 |
| December 1, 2023 to December 31, 2023 | 704,434 | $15.30 | $10,777,840 |
| January 1, 2024 to January 31, 2024 | 5,330,167 | $16.13 | $85,975,594 |
| February 1, 2024 to February 28, 2024 | 2,399,072 | $15.45 | $37,065,662 |
| March 1, 2024 to March 31, 2024 | 1,906,662 | $15.86 | $30,239,659 |
| April 1, 2024 to April 30, 2024 | 2,952,427 | $15.80 | $46,648,347 |
| May 1, 2024 to May 31, 2024 | 4,705,212 | $13.22 | $62,202,903 |
| June 1, 2024 to June 30, 2024 | 3,155,285 | $12.27 | $38,715,347 |
| July 1, 2024 to July 31, 2024 | 1,750,537 | $11.93 | $20,883,906 |

306. Given that the price of ZoomInfo stock was $8.01 per share after the corrective disclosures on August 5, 2024, the true value of the approximately 45 million repurchased shares was roughly $360.5 million. Accordingly, the Individual Defendants caused the Company to overpay by approximately *$368.9 million* to repurchase these shares during the Relevant Period.

***Harm to the Company***

307. As a direct and proximate result of the Individual Defendants' misconduct, ZoomInfo has lost and expended, and will lose and expend, millions of dollars.

308. Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Schuck, Hyzer, and Hays, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

309. Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, as well as the hundreds of millions of dollars the Individual Defendants caused the Company to spend


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

in repurchasing its stock at artificially inflated prices during the Relevant Period.

310. Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

311. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

312. ZoomInfo is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

313. Plaintiffs are current shareholder of ZoomInfo and were continuous shareholders of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

314. A pre-suit demand on the Board of ZoomInfo is futile and, therefore, excused. At the time of the filing of this consolidated amended complaint, the ten-member Board was comprised of Defendants Enright, Evans, Gleeson, Mader, Schuck, and Winn (the "Current Director Defendants"), and non-parties Domenic Maida ("Maida"), Katie Rooney, Rob Giglio, and Owen Wurzbacher ("Wurzbacher") (collectively with the Current Director Defendants, the "Current Directors"). Accordingly, Plaintiffs are only required to show that five Current Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Current Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

315. The Current Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

316. Each of the Current Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

317. Each of the Current Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suite even if they instituted it. For instance, the 2020 10-K and 2021 10-K were signed by Current Director Defendants Schuck, Enright, Evans, Mader, and Winn, and the 2022 10-K was signed by Current Director Defendants Schuck, Enright, Evans, Gleeson, Mader, and Winn.

318. Additionally: (i) Current Director Defendants Schuck, Enright, Evans, Mader, and Winn each solicited the 2022 Proxy, which led to the reelection of Defendant Mader to the Board, allowing him to continue breaching his fiduciary duties to the Company; (ii) Current Director Defendants Schuck, Enright, Evans, Mader, and Winn each solicited the 2023 Proxy, which led to the reelection of Defendants Crockett, McCarter, and Winn to the Board, allowing them to continue breaching their fiduciary duties to the Company; and (iii) Current Director Defendants Schuck, Enright, Evans, Mader, Winn, Gleeson, and McCarter each solicited the 2024 Proxy, which led to the reelection of Defendants Enright and Schuck to the Board, allowing them to continue breaching their fiduciary duties to the Company.

319. Moreover, the Current Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

recurrence.

320. As members of the Board charged with overseeing the Company's affairs, each of the Current Directors had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of ZoomInfo, the Current Directors knew, or should have known, the material facts surrounding ZoomInfo's financial condition and internal control mechanisms.

321. Defendant Schuck is not disinterested or independent and is therefore incapable of considering a demand. Defendant Schuck is a co-founder of the Company and serves as the Company's CEO. Thus, the Company admits that Defendant Schuck is a non-independent director. Furthermore, Defendant Schuck is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

322. Additionally, each of the Current Director Defendants received payments, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Furthermore, Defendants Schuck, Winn, Enright, and Mader each made insider sales of the Company's common stock while the price was artificially inflated as a result of the materially false and misleading statements alleged herein.

323. Moreover, the Current Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures over financial reporting and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Current Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

324. In the event the Court determines that demand futility should be analyzed with respect to the membership of the Company's Board on December 2, 2024, (the "Initial Board"),



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

the date that the first complaint was initiated, demand would nonetheless be excused as futile.[15]

325. A pre-suit demand on the Initial Board is futile and, therefore, excused. At the time of filing on December 2, 2024, the Initial Board consisted of the following nine individuals: Defendant McCarter and the Current Director Defendants (collectively, the "Director Defendants"), and non-parties Maida and Wurzbacher (with the Director-Defendants, the "Initial Directors").[16] Plaintiffs need only to allege demand futility as to five of the nine Initial Directors that were on the Initial Board.

326. Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

327. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

328. Additional reasons that demand on Defendant McCarter is futile follow. Defendant McCarter served as a director of the Company from February 2020 to February 2025. Defendant McCarter also served as Chair of the Board's Nominating and Corporate Governance Committee

---

[15] Demand futility is examined with respect to the membership of the Board at the time the amended complaint is filed unless the asserted terms are "validly in litigation" at the time of the original complaint. *Braddock v Zimmerman*, 906 A.2d 776, 778-79 (Del. 2006).

[16] The Current Directors and Initial Directors, together, are the "Directors."


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

and as a member of the Board's Compensation Committee. Defendant McCarter previously served on the board of managers of ZoomInfo Holdings LLC from 2018 until June 2020. Defendant McCarter received handsome compensation for his role as a Company director. As a trusted Company director, he failed to conduct sufficient oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant McCarter also signed the false and misleading 2020 10-K, 2021 10-K, and 2022 10-K. He also solicited the 2024 Proxy was led to the which led to the reelection of Defendants Enright and Schuck to the Board, allowing them to continue breaching their fiduciary duties to the Company. For these reasons Defendant McCarter breached his fiduciary duties and faces a substantial likelihood of liability. As such, demand upon him is futile and, therefore, excused.

329. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

330. Defendants Enright, Evans, and Mader served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

331. [redacted]



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

[redacted]

332. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

333. Additionally, the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. Furthermore, the Director Defendants are not independent or disinterested due to their longstanding business and personal relationships with each other and the Company. For instance, Defendants Enright, Evans, Mader, McCarter, and Winn all previously served on the board of managers of ZoomInfo Holdings LLC, a subsidiary of the Company of which Defendant Schuck serves as the CEO.

334. Moreover, none of the Directors have taken remedial action to redress the misconduct alleged herein.

335. The Directors' conduct described herein and summarized above could not have been the product of legitimate business judgement as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgement about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

336. The acts complained of herein constitute violations of fiduciary duties owed by ZoomInfo's officers and directors, and these acts are incapable of ratification.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

337. Accordingly, for all of the reasons set forth above, the Current Director Defendants, and, if not all of them, at least five of the Current Director Defendants, are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

338. Thus, for all of the reasons above, and if the Court so chooses, all of the Director Defendants, and if not all of them, at least five of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand on the Initial Board is excused as futile.

**COUNT I**

**Against the Defendants Schuck, Dhruv, Enright, Evans, Crockett, Gleeson, Mader, McCarter, and Winn for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

339. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

340. The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

341. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that:

> It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 781].

342. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9

343. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2022 Proxy, 2023



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

Proxy, and the 2024 Proxy (collectively, the "Proxy Statements"), which were each filed with the SEC. As alleged above, the Proxy Statements were materially false and misleading because they failed to disclose, *inter alia*, that (i) the Board and management were not properly overseeing risks to the Company, namely risks related to inaccurate financial reporting metrics, overstated customer numbers and other metrics, and the coercive and/or harmful actions taken by the Company; and (ii) the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (a) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; (b) causing the Company to institute deceptive and coercive auto-renewal policies and omissions alleged herein; and (c) failing to report violations of the Code of Conduct.

344. The misrepresentations and omissions in the Proxy Statements were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, the reelection of certain Director Defendants.

345. The materially false and misleading statements contained in the 2022 Proxy misleadingly induced shareholders to vote for the reelection of Defendant Mader to the Board, thereby allowing him to continue breaching his fiduciary duties to the Company.

346. The materially false and misleading statements contained in the 2023 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Crockett, McCarter, and Winn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

347. The materially false and misleading statements contained in the 2024 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Enright and Schuck to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

348. The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Proxy Statements.

349. As a result of the Individual Defendants' material misrepresentations and



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

omissions, the Company has sustained significant damages.

350. Plaintiffs, on behalf of ZoomInfo, have no adequate remedy at law.

**COUNT II**
**Against the Individual Defendants for Violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

351. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein

352. The Individual Defendants participated in a scheme with the purpose and effect of defrauding ZoomInfo. Not only is ZoomInfo now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon ZoomInfo by the Individual Defendants.

353. During the Relevant Period, while the price of the Company's stock was artificially inflated as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by approximately $368.9 million to repurchase approximately 45 million shares of ZoomInfo common stock.

354. The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

355. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ZoomInfo not misleading.

356. The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

control the conduct complained of herein and the content of the public statements disseminated by ZoomInfo.

357. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

358. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend approximately $729.4 million in the repurchase of ZoomInfo stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

359. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

360. Plaintiffs, on behalf of ZoomInfo, have no adequate remedy at law.

**COUNT III**
**Against the Individual Defendants**
**For Violations of Section 20(a) of the Exchange Act**

361. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

362. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase ZoomInfo stock at prices artificially inflated by those materially false and misleading statements.

363. Plaintiffs, on behalf of ZoomInfo, have no adequate remedy at law


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

**COUNT IV**
**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

364. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

365. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

366. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

367. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

368. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (i) the COVID-19 pandemic had temporarily inflated the demand for the Company's platform, and this increased demand was unsustainable; (ii) the Company's reported RPO was inconsistent with GAAP and was inflated due to the lack of due diligence and variable constraint analysis; (iii) there were increased risks of nonpayment from the Company's customers; (iv) a significant amount of the debts owed to the Company remained in accounts receivable despite ongoing delinquency, and the Company was unable to collect on many of these debts; (v) in order to retain its diminishing customer base, the Company instituted deceptive and coercive auto-renewal policies; (vi) as a result of coercive auto-renewal policies, lack of due diligence, and inactive customers, the Company's reported revenues, operating income, and


**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

customer retention metrics were materially overstated; (vii) ZoomInfo's financial decline and adverse economic conditions were caused by the Company's own actions and not extraneous factors; (viii) the Company failed to maintain adequate oversight and internal controls over its financial reporting; and (ix) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

369. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

370. Additionally, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices during the Relevant Period.

371. Furthermore, six of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the stock was artificially inflated, netting billions of dollars in proceeds for themselves.

372. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

373. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

374. Plaintiffs, on behalf of ZoomInfo, have no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants**
**For Gross Mismanagement**



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

375. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

376. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of ZoomInfo in a manner consistent with the operations of a publicly-held corporation.

377. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, ZoomInfo has sustained, and will continue to sustain, significant damages.

378. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

379. Plaintiffs, on behalf of ZoomInfo, have no adequate remedy at law.

**COUNT VI**
**Against the Individual Defendants**
**For Unjust Enrichment**

380. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

381. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, ZoomInfo.

382. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from ZoomInfo that were tied to the performance or artificially inflated valuation of ZoomInfo, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

383. Plaintiffs, as shareholders and representatives of ZoomInfo, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

384. Plaintiffs, on behalf of ZoomInfo, have no adequate remedy at law.

**COUNT VII**
**Against the Individual Defendants**
**For Abuse of Control**

385. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

386. The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

387. As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

388. Plaintiffs, on behalf of ZoomInfo, have no adequate remedy at law.

**COUNT VIII**
**Against the Individual Defendants**
**For Waste of Corporate Assets**

389. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

390. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

391. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; (ii) causing the Company to repurchase millions of shares of its own common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

392. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

393. Plaintiffs, on behalf of ZoomInfo, have no adequate remedy at law.

**COUNT IX**
**Against Individual Defendants Schuck, Hyzer, and Hays for Contribution Under Section 10(b) (15 U.S.C. § 78(j)) and 21D (15 U.S.C. § 78u-4(f)) of the Exchange Act**


BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

394. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

395. ZoomInfo and Individual Defendants Schuck, Hyzer, and Hays are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Section 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If, and when, the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Defendants Schuck's, Hyzer's and/or Hays's willful and/or reckless violations of their obligations as officers and/or directors of ZoomInfo.

396. Defendants Schuck, Hyzer, and Hays, because of their positions of control and authority as officers and/or directors of ZoomInfo, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of ZoomInfo, including the wrongful acts complained of herein and in the Securities Class Action.

397. Accordingly, Defendants Schuck, Hyzer, and Hays are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

398. As such, ZoomInfo is entitled to receive all appropriate contribution or indemnification from Defendants Schuck, Hyzer and/or Hays.

399. Plaintiffs, on behalf of ZoomInfo, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A. Declaring that Plaintiffs may maintain this action on behalf of ZoomInfo, and that Plaintiffs are adequate representatives of the Company;

B. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do



BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

not participate therein or benefit thereby;

C. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

D. Directing ZoomInfo and the Individual Defendants to take all necessary actions to reform and improve ZoomInfo's corporate governance and internal procedures to comply with applicable laws and to protect ZoomInfo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation, and the following actions as may be necessary to ensure proper corporate governance policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
- a provision to permit the shareholders of ZoomInfo to nominate at least five candidates for election to the Board;
- a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.



**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynwood, WA 98036
(206) 621-6566

Dated: August 11, 2026

**BADGLEY MULLINS TURNER PLLC**

By: */s/ Duncan C. Turner*

Duncan C. Turner, WSBA No, 202597
19910 50th Avenue, Suite 103
Lynnwood, WA 98036
Telephone: (206) 621-6566
Email: dturner@badgeymullins.com

*Local Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Co-Lead Counsel for Plaintiffs*

**RIGRODSKY LAW, P.A.**
Vincent A. Licata
Leah B. Wihtelin
225 Broadway, Suite 3707
New York, NY 10007
Telephone: (212) 201-7690
Email: vl@rl-legal.com
Email: lw@rl-legal.com

*Co-Lead Counsel for Plaintiffs*

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

*Of Counsel for Plaintiff Joshua Steffens*

Docusign Envelope ID: 3FDE707F-45C3-8ECA-8195-2BA599DF6FCC


**VERIFICATION**

I, Nick Harley, am a plaintiff in the within action. I have reviewed the allegations made in this Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of July 2026.

DocuSigned by:



6709174DC1214CA...

Nick Harley

# VERIFICATION

I, Joshua Steffens, have reviewed the allegations made in this Consolidated Amended Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a continuous holder, of ZoomInfo Technologies Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed 7/30/2026.

Signed by:
Joshua Steffens
68EFCDA95CAE4E5

Joshua Steffens

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies under the penalty of perjury under the laws of the United States of America that on this date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which shall serve a true and correct copy of such filing to all counsel of record.

DATED September 23, 2026 at Lynnwood, Washington

*s/ Yonten Dorjee*
Yonten Dorjee | Paralegal
**BADGLEY MULLINS TURNER PLLC**
Email: ydorjee@badgleymullins.com